UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HEALTHPLAN SERVICES, INC.,
    a Florida corporation,

    Plaintiff,

v.

CASE NO.: 8:18-cv-02608-SDM-AAS

RAKESH DIXIT, an individual,
FERON KUTSOMARKOS, an individual,
E-INTEGRATE, INC., a Florida corporation,
KNOWMENTUM, INC, a Florida corporation, and
MEDIA SHARK PRODUCTIONS, INC.,
a Florida corporation,

    Defendants.
_____/

**DEFENDANTS FERON KUTSOMARKOS' AND E-INTEGRATE, INC.'S
RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL (D.E. 81)**

Defendants FERON KUTSOMARKOS ("Kutsomarkos") and E-INTEGRATE, INC ("EI" or E-Integrate) (referred to herein as "Defendants") hereby file this Response in Opposition to Plaintiff's Motion to Compel, and they state as follows in support:

**I.    INTRODUCTION AND BACKGROUND:**

This is a complicated lawsuit, relating to federal trade secret misappropriation, Florida deceptive and unfair trade practices, common law unfair competition, copyright infringement, and breach of contract. It's a lawsuit that spans more than eight years (2011 to 2019), that involves hundreds, if not thousands, of people and companies, and that relates to several other lawsuits.[1] For example, Plaintiff states the following in its Amended Complaint:

---

[1] See *Michael Bojkovic v. Rakesh Dixit, et al.*, Case No. 16-001246-CI, **pending** in the Circuit Court of the Sixth Judicial Circuit, in and for Pinellas County, Florida. **It is important to note that, in response to Defendants' discovery requests, "HealthPlan objects to producing any documents <u>covered by the common interest and joint defense privileges between Dr. Bojkovic and HealthPlan</u>,"** *which has not been produced* (*see* D.E. 82-7, p. 21).

1

- Between 2011 and 2014, HealthPlan developed ExchangeLink®, a powerful healthcare-related software system. The **ExchangeLink® system connects organizations to public and private health insurance exchanges**. **It aggregates and processes data across multiple healthcare platforms and distribution channels**. HealthPlan invested nearly $100 million dollars in time, talent and treasure into developing the ExchangeLink® system. As a result, **many of the largest insurance and managed care providers in the United States implemented the ExchangeLink® system**. Ultimately, the ExchangeLink® system became the premier software system associated with the Affordable Care Act. (D.E. 37, ¶ 1.)

- **The HealthPlan Project required HealthPlan to hire numerous contractors, subcontractors, and employees to assist with various and extensive development and marketing tasks**. E-Integrate and Dixit were among the contractors hired by HealthPlan in the development of the ExchangeLink® system. Specifically, E-Integrate and Dixit contributed to the development of the ExchangeLink® system software code. (D.E. 37, ¶ 18.)

- **In addition, HealthPlan invested heavily in commercializing, marketing and promoting the ExchangeLink® system**. HealthPlan created comprehensive, specialized scripts, videos, and presentations to market and promote the ExchangeLink® system to healthcare insurance and managed care service providers nationwide. (D.E. 37, ¶ 20.)

- […], **HealthPlan insisted that contractors—especially those with access to HealthPlan's trade secrets—enter into formal, written agreements governing confidentiality and intellectual property ownership**. […]. (D.E. 37, ¶ 27.)

- In late 2011, HealthPlan engaged Ultramatics, Inc., a software development contractor, in connection with the development of the ExchangeLink® system. (D.E. 37, ¶ 34.)

- In May 2013, HealthPlan directly hired Dixit to be its Vice President, Links Core Product Development. In his capacity as Vice President for HealthPlan, Dixit supervised and managed various aspects of the ExchangeLink® development. He also had direct access to the HealthPlan Trade Secrets. (D.E. 37, ¶¶ 37-38.)

- In 2014, HealthPlan contracted with Kutsomarkos' *former* company, Media Shark, in connection with the development and promotional activities associated with the ExchangeLink® system (the "MediaShark Agreement"). Media Shark was hired by HealthPlan in the development of extensive media and marketing materials, and **much**

---

*Ultramatics, Inc. v. E-Integrate, Inc., et al.*, Case No. 13-CA-13413, **closed** in the Circuit Court of the Thirteenth Judicial Circuit, in and for Hillsborough County, Florida;
*California Physicians Service, Inc. v. HealthPlan Services, Inc., et al*, Case No. 3:18-cv-03730-JD, **pending** in the United States District Court, Northern District of California.

**of Media Shark's work at HealthPlan involved the process of selling and educating prospective clients and "onboarding" new clients**. (D.E. 37, ¶¶ 21-24.)

In addition to Plaintiff's Amended Complaint, there is EI's Counterclaim (*see* D.E. 83, pp. 15-31), which likewise spans more than eight years (2011 to 2019), that involves hundreds, if not thousands, of people and companies, and that relates to several other lawsuits (*see footnotes 1 and 2*). For example, since November 2011, EI had at least four (4) resources assigned to work for Ultramatics/HealthPlan; and, in or about May 2012, EI and Ultramatics executed a formal "Master Services Agreement" (the "MSA"), made and entered into as of February 23, 2012. Under the MSA, EI provided specific consulting services and consultants (the "Services") to Ultramatics, and its customer HealthPlan, as somewhat described in Plaintiff's First Amended Complaint.

Once EI was fully integrated and immersed into HealthPlan in early 2013, it quickly became apparent that both HealthPlan and Ultramatics had no idea what they were doing. Specifically, the "HealthPlan Project" that HealthPlan and its CTO and Ultramatics "developed" for the insurance and health benefits industries was, in early 2013, useless. HealthPlan and its CTO (and primary IT vendor, Ultramatics) consumed millions of dollars and thousands of hours in the development of a system that was nonfunctional and of no use.

In early 2013, James Vertino, the "E.V.P." and "Chief Information Officer" of HealthPlan, asked that EI's pre-existing intellectual property, technology, and assets be made available to HealthPlan, locally in its network operations center ("NOC"), so that it can "trick" its customers and clients (including but not limited to Blue Shield of California ("BSC"), Florida Blue ("FL Blue"), CIGNA, among others) into believing that HealthPlan had developed "the most technologically advanced software platform available to the insurance and managed care industries (the "ExchangeLink system")" (*see* D.E. 37, ¶¶ 15-19).

Naively (or ignorantly while EI was being paid on a weekly basis), EI worked with HealthPlan (via Ultramatics) to convince HealthPlan's clients and customers (*e.g.*, BSC, FL Blue, and CIGNA among others) that HealthPlan had functioning and working solutions in place to provide the logistical and administrative systems, methods, and processes needed for them. This included EI sharing its pre-existing intellectual property, technology, and assets to HealthPlan, as a sub-contractor to Ultramatics, to help show HealthPlan's customers and clients that "HealthPlan had" "developed" "mockups," "demos," "screenshots," etc., of "the most technologically advanced software platform available to the insurance and managed care industries (the "ExchangeLink system")" (*see* D.E. 37, ¶¶ 15-19) – *HealthPlan had not.*

When it became apparent to all (and not just HealthPlan's Executives) that HealthPlan will not be able to perform or deliver as promised or advertised to its customers, HealthPlan's Executives asked EI, among others (*e.g.,* MediaShark), to position available and proven pre-existing intellectual property, technology, and assets (like FMC, ETM, and eDashboard assets from EI) to cover for HealthPlan's inadequacies and failures. HealthPlan specifically used EI's "eDashboard" to convince, among others, CIGNA that it knew how to manage a project as large as the "HealthPlan Project."

By way of another example of HealthPlan's and Ultramatic's incompetence and ineptitude, in August 2013, Douglas (Doug) Vanderpool, "SVP Product Development" for HealthPlan, specifically said that HealthPlan will fail if they were asked to support the original set of requirements established by HealthPlan and Ultramatics prior to EI's involvement. *See, e.g., California Physicians' Service, Inc., et al., v. HealthPlan Services, Inc., et al.*, Case No. 3:18-cv-03730-JD, in the United States District Court, Northern District Of California.[2]

---

[2] **EI has been served a subpoena in this case.**

Pursuant to HealthPlan's and Ultramatics's machinations, by September or October 2013, both HealthPlan and Ultramatics believed that EI had "transferred" all of its pre-existing intellectual property, technology, and assets to HealthPlan and Ultramatics. Rather than accepting responsibility for their own failures, ineptitude, and inability to perform, HealthPlan and Ultramatics blamed EI, among others (internally), for allegedly exposing their failures, ineptitude, and inability to perform for their customers (*e.g.*, BSC, FL Blue, and CIGNA).

Consequently, in or about late August or early September 2013, Ultramatics, with assistance from HealthPlan, devised a "scheme" that would allow Ultramatics' to wrongfully blame EI and withhold more than $750,000 from EI for services that were provided to, approved by, and accepted by Ultramatics for HealthPlan's benefit. Upon information and belief, HealthPlan purposefully did not make timely payments due and owing to Ultramatics, pursuant to their machinations, which then allowed Ultramatics to claim that it did not have to pay EI for its Services, despite Ultramatics having already been paid more than $18,000,000 by HealthPlan based substantially on EI's Services for Ultramatics/HealthPlan.

Under Ultramatics's and HealthPlan's scheme, Ultramatics was able to hold back (or bank with HealthPlan's assistance), more than $750,000 with HealthPlan, and therefore from EI, all the while EI was paying its employees and contractors to perform Services for Ultramatics, for the benefit of HealthPlan, in apparent retribution for allegedly exposing Mr. Seshadri's and Ultramatics' failures at or with HealthPlan and, more importantly, its customers. The final step of Ultramatics's and HealthPlan's scheme was the filing of a lawsuit on October 30, 2013; *that is*, instead of paying the first invoice that came due on October 22, 2013, Ultramatics filed a lawsuit so as to justify Ultramatics' refusal to pay EI for services rendered between September through November 2013; services for which HealthPlan paid Ultramatics. *See Ultramatics, Inc. v. EI, Inc.,*

*et al.*, Case No. 13-CA-13413, in the Circuit Court of the Thirteenth Judicial Circuit, in and for Hillsborough County, Florida.

Unfortunately for Ultramatics and HealthPlan, and because Ultramatics was nothing more than an IT body shop, they did not realize that EI developed, coded, and retained components of the HealthPlan Project (the "Source Code") to its cloud-based source code repository (the "SourceRepo Library"). On December 5, 2013, Ultramatics made written demands, at the behest of HealthPlan, to EI for the immediate production of all account information, passwords, or other information that would allow Ultramatics and HealthPlan to secure the SourceRepo Library and/or otherwise gain access to the Source Code. For reasons that should be obvious, EI said, "No," and it demanded that it be paid for its work, including pre-existing intellectual property, technology, and assets made available to HealthPlan.

In this regard, EI offered to return the Source Code to HealthPlan in exchange for (i) a long-term contract for EI resources to work on the HealthPlan Project, *and* (ii) up-front payments totaling the amount of $750,420.69 from HealthPlan to E-Integrate (the "Payment"), which E-Integrate represented was the full amount owed to E-Integrate by Ultramatics, plus interest (the "Receivable"). In exchange for the long-term contract *and* Payment, E-Integrate agreed to assign to HealthPlan rights in the Receivable.

On January 17, 2014, HealthPlan and EI entered into the "Consulting Agreement" (the "HealthPlan-EI Agreement"), a copy of which is attached to Plaintiffs First Amended Complaint as Exhibit 1 (D.E. 37-1). Under terms of the HealthPlan-EI Agreement, EI fully assigned its unpaid Invoices to HealthPlan; it is unknown, however, whether Ultramatics paid HealthPlan back (or whether HealthPlan even asked) for EI's services rendered between September through November 2013. *HealthPlan has so far refused to produce discovery regarding the same, despite demanding*

6

*EI to pay over to HealthPlan the amount $775,420.69 in connection with the HealthPlan-EI Agreement*. In addition, and pursuant to the HealthPlan-EI Agreement, EI returned the Source Code to HealthPlan, it did not retain a copy of it; and, commencing January 6, 2014, EI provided certain "Consultant Resources" (as defined in the HealthPlan-EI Agreement) to perform the "Services" for HealthPlan (as defined in the HealthPlan-EI Agreement) throughout the term of the Agreement, through December 31, 2014.

EI, nor its Consultant Resources, knew or had reason to know that HealthPlan did not actually intend to abide by the terms of the HealthPlan-EI Agreement, as confessed by HealthPlan in its First Amended Complaint. In early 2014, HealthPlan severed all ties with EI in breach of the HealthPlan-EI Agreement, and it stopped paying EI in June 2014. As of September 20, 2014, HealthPlan owed EI $257,010.59 for consulting fees EI due under the HealthPlan-EI Agreement. In addition, under the HealthPlan-EI Agreement, EI was due to earn and collect a total of $947,810.49, for consulting fees due to EI, June through December 31, 2014.

On October 23, 2018, HealthPlan decided to file this lawsuit, *more than four (4) years later*, seeking injunctive relief and the following, in relevant part:

> B. Ordering that Defendants, jointly and severally, be required to account for and pay over to HealthPlan an amount equal to Defendants' actual damages, and all of the gains, profits, savings, and advantages realized by Defendants as a result of Defendants' trade secret misappropriation, unfair competition, copyright infringement and deceptive and unfair trade practices, and, if Defendants' actions are deemed willful and intentional, then such amount should be increased to an amount not exceeding three times of such amount.
>
> C. Ordering that Defendants pay over to HealthPlan an amount sufficient to compensate HealthPlan for corrective advertising in connection with Defendants' unfair competition.
>
> D. Ordering that E-Integrate pay over to HealthPlan the amount $775,420.69 in connection with the HealthPlan-EI Agreement.

F. Ordering that Media Shark pay over to HealthPlan all amounts paid to Media Shark in connection with the Media Shark Agreement.

In other words, HealthPlan wants to turn back time and unwind its contracts and agreements; and, it wants to do so *without* acknowledging the span of time that has passed (2011 to 2019), *without* involving (or disclosing) the hundreds, if not thousands, of people and companies that were involved, and *without* disclosing the several other lawsuits that relate to these matters (*as evidenced by Plaintiff's yet to be produced joint defense agreements and non-party subpoenas*).

## II. ARGUMENT:

### A. DEFENDANTS ARE NOT REQUIRED TO AMEND THEIR INITIAL DISCLOSURES

Plaintiff filed a Motion to Compel Amended Initial Disclosures, complaining "the Kutsomarkos Defendants still categorically refuse to reduce their list of ***350 potential witnesses*** purportedly having knowledge concerning the claims at issue in the case." However, unlike Plaintiff's *first* Motion to Compel Amended Initial Disclosures (D.E. 68), where Plaintiff sought an "order […] limiting Defendants **to ten or less individuals, and imposing fees and sanctions as a result of Defendants' misconduct**" (D.E. 68 p. 3, emphasis added), Plaintiff *now* cries that, "Amended Initial Disclosures should be compelled from all of the Defendants because they contain a grossly over-inclusive list of undifferentiated individuals alleged to likely have discoverable information supporting their claims or defenses" (D.E. 81, p. 2). However, what does Plaintiff's demands or requests (or its remedies) even mean?

Federal Rule of Civil Procedure 26(a) requires that "a party must, without awaiting a discovery request" provide the other parties with certain initial disclosures. Disclosures required under Rule 26(a) include "the name and, if known, the address and telephone number of each individual likely to have discoverable information-along with the subjects of that information-that

the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment [.]" Fed. R. Civ. P. 26(a)(1)(A)(I).

Rule 37 (c) provides for sanctions against a party that fails to disclose information required under Rule 26(a) or (e).  *See Mee Indus. v. Dow Chem. Co*., 608 F.3d 1202, 1221 (11th Cir. 2010). Specifically, Rule 37(c) states that:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1).

Plaintiff has cited no case supporting its proposition that the Defendants' Rule 26 disclosures should be limited.  The cases Plaintiff did cite are easily distinguishable, as shown below:

In *United States ex rel. Brown v. Celgene Corp*., 2015 U.S. Dist. LEXIS 189371, at *10 (C.D. Cal. July 24, 2015), the court found that, "Plaintiff's list of 130 potential witnesses, **without any indication of the subject matter of their anticipated testimony**, does not further the purposes of Rule 26(a)(1)(A)(1)" (emphasis added), *which is obviously not that case here*.

Similarly, in *Sender v. Mann*, 225 F.R.D. 645, (D. Colo. 2004), the court held, *inter alia*:

> If a party is unwilling to conduct a reasonable inquiry in advance of making Rule 26(a)(1) disclosures, that party cannot defeat the purposes of Rule 26(a)(1) simply by providing a laundry list of **undifferentiated witnesses** (emphasis added).

*Id.* at 651. Plaintiff has not demonstrated and Defendants deny that their Rule 26 disclosures are "undifferentiated."

Likewise, in *Lobato v. Ford,* 2007 U.S. Dist. LEXIS 65574, (D. Colo. Sep. 5, 2007), the court did not address numerosity, it merely discussed the adequacy of plaintiffs' description of the subject matter of a single witnesses' testimony by stating the following, *inter alia:*

9

> Defendant Ford also challenges the sufficiency of the Fields disclosure on December 15th. Plaintiffs' Second Supplemental Disclosure merely indicated that Ms. Fields had "information regarding Defendant, Ranjan Ford." Citing this court's decision in *Sender v. Mann*, 225 F.R.D. 645 (D. Colo. 2004), Defendant Ford contends that this disclosure failed to "sufficiently apprise Defendant Ford of the nature of [the] information" Ms. Fields might provide in support of Plaintiffs' claims.

*Id* at *22.

Like *Lobato, Hammonds v. Jackson*, 2015 U.S. Dist. LEXIS 183808, (N.D. Ga. Mar. 16, 2015), the court addressed plaintiffs' description of the subject matter of (two) witnesses' testimony, and not numerosity, stating the following, in relevant part*:*

> Plaintiff's initial disclosures named Latasha and Marilyn Levo as potential witnesses, but they failed to specify the subjects of the information discoverable from these women. The mere disclosure that they "have knowledge of the facts and allegations in the . . . Complaint" is no more informative than the disclosure "these witnesses are knowledgeable about the case"—Lobato's example of a plainly deficient initial disclosure under Rule 26(a)(1).

*Id.*, at *5.

Instead, a case from an Eleventh Circuit District Court supports the numerosity of Defendants' Rule 26(a) disclosures: *Braggs v. Dunn,* 2017 U.S. Dist. LEXIS 23151, (M.D. Ala. Feb. 17, 2017). *Braggs* is a class action that relates to, among other things, constitutionally inadequate medical and mental health treatment in Alabama prison facilities. In discussing the numerosity of witnesses, the *Braggs* court held the following, in relevant part*:*

> This court is not persuaded that the large number of potential witnesses disclosed alone necessarily renders the March disclosure inadequate. In a case such as this one, involving the health care provided to and the accommodation of disabilities of thousands (indeed, perhaps tens of thousands) of prisoners, **there may well be hundreds of prisoners who have not only discoverable, but highly pertinent, information which the parties "may use to support" their claims.** Fed. R. Civ. P. 26(a)(1)(A)(i). <u>**Parties are not required to narrow down their final witness selections before the close of discovery; indeed, they need not do so until their required witness list submissions.**</u> See Fed. R. Civ. P. 26(a)(3). However, to the extent that they have identified individuals with potentially discoverable information upon which they may rely, parties are under a clear obligation to disclose them in a timely manner. And to the extent they know their prior

> disclosures are no longer accurate, parties must amend their disclosures in a timely manner.

*Id.* at *14-15 (emphasis added).

Plaintiff's contentions are patently absurd given the scope and breadth of the claims and disputes between the parties, which go all the way back to 2011, the amount for which Plaintiff (or EI) demands in damages, and the injunctive relief it seeks. While Plaintiff contends that Defendants insufficiently identify the subject of the witnesses' testimony, *which is not true*, Plaintiff failed to identify a single listed witness and his or her associated subject matter description that Plaintiff finds to be wanting in sufficient detail. Plaintiff has simply filed a blanket objection, devoid of any specificity, like all of its discovery responses in this case (*see, e.g.,* D.E. 72, 74 or 82).

There is simply no legal basis for Plaintiff's claim that Defendant must limit its Rule 26 disclosures, much less for sanctions, "as a result of Defendants' misconduct." Defendants deny that they have not sufficiently identified the subject of the witnesses' testimony and, as such, Plaintiff's Motion is due to be denied, with fees and costs to be awarded to Defendants for having to respond to such a frivolous and baseless motion.

**B. DEFENDANTS COMPLETED THEIR DOCUMENT PRODUCTION**

As a threshold matter, Defendants have produced more than **56 gigabytes** of documents and information, **which is an enormous amount of information**, and the balance of Plaintiff's requests relate to Defendants' financial information, which is either not in the possession, custody, or control of these Defendants or they are meant to harass and vex Defendants.

On March 29, 2019, Plaintiff made its "*first rolling*" production of documents in response to Defendants' First Request for Production of Documents, which were served three (3) months earlier, on December 21, 2018. Plaintiff's *paltry* "first" production of documents generally relates

to advertising and marketing materials, which it easily could have been produced several months ago. **Plaintiff has produced nothing more since then** (*e.g., no emails, no contracts, no agreements, no employment records, no invoices, no text messages, no correspondence, no software nor code, nothing, etc.*) (*see* D.E. 82).

Obviously, Plaintiff intends to perform discovery by a double standard, *e.g.*, Plaintiff demands Defendants produce all documents and information immediately; while Plaintiff withholds and avoids its discovery obligations, including filing baseless Motions to Compel to mask its own failures in complying with its discovery obligations.

1. **Requests for Production to Kutsomarkos and Responses**

**Request No. 26: Documents relating or referring to expenses incurred by You in connection with your ownership of MEDIA SHARK**.

Plaintiff claims that this Request is relevant to its claims "because expenses incurred by Kutsomarkos concern whether Kutsomarkos failed to observe corporate formalities by commingling funds of the corporation with funds of other corporations and with personal funds or by using the assets of the corporation for personal use, and if so, warrants piercing the corporate veil" (D.E. 81, p. 18).

However, Plaintiff's Amended Complaint does not allege anywhere, under any count, a claim to "pierce the corporate veil" of any Defendant. The only allegations, or support in any of the claims against Kutsomarkos, is her position at or with MediaShark. Simply holding the position of managing member, chief executive officer, or subcontractor is not enough to prove this element. *See TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC*, 945 F.Supp.2d 1331, 1346-47 (M.D. Fla. 2013).

Plaintiff's claim is nothing more than legal conclusions masquerading as facts. "The law is clear that the mere ownership of a corporation by a few shareholders, or even one shareholder,

is an insufficient reason to pierce the corporate veil." *Gasparini v. Pordomingo*, 972 So.2d 1053, 1055 (Fla. 3d DCA 2008). "[E]ven if a corporation is merely an alter ego of its dominant shareholder or shareholders, the corporate veil cannot be pierced so long as the corporation's separate identity was lawfully maintained." *Lipsig v. Ramlawi*, 760 So.2d 170, 187 (Fla. 3d DCA 2000).

Here, MediaShark was Plaintiff's contractor, ***not*** Kutsomarkos. Plaintiff is required to **plead facts**, which if true, would "pierce the corporate veil" and/or establish personal liability for the individual Defendant. *See Steinhardt v. Banks*, 511 So. 2d 336, 339 (Fla. 4th DCA 1987) (holding that to establish alter-ego courts will look through the screen of corporate entity to the individuals who compose it for liability). Plaintiff's allegation that Defendants, together or *in toto*, made false statements or committed tortious acts does not come close to this pleading standard. There is no single statement nor act in the Complaint attributed directly to Kutsomarkos. *See Morgan v. W.R. Grace & Co.--Conn.*, 779 So. 2d 503, 506 (Fla. 2nd DCA 2000).

In addition, an individual's financial information is protected from disclosure by Florida's constitutional right of privacy, pursuant to Art. I, § 23, Fla. Const., unless there is a relevant or compelling reason to compel disclosure. The Florida Supreme Court has held that this provision in the Florida Constitution "recognizes an individual's legitimate expectation of privacy in financial institution records." *Winfield v. Division of Pari-Mutuel Wagering, Dept. of Business Regulation*, 477 So.2d 544, 548 (Fla. 1985). The Florida Constitution's safeguarding of an individuals' private financial information extends to all state actions, which includes court orders compelling discovery." *Berkeley v. Eisen*, 699 So.2d 789, 790 (Fla. 4th DCA 1997).

The Florida Supreme Court held that the right of privacy demands the "compelling state interest standard." *Winfield*, *supra* at 547. This means that the "party seeking discovery of

confidential information must make a showing of necessity which outweighs the countervailing interest in maintaining the confidentiality of such information." *Higgs v. Kampgrounds of America*, 526 So.2d 980, 981 (Fla. 3d DCA 1988) (emphasis added). Under the compelling interest standard, only where the discovery of the confidential financial information is required to move the case forward, will the interference with individual's right to privacy be justified. Thus, the rule in Florida is that personal financial information is discoverable only in aid of execution after a judgment has been entered. *See Friedman v. Heart Institute of Port St. Lucie, Inc.*, 863 So.2d 189, 194 (Fla. 2003).

The disclosure of personal financial information may cause irreparable harm to the disclosing party; therefore, the financial records of a party are not discoverable unless the information sought is relevant to contested issues. *See Mogul v. Mogul*, 730 So.2d 1287, 1290 (Fla. 5th DCA 1999); *Woodward v. Berkery*, 714 So.2d 1027 (Fla. 4th DCA), *rev. denied,* 717 So.2d 528 (Fla.1998); *Graphic Assocs., Inc. v. Riviana Rest. Corp.*, 461 So.2d 1011 (Fla. 4th DCA 1984).

Kutsomarkos' former company, MediaShark, was a contractor of Plaintiff, and Plaintiff does not allege that it made payments to her. In fact, Kutsomarkos, individually, never received payment from Plaintiff. Thus, there is simply no factual or legal justification for seeking personal, confidential financial information from Defendants at this juncture of this case.

**Request No. 31: Documents sufficient to show all payments received by You, whether directly or indirectly, from DIXIT, E- INTEGRATE, MEDIA SHARK, KNOWMENTUM, Drake Collaborative, Inc., Dr. Michael Bojkovic or Frank Perez, III.**

Plaintiff's Motion must be denied on the same grounds as set forth above.

**Request No. 43 and Kutsomarkos' Response: Documents sufficient to show all compensation received for the purchase of MEDIA SHARK.**

Plaintiff's Motion must be denied on the same grounds as set forth above.

**Request No. 48 and Kutsomarkos' Response: Documents sufficient to show Your revenues, profits and/or losses relating to any business venture between You and Dr. Michael Bojkovic.**

Plaintiff's Motion must be denied on the same grounds as set forth above.

**2.    Requests for Production to E-Integrate and Responses**

**Request No. 30 and E-Integrate's Response: All documents and things relating or referring to payments made to, and gains and profits realized by, E-INTEGRATE as a result of any dealings with Dr. Michael Bojkovic.**

Plaintiff's Motion must be denied on the same grounds as set forth above. In addition, no information responsive to this Request is being withheld pursuant to such objections as E-Integrate has no responsive documents.

**Request No. 33 and E-Integrate's Response: Documents sufficient to show all payments made by E-INTEGRATE, whether directly or indirectly, to DIXIT, KUTSOMARKOS, MEDIA SHARK, KNOWMENTUM, Drake Collaborative, Alex Pokusholov, Dr. Michael Bojkovic or Frank Perez.**

Plaintiff's Motion must be denied on the same grounds as set forth above. In addition, no information responsive to this Request is being withheld pursuant to such objections as E-Integrate has no responsive documents.

**Request No. 47 and E-Integrate's Response: All documents and things relating or referring to the ownership of E-INTEGRATE or the transfer of such ownership.**

Plaintiff's Motion must be denied on the same grounds as set forth above. In addition, no information responsive to this Request is being withheld pursuant to such objections as E-Integrate has no responsive documents.

**C.    THE COURT SHOULD DENY PLAINTIFF'S REQUEST FOR ATTORNEY'S FEES AND COSTS**

As the above argument indicates, Defendants have objected to Plaintiff's discovery in good faith, and there is no evidence that Defendants have acted with bad faith. At best, the dispute reflects legitimate disputes about the proper scope of discovery in this case—and this particular

stage of this case— under Rule 26(b)(1). *See* Fed. R. Civ. P. 37(a)(5)(A) (noting that the court must not order payment of attorney's fees and costs for bringing the motion if "the opposing party's nondisclosure, response, or objection was substantially justified" or "other circumstances make an award of expenses unjust."). "The Supreme Court has clarified that an individual's discovery conduct should be found 'substantially justified' under Rule 37 if it is a response to a 'genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.'" *Devaney v. Cont'l Am. Ins. Co.*, 989 F.2d 1154, 1163 (11th Cir. 1993) (*quoting Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).

Defendants' objections, nondisclosures, and responses were (and are) substantially justified, and the circumstances would make an award of expenses unjust. As such, Plaintiff should not be awarded attorney's fees or costs for bringing the instant motion.

WHEREFORE, Defendants FERON KUTSOMARKOS and E-INTEGRATE, INC. respectfully request that the Plaintiff's Motion to Compel and for sanctions be denied.

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been furnished electronically with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all of the parties and their counsel of record on this 26th day of April 2019.

Respectfully submitted,
***Dixit Law Firm***
*/s/ Shyamie Dixit*
Shyamie Dixit, Esq. (sdixit@dixitlaw.com)
Florida Bar No.: 719684
Robert L. Vessel, Esq. (rvessel@dixitlaw.com)
Florida Bar No.: 314536
3030 N. Rocky Point Drive West, Suite 260
Tampa, FL 33607
Tel: (813) 252-3999
Fax: (813) 252-3997

*Attorneys for Defendants Feron Kutsomarkos and
E-Integrate, Inc.*

*Attorneys for Defendants Feron Kutsomarkos and
E-Integrate, Inc.*