**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

HEALTHPLAN SERVICES, INC.,
    a Florida corporation,

                                    CASE NO.:  8:18-cv-02608-SDM-AAS

    Plaintiff,

    v.

RAKESH DIXIT, an individual,
FERON KUTSOMARKOS, an individual,
E-INTEGRATE, INC., a Florida corporation,
KNOWMENTUM, INC, a Florida corporation,  and
MEDIA SHARK PRODUCTIONS, INC.,
a Florida corporation,

    Defendants.
_____/

**DEFENDANTS' MOTION TO COMPEL THE 2018 VERSION OF HPS' SOFTWARE CODE PURSUANT TO THE ORDER REGARDING INSPECTION OF COMPUTER CODE (DOC. NO. 106), WITH INCORPORATED MEMORANDUM OF LAW, AND REQUEST FOR ORAL ARGUMENT**

Defendants Feron Kutsomarkos and E-Integrate, Inc. ("E-Integrate" or "EI"), joined by Defendants Rakesh Dixit, KnowMentum, Inc., and MediaShark Productions, Inc. (collectively referred to herein as "Defendants"), by and through their undersigned counsel and pursuant to Federal Rules 26, 33, 34, and 37, and Local Rule 3.04(a) of the Middle District of Florida, hereby move this Honorable Court for an Order compelling Plaintiff HEALTHPLAN SERVICES, INC. ("Plaintiff" or "HPS") to produce the 2018 version of its Software Code pursuant to the Order Regarding Inspection Of Computer Code (Doc. No. 106); and, Defendants Request Oral Argument pursuant to Local Rule 3.01(j).

Defendants estimate that one (1) hour will be required for oral argument in support of this motion, and Defendants state as follows in support:

1

## I. INTRODUCTION

The nature of this case and the discovery disputes between the parties are well-known to this Court, and they are well-documented (*see, e.g.,* Doc. Nos. 78, 88, 93, 103-06, 117, 141). Important for this Motion is Plaintiff's production for inspection and analysis, pursuant to the Court's Order Regarding Inspection Of Computer Code (Doc. No. 106), its **software code development work at HealthPlan**, [*i.e.,*] **the ExchangeLink® system**[, which] included the entirety of the ExchangeLink® software program, including source and object code associated with the ExchangeLink® system" (*see, e.g.,* Plaintiff's First Amended Complaint ("the FAC"), ¶¶ 19, 28(i), 33(e-g), 58, 61, 73, or 99, and collectively referred to herein as "**ExchangeLink**").

Although Plaintiff agreed to produce for inspection and analysis the **2014** version of ExchangeLink, Plaintiff is refusing to produce for inspection and analysis the **2018** version of ExchangeLink (*see* **Exhibit 1**, *email from William Frankel, Esq. dated August 20, 2019*), thus necessitating this separate and additional Motion to Compel – HPS's counsel demanded that Defendants file a separate Motion to Compel despite the Court's Order following the July 29th discovery conference and the follow-up discovery conference set for September 20, 2019 (*see* Doc. No. 141).

## II. THE SCOPE OF DISCOVERY

The scope of discovery under Rule 26(b) is broad: "parties may obtain discovery regarding any matter, not privileged, which is relevant to the claims or defense of any party involved in the pending action." *Hickman v. Taylor*, 329 U.S. 495, 507-508, 67 S. Ct. 385, 91 L. Ed. 451 (1947); *Farnsworth v. Procter and Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985) (the Federal Rules of Civil Procedure "strongly favor full discovery whenever possible"); *Canal Authority v. Froehlke*, 81 F.R.D. 609, 611 (M.D. Fla. 1979). Under Rule 26, relevancy is "construed broadly

to encompass any matter that bears on, or that reasonably could lead to another matter that could bear on any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978). Discovery is not limited to the issues raised by the pleadings because "discovery itself is designed to help define and clarify the issues." *Id.* at 352. Information can be relevant and therefore discoverable, even if not admissible at trial, so long as the information is reasonably calculated to lead to the discovery of admissible evidence. *Dunbar v. United States*, 502 F.2d 506 (5th Cir. 1974). Rule 26 restricts the scope of discovery to the claims or defenses of the parties, rather than merely the subject matter. *Donahay v. Palm Beach Tours & Transp., Inc.*, 242 F.R.D. 685, 687 (S.D. Fla. 2007).

Plaintiff, HPS, as the party resisting discovery, bears the burden to demonstrate specifically how the objected-to request is unreasonable or otherwise unduly burdensome. *See* FED.R.CIV.P. 33(b)(4); *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1559 (11th Cir. 1985); *Rossbach v. Rundle*, 128 F.Supp.2d 1348, 1354 (S.D. Fla. 2000); *Gober v. City of Leesburg*, 197 F.R.D. 519, 521 (M.D. Fla. 2000) ("The party resisting production of information bears the burden of establishing lack of relevancy or undue burden in supplying the requested information."). To voice a successful objection, the objecting party cannot simply intone the familiar litany that an interrogatory or request for production is overly broad, burdensome, oppressive, and irrelevant. Rather, the objector must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each interrogatory or request is not relevant or how each question is overly broad, burdensome or oppressive, by submitting affidavits or offering evidence revealing the nature of the burden. *Roesberg v. Johns-Manville Corp.*, 85 F.R.D. 292, 1980 U.S. Dist. LEXIS 10039, 28 Fed. R. Serv. 2d (Callaghan) 1170 (E.D. Pa. 1980).

Finally, a word about proportionality: Proportionality requirements are nothing new to Rule 26. The concept of proportionality in discovery was formally embedded in the Federal Rules of Civil Procedure in 1983. At that time, Rule 26(b)(1)(iii) was amended to "address the problems of discovery that is disproportionate to the individual lawsuit"[1] and the perceived tendency of litigants to abuse the discovery process in order to attain a tactical advantage. The amended Rule 26 required courts to limit discovery where "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."

### III. THE 2018 VERSION OF EXCHANGELINK IS RELEVANT AND IT SHOULD BE PRODUCED TO THE PARTIES' EXPERTS

This is a complicated lawsuit, relating to federal trade secret misappropriation, Florida deceptive and unfair trade practices, common law unfair competition, copyright infringement, and breach of contract. It's a lawsuit that spans more than eight years (*e.g.*, 2011 to 2019), which involves, *inter alia*, all versions of ExchangeLink between 2014 and 2018. For example, Plaintiff states the following in its Amended Complaint:

- Between 2011 and 2014, HealthPlan developed ExchangeLink®, a powerful healthcare-related software system. The **ExchangeLink® system connects organizations to public and private health insurance exchanges**. **It aggregates and processes data across multiple healthcare platforms and distribution channels**. HealthPlan invested nearly $100 million dollars in time, talent and treasure into developing the ExchangeLink® system. As a result, **many of the largest insurance and managed care providers in the United States implemented the**

---

[1] FED. R. CIV. P. 26, Advisory Committee Notes (1983) ("The elements of Rule 26(b)(1)(iii) address the problem of discovery that is disproportionate to the individual lawsuit as measured by such matters as its nature and complexity, the importance of the issues at stake in a case seeking damages, the limitations on a financially weak litigant to withstand extensive opposition to a discovery program or to respond to discovery requests, and the significance of the substantive issues, as measured in philosophic, social, or institutional terms. Thus the rule recognizes that many cases in public policy spheres, such as employment practices, free speech, and other matters, may have importance far beyond the monetary amount involved. The court must apply the standards in an even-handed manner that will prevent use of discovery to wage a war of attrition or as a device to coerce a party, whether financially weak or affluent.")

    **ExchangeLink® system**. Ultimately, the ExchangeLink® system became the premier software system associated with the Affordable Care Act. (D.E. 37, ¶ 1.)

- **The HealthPlan Project required HealthPlan to hire numerous contractors, subcontractors, and employees to assist with various and extensive development and marketing tasks**. E-Integrate and Dixit were among the contractors hired by HealthPlan in the development of the ExchangeLink® system. **Specifically, E-Integrate and Dixit contributed to the development of the ExchangeLink® system software code**. (D.E. 37, ¶ 18.)

- **In addition, HealthPlan invested heavily in commercializing, marketing and promoting the ExchangeLink® system**. HealthPlan created comprehensive, specialized scripts, videos, and presentations to market and promote the ExchangeLink® system to healthcare insurance and managed care service providers nationwide. (D.E. 37, ¶ 20.)

- In late 2011, HealthPlan engaged Ultramatics, Inc., a software development contractor, in connection with the development of the ExchangeLink® system. (D.E. 37, ¶ 34.)

- In May 2013, HealthPlan directly hired Dixit to be its Vice President, Links Core Product Development. In his capacity as Vice President for HealthPlan, Dixit supervised and managed various aspects of the ExchangeLink® development. He also had direct access to the HealthPlan Trade Secrets. (D.E. 37, ¶¶ 37-38.)

- In 2014, HealthPlan contracted with Kutsomarkos' *former* company, Media Shark, in connection with the development and promotional activities associated with the ExchangeLink® system (the "MediaShark Agreement"). Media Shark was hired by HealthPlan in the development of extensive media and marketing materials, and **much of Media Shark's work at HealthPlan involved the process of selling and educating prospective clients and "onboarding" new clients**. (D.E. 37, ¶¶ 21-24.)

- In **2018**, HealthPlan currently owns and possesses certain confidential, proprietary, and trade secret information. **One example of the trade secret information is reflected in the Source Code of the ExchangeLink® system**. (D.E. 37, ¶73.)

- In **2018**, HealthPlan claims that if Dixit, Kutsomarkos, E-Integrate, Media Shark, and Knowmentum are not enjoined, **they will continue to misappropriate and use HealthPlan's trade secret information for their own benefit and to HealthPlan's detriment**. (D.E. 37, ¶81.)

- In **2018**, HealthPlan seeks, in addition to damages, temporary, preliminary and permanent injunctive relief to recover and protect its confidential, proprietary and trade secret information and to protect other legitimate business interests. **HealthPlan operates in a competitive market and will continue suffering irreparable harm absent injunctive relief**. (D.E. 37, ¶82.)

- In **2018**, HealthPlan claims it was further harmed insofar as Dixit, Kutsomarkos, E-Integrate and Media Shark **delivered work products of a lower market value than that which should have been delivered to HealthPlan**. In particular, Dixit, Kutsomarkos, E-Integrate and Media Shark delivered works, **including HealthPlan Trade Secrets and Source Code, that were not exclusively provided to HealthPlan, but instead were reused by third parties, including at least Knowmentum**. (D.E. 37, ¶89.)

- In **2018**, HealthPlan claims, "Defendants continue to infringe the HealthPlan Copyrights by copying, making derivative works of and reproducing the HealthPlan Copyrights in connection with promoting sham investments to third parties, thus causing HealthPlan and the public irreparable harm. Accordingly, **HealthPlan is entitled to injunctive relief, preventing Defendants from impairing HealthPlan's ability to exploit the ExchangeLink® system, while preventing the Defendants from deceiving the public**." (D.E. 37, ¶112.)

In addition, there is EI's Counterclaim (*see* D.E. 83, pp. 15-31), which likewise spans more than eight years (2011 to 2019) and involves, *inter alia*, all versions of ExchangeLink between 2014 and 2018. For example, on January 17, 2014, HealthPlan and EI entered into the "Consulting Agreement" (the "HealthPlan-EI Agreement"), a copy of which is attached to Plaintiffs FAC as Exhibit 1 (D.E. 37-1). Under terms of the HealthPlan-EI Agreement, EI returned the "Source Code" to HealthPlan, it did not retain a copy of it; and, commencing January 6, 2014, EI provided certain "Consultant Resources" (as defined in the HealthPlan-EI Agreement) to perform the "Services" for HealthPlan (as defined in the HealthPlan-EI Agreement) throughout the term of the Agreement, through December 31, 2014.

EI, nor its Consultant Resources, knew or had reason to know that HealthPlan did not actually intend to abide by the terms of the HealthPlan-EI Agreement, as confessed by HealthPlan in its First Amended Complaint. In early 2014, HealthPlan severed all ties with EI in breach of the HealthPlan-EI Agreement, and it stopped paying EI in June 2014. As of September 20, 2014, HealthPlan owed EI $257,010.59 for consulting fees EI due under the HealthPlan-EI Agreement.

In addition, under the HealthPlan-EI Agreement, EI was due to earn and collect a total of $947,810.49, for consulting fees due to EI, June through December 31, 2014.

Before filing this lawsuit in October 2018, HPS never alleged (*and it cannot prove*) that EI (*i.e.*, the "Consultant and Consultant Resources") failed or refused to comply with any provisions of the Consulting Agreement (*because they have not*). In addition, EI has "**Pre-existing Property**," knowledge, and "**Residuals**" under the HPS-EI Agreement (*assuming its enforceable, which it's not*), which are defined as follows (*see* D.E. 37-1):

> (e) **Pre-existing Property**. **Consultant shall retain all right, title and interest in and to all information, data, tools and other materials: (i) developed by Consultant prior to November 14, 2011; (ii) used on or in connection with ExchangeLink or ExchangeLink Code; and (iii) listed on Exhibit F hereto ("Pre-existing Property")**. Consultant shall not incorporate any Pre-existing Property into Developments or ExchangeLink Code without Company's prior written consent, which shall not be unreasonably withheld. […]. **Company shall have no rights of resale, or distribution to the Pre-existing Property except as incorporated into the ExchangeLink Code.**
>
> (f) **Residuals**. **Nothing in this Agreement shall preclude Consultant or a Consultant Resource from using Residuals for any purpose, including use in development, manufacture, promotion, sale and maintenance of its products and services. "Residuals" means general know-how and skills developed by Consultant's employees during the course of performance of the Services**, […]. Subject to Section 7(b) above, **Contractor is free to use Residuals for any purpose, including use in development, manufacture, sale and maintenance of its products and services**.

On October 23, 2018, HealthPlan decided to file this lawsuit, *more than four (4) years later*, seeking injunctive relief and the following, in relevant part:

> B. Ordering that Defendants, jointly and severally, be required to account for and pay over to HealthPlan an amount equal to Defendants' actual damages, and all of the gains, profits, savings, and advantages realized by Defendants as a result of Defendants' trade secret misappropriation, unfair competition, copyright infringement and deceptive and unfair trade practices, and, if Defendants' actions are deemed willful and intentional, then such amount should be increased to an amount not exceeding three times of such amount.

  C. Ordering that Defendants pay over to HealthPlan an amount sufficient to compensate HealthPlan for corrective advertising in connection with Defendants' unfair competition.

  D. Ordering that E-Integrate pay over to HealthPlan the amount $775,420.69 in connection with the HealthPlan-EI Agreement.

  F. Ordering that Media Shark pay over to HealthPlan all amounts paid to Media Shark in connection with the Media Shark Agreement.

In other words, HealthPlan wants to turn back time and unwind its contracts and agreements; and, it wants to do so *without* acknowledging the span of time that has passed (2011 to 2019), and *without* disclosing the versions of ExchangeLink between 2014 and 2018. However, the parties' experts will require, at a minimum, the 2014 and 2018 versions of ExchangeLink to inspect, analyze, or investigate, ***among other things***, the following:

- On February 1, 2017, HPS and counsel for Dr. Michael Bojkovic surreptitiously entered into a "Common Interests Confidentiality Agreement" (attached as ***Exhibit 2***) relating to the state court action, *Michael Bojkovic v. Rakesh Dixit, et al.*, Case No. 16-001246-CI, pending in the Circuit Court of the Sixth Judicial Circuit, in and for Pinellas County, Florida (the "*Bojkovic* action"). After that agreement, in August 2017, James Vertino gave a deposition in the *Bojkovic* action (*for approximately seven (7) hours*); and, in January 2018, Dr. Bojkovic's counsel amended the state court complaint to include *new defendants* (*i.e.,* Dr. Bojkovic added the non-Rakesh Dixit Defendants in this federal action) and the false and salacious claims James Vertino made during his deposition about them, which were regurgitated in this action in October 2018 (*see* Doc. No. 1). For example, James Vertino (*i.e.,* HPS' supposed "star" witness) claims that the ExchangeLink Source Code was stolen from HPS by Rakesh Dixit and/or Feron Kutsomarkos on or about their terminations. Obviously, within the confines of HPS, its purported security monitoring and tracking capabilities will show when the alleged version of the ExchangeLink Source Code was

"copied" or "downloaded" as a part of Defendants' "heist," and the alleged versions of the ExchangeLink Source Code should be similar, if not identical, to an "AS-BUILT" functional and technical specifications document developed for HPS by Rakesh Dixit.

- James Vertino erroneously and maliciously claimed that a "time-bomb" was purportedly embedded and enabled within the ExchangeLink Source Code by Rakesh Dixit (*see, e.g.,* FAC, Doc. No. 37, ¶50). The 2014 version of ExchangeLink version with the alleged "time-bomb" should be visible (to the parties' experts), or James Vertino or HPS's experts should show it to Defendants' expert (and the jury ultimately); and, HPS should produce the later version of ExchangeLink with the "time-bomb" removed.

- In 2014, before HPS severed all ties with EI in breach of the HealthPlan-EI Agreement, ExchangeLink and its benefits exchange environment worked (*e.g.,* EI and Rakesh Dixit successfully onboarded insurance carriers for HPS). However, *after* HPS terminated EI and Rakesh Dixit, HPS's insurance carriers (*e.g.,* Blue Shield California, CINGA, Florida Blue, *etc.*) reported errors or failures regarding ExchangeLink, and HPS's benefits exchange environment, which did not occur nor was reported to (or against) EI or Rakesh Dixit while they were at HPS in support of the insurance carriers; and, the types of malfunctions and failures reported should show, by a trained and capable software expert, that HPS mismanaged and negligently handled ExchangeLink – *e.g., HPS broke its Source Code between 2014 and 2015*. A comparison of the 2014 and 2018 versions of ExchangeLink should show that HPS is responsible and liable for destroying the 2014 version of ExchangeLink, the failures of which were identified by HPS's insurance carriers (*e.g.,* Blue Shield California, CINGA, Florida Blue, *etc.*). In addition, the later 2018 version of ExchangeLink (*likely rebuilt by WIPRO after HPS sold its broken technology to*

*the conglomerate based in India*) should show that the 2018 version of ExchangeLink is completely different from the 2014 version of ExchangeLink.

- HPS claims that all of the Defendants developed a software platform known as "FIT" and that FIT "was identical in every material way to the ExchangeLink® system" (*see, e.g.,* FAC, Doc. No. 37, ¶¶57-71). HPS claims that Kutsomarkos "had access to the HealthPlan Copyrights **and up-to-date HealthPlan Trade Secrets**," and "unbeknownst at the time to HealthPlan, Dixit and Kutsomarkos "rebranded" their illicit copy of the ExchangeLink® system as 'Fit.'" Obviously, a comparison of the 2014 and 2018 versions of ExchangeLink with or to FIT should show that FIT was a more capable and mature health benefits management software platform than any version that HPS can produce; in addition, FIT was not similar in build specifications and source code because, among other things to be testified to by Defendants' experts, the baseline software development stacks are completely different from ExchangeLink, which will be explained further and reported by the parties' experts.

- Finally, a comparison of the 2014 and 2018 versions of ExchangeLink with or to FIT should show that FIT was built using (*among other things*) Defendants' "**Pre-existing Property**," knowledge, and "**Residuals**."

Defendants assert that there are additional reasons for the production of the 2014 and 2018 versions of ExchangeLink, which are not apparent yet because HPS is, among other things, preventing, delaying, and obfuscating discovery in this case (*e.g., HPS failed to produce Rakesh Dixit's and EI's Consultants' 2013 and 2014 emails that substantiate the assertions above*). However, under Rule 26, relevancy is "construed broadly to encompass any matter that bears on, or that reasonably could lead to another matter that could bear on any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352, 98 S. Ct. 2380, 57 L. Ed. 2d 253

(1978).  Under this standard, this Honorable Court should issue an order compelling HPS to produce the 2018 version of its Software Code pursuant to the Order Regarding Inspection Of Computer Code (Doc. No. 106).

IV. **DEFENDANTS ARE ENTITLED TO THEIR REASONABLE FEES, COSTS, AND EXPENSES**

Here, HPS ordered this Motion to Compel to be filed because HPS demanded this "motion to be resolved […] **before any inspection takes place**" because it insists "**there to be one inspection of HPS code in the Florida actions**" (*see, e.g., Exhibit 1*, because an inspection was also ordered in the *Bojkovic* action).  Put aside the fact that HPS is being hypocritical by demanding the discovery in this action be consolidated with the *Bojkovic* action, Rule 37 expressly allows for motions to compel discovery and provides that "[f]or the purposes of this subdivision an evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose answer or respond." Fed. R. Civ. P. 37(a)(2)(B), 37(a)(3). In addition, the form of the instant Motion complies with United States District Court for the Middle District of Florida, Local Rules, Rule 3.04(a).  Federal Rule of Civil Procedure 26 provides, in pertinent part:

> (b) Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows: (1) In General. Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. [...] Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. […].

Fed. R. Civ. P. 26(b)(1).  In addition, the Rules provide:

> (d) Timing and Sequence of Discovery. … Unless the court upon motion, for the convenience of parties and witnesses and in the interests of justice, orders otherwise, methods of discovery may be used in any sequence, and the fact that a party is conducting discovery, whether by deposition or otherwise, does not operate to delay any other party's discovery.

Fed. R. Civ. P. 26(b)(1).

Defendants seek their reasonable fees, costs, and expenses in connection with this Motion, to the extent the Motion is granted. Federal Rule of Civil Procedure 37 provides that if a motion to compel discovery is granted, a court must "require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). Here, especially, fees are warranted because of Plaintiff's unjustified categorical refusal to follow the Rules of Federal Civil Procedure, the Local Rules, and the handbook on civil discovery practice in the United States District Court, Middle District of Florida.

## M.D. FLA. LOC. R. 3.01(G) CERTIFICATION

Pursuant to M.D. Fla. Loc. R. 3.01(g), undersigned counsel, Shyamie Dixit, certifies that he has corresponded and conferred with Plaintiff's counsel, William Frankel, Esq. (among several other attorneys for the Plaintiff), on multiple occasions, in a good faith effort to eliminate our dispute and/or the necessity of a motion to compel (*see, e.g.,* **Exhibit 1**). Plaintiff's counsel(s) advised that Plaintiff objects to the relief requested in this Motion and that it refuses to produce the 2018 version of ExchangeLink.

**WHEREFORE**, Defendants respectfully request this Honorable Court enter an order granting Defendants' Motion to Compel Plaintiff to produce the 2018 version of its Software Code pursuant to the Order Regarding Inspection Of Computer Code (Doc. No. 106).

Respectfully submitted,
***Dixit Law Firm***
*/s/ Shyamie Dixit*
Shyamie Dixit, Esq. (sdixit@dixitlaw.com)
Florida Bar No.: 719684
Robert L. Vessel, Esq. (rvessel@dixitlaw.com)
Florida Bar No.: 314536
3030 N. Rocky Point Drive West, Suite 260

Tampa, FL 33607
Tel: (813) 252-3999
Fax: (813) 252-3997
*Attorneys for Defendants Feron Kutsomarkos and E-Integrate, Inc.*

*And, with permission,*

**DUSTIN D. DEESE, P.A.**
Dustin D. Deese, Esq.
Florida Bar No. 634441
Primary: dustin@deeselegal.com
P.O. Box 1720
Dade City, FL 33526
Tel.: 813-517-9732
Fax: 813-574-2664
*Attorney for Rakesh Dixit, KnowMentum, Inc., Media Shark Productions, Inc., and E-Integrate, Inc.*

**JRH.LAW PLLC**
John R. Hightower, Jr., Esq.
Florida Bar No. 77478
Primary: jrh@jrh.law
Secondary: svc.flmd@jrh.law
5470 E. Busch Blvd. # 149
Temple Terrace, FL 33617-5417
Tel.: 813-252-1849
Fax: 813-354-3312
*Attorney for: Rakesh Dixit; KnowMentum, Inc.; Media Shark Productions, Inc.; and E-Integrate, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished electronically with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all of the parties and their counsel of record on this 4th day of September 2019.

*Dixit Law Firm*

*/s/ Shyamie Dixit*
Shyamie Dixit, Esq. (sdixit@dixitlaw.com)
Florida Bar No.: 719684