# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

HEALTHPLAN SERVICES, INC.,
    Plaintiff,

v.                                           CASE NO.: 8:18-cv-02608-SDM-AAS

RAKESH DIXIT, *et al.*,
    Defendants.
_____/

## HEALTHPLAN SERVICES, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL THE 2018 VERSION OF HEALTHPLAN SERVICES, INC.'S CODE

Plaintiff HealthPlan Services, Inc. ("HealthPlan") hereby submits its response in opposition to Defendants' motion (Dkt. 170, "Motion") to compel the inspection of the 2018 version of HealthPlan's source code for the ExchangeLink® software (the "2018 Code"), and states as follows:

**I.    INTRODUCTION**

Having been caught red-handed with illicit copies of HealthPlan's 2014 code,[1] Defendants are attempting to improperly shift the focus of the lawsuit to the 2018 Code. The request for HealthPlan's newest edition of source code, however, should be rejected for several reasons.

Firstly, Defendants' request is yet another discovery abuse meant to harm HealthPlan. Any information that Defendants could glean from an inspection of the 2018 Code would jeopardize the years of planning and hard work that went into the development of HealthPlan's

---

[1] As confirmed by a review of Defendants' recent document production to California Physicians' Service, Inc., d/b/a Blue Shield of California ("BSC"), Defendants are unlawfully in possession of significant portions of HealthPlan's 2014 code. *See* Dkt. 169, at 3. The August 5, 2019 production consists of emails from the HPS email account that Rakesh Dixit used while he was employed by HPS, with attached files containing HealthPlan's source code, that he retained in violation of this legal and contractual obligations. *Id.*

latest technological achievement. Based on Defendants' blatant disregard of this Court's Protective Order and the confidentiality status of HealthPlan's documents, an order granting the Motion would enable Defendants to access and carelessly, if not knowingly, divulge HealthPlan's newest trade secrets to non-parties. Thus, the Motion should be denied to prevent repeat abuses and irreparable harm.

Secondly, the pleadings do not support the requested review of the 2018 Code. Defendants contort the allegations set forth in HealthPlan's First Amended Complaint (Dkt. 37, "FAC") in an effort to improperly interject the 2018 Code into the scope of the claims and defenses of the parties. A careful reading of the incomplete and misstated allegations referenced in the Motion in fact demonstrates that HealthPlan's claims relate to Defendants' unlawful use of the source code that dates back to the 2014 period. Further, none of the allegations set forth in Defendants' defenses or counterclaims relate to HealthPlan's post-2014 source code. Accordingly, on the face of the pleadings, the 2018 Code is irrelevant to this action.

Finally, as a matter of law, the requested review of the 2018 Code cannot affect the liability or damages analyses in this action. While the Motion cites depositions and other issues from an unrelated State court action, this Court should remain focused on the present causes of actions. Because none of the claims and defenses require an inspection of the 2018 Code, Defendants would not be prejudiced by a denial of the Motion. In sum, the fishing expedition requested by Defendants does not outweigh the harm that would be caused by the disclosure of the 2018 Code to Defendants and, through them, to HealthPlan's competitors.

## II. LEGAL STANDARDS

### A. The Necessity to Protect Confidential Information And Trade Secrets

Pursuant to Rule 26(c)(1)(G), Federal Rules of Civil Procedure, the court may issue a protective order "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G); *see also Total Containment Sols., Inc. v. Glacier Energy Servs.*, No. 2:15-cv-63-FtM-38CM, 2015 U.S. Dist. LEXIS 146776, at *7 (M.D. Fla. Oct. 29, 2015) (herein, "*Total Contain.*") (finding that defendant failed to adequately address how the requested trade secret information is relevant). "Courts have acknowledged that disclosure of confidential information to a competitor is presumed to be harmful to the disclosing entity." *Total Contain.*, at *8, citing *Cytodyne Tech., Inc. v. Biogenic Tech., Inc.*, 216 F.R.D. 533, 535 (M.D. Fla. 2003) (citing *Am. Standard Inc. v. Pfizer, Inc.*, 828 F.2d 734, 741 (Fed. Cir. 1987)).

"Once a party establishes that the information sought is confidential and disclosure would be harmful, the burden shifts to the party seeking the disclosure to show that the information sought is relevant <u>and</u> necessary." *Id*. (emphasis added), citing *Gober v. City of Leesburg*, 197 F.R.D. 519, 521 (M.D. Fla. 2000); *see also Empire of Carolina, Inc. v. Mackle*, 108 F.R.D. 323, 326 (S.D. Fla. 1985) ("Once these requirements are met, the burden shifts to the [party seeking the information] to establish that discovery of trade secrets or confidential information is relevant and necessary to the action."). "It is within the discretion of the trial court to determine <u>whether the need outweighs the harm of disclosure</u>." *Total Contain.*, at *7-8 (emphasis added).

### B. A Trade Secret Privilege Exists Under Fla. Stat. § 90.506

"Production of the source code, without a showing and finding of reasonable necessity, would cause [] irreparable harm." *Rare Coin-It v. I.J.E., Inc.*, 625 So. 2d 1277, 1279 (Fla. 3rd DCA 1993). "This is true <u>even when the trial court orders production subject to a protective order</u>." *Id*. (emphasis added) (quashing the order that granted discovery because respondent failed to demonstrate a necessity for production of the trade secret, and the trial court's order failed to address whether disclosure was necessary). "When trade secret privilege is asserted as the basis for resisting production, the trial court must determine whether the requested production constitutes a trade secret; if so, the court must require the party seeking production to show reasonable necessity for the requested materials." *Id*. at 1278-79, citing *Gen. Hotel & Rest. Supply Corp. v. Skipper*, 514 So. 2d 1158 (Fla. 2d DCA 1987); *E. Cement Corp. v. Dep't of Envtl. Regulation*, 512 So. 2d 264 (Fla. 1st DCA 1987); *Goodyear Tire & Rubber Co. v. Cooey*, 359 So. 2d 1200 (Fla. 1st DCA 1978). "If the court grants disclosure, it must take adequate measures to protect the interests of the petitioner, the parties, and justice." *Gen. Hotel & Rest. Supply Corp.*, 514 So. 2d at 1159, citing § 90.506 of the Florida Statutes.

Fla. Stat. § 90.506 provides:

A person has a privilege to refuse to disclose, and to prevent other persons from disclosing, a trade secret owned by that person if the allowance of the privilege will not conceal fraud or otherwise work injustice. When the court directs disclosure, it shall take the protective measures that the interests of the holder of the privilege, the interests of the parties, and the furtherance of justice require. The privilege may be claimed by the person or the person's agent or employee.

4

## III. ARGUMENTS

The 2018 Code is a trade secret that is highly valued by HealthPlan. **Exhibit 1**, ¶ 5. Notably, the Motion does <u>not</u> assert that the 2018 Code comprises non-confidential information. Nor could it do so. To the contrary, HealthPlan takes great measures to protect the 2018 Code. *See* Exhibit 1, ¶ 6. As discussed below in detail, the Motion fails to establish that discovery of the 2018 Code is relevant and necessary to the action. Furthermore, the harm of the code's disclosure greatly outweighs the contrived "need" asserted in the Motion.

### A. It Is Indisputable That HealthPlan And Defendants Are Competitors

Defendants have conceded that they are HealthPlan's competitors. The Motion asserts that Defendants' "FIT [software platform] was a more capable and mature health benefits management software platform than any version that HPS can produce." Motion, at 10. Further, in their counterclaims, Defendants accuse HealthPlan of diverting business opportunities—while the reverse is actually true. *See* Dkt. 83, ¶ 76 at p. 30. Not only did Defendants use HealthPlan's 2014 code to create the infringing FIT software in order to compete with HealthPlan, but they unscrupulously disseminated copies of HealthPlan's 2014 code to other competitors of HealthPlan in violation of the Protective Order. *See* n.1, supra. Justice requires that HealthPlan's competitors be prevented from having any access to the 2018 Code. *See Total Contain.*, at *8 ("Courts have acknowledged that disclosure of confidential information to a competitor is presumed to be harmful to the disclosing entity.").

### B. Defendants Seek The 2018 Code For Improper And Unlawful Purposes

Defendants seek to attain a tactical advantage by conflating HealthPlan's development of the relevant 2014 code, which occurred while Defendants Rakesh Dixit ("Dixit") and

E-Integrate, Inc. ("E-Integrate") worked for HealthPlan, with HealthPlan's advancements that were achieved *after* HealthPlan severed ties with Dixit and E-Integrate in 2014. Importantly, Defendants improperly disseminated HealthPlan's 2014 code without any restriction based on the unfounded position that HealthPlan's source code is not confidential. *See* n.1, supra. To further harm HealthPlan, Defendants now seek to do the same with the 2018 Code and compromise the trade secret status of HealthPlan's latest technological achievements. *See* Exhibit 1, ¶ 7; *Rare Coin-It v. I.J.E., Inc.*, 625 So. 2d at 1279 ("Production of the source code, without a showing and finding of reasonable necessity, would cause [] irreparable harm."). Given Defendants' blatant disrespect for the Protective Order, the Court should deny Defendants' Motion to prevent such an injustice (*e.g.*, loss of trade secret protection due to the Defendants' use and disclosure to others of the 2018 Code).

  **C.** **The 2018 Code Is Not Necessary To This Action, And A Denial Of The Motion Would Not Prejudice Defendants**

As discussed in Section D, the pleadings do not include any allegations concerning the 2018 Code. Thus, the 2018 Code is not relevant to this action. More importantly, as addressed below, the claims and defenses do not necessitate an analysis of such code. Thus, the Motion should be denied. *See Total Contain.*, at *8, citing *Empire of Carolina, Inc.*, 108 F.R.D. at 326 (holding that the trade secrets or confidential information must be relevant <u>and</u> necessary to this action … as opposed to the unrelated State court action).

Defendants state that the parties' experts will need to compare the 2014 and 2018 versions of ExchangeLink in order to analyze the topics listed on pages 8-10 of the Motion. Defendants' arguments are misplaced because their enumerated topics are not tied to the 2018 Code:

- Defendants' first topic concerns the unrelated State court litigation, *Bojkovic v. Dixit*, 2016-CA-001246 (Fla. 6th DCA 2016) (the "*Bojkovic* Action"). Defendants state that HealthPlan's "security monitoring and tracking capabilities will show *when* the alleged version of the ExchangeLink Source Code was 'copied' or 'downloaded' as a part of Defendants' 'heist'" that resulted in the infringing FIT software presented to Dr. Bojkovic. Motion, at 8-9 (emphasis added). First, an assessment of HealthPlan's security capabilities do not require a review of the 2018 Code. Second, the "heist" occurred in 2014. Clearly, the *Bojkovic* Action—which commenced in 2016—did not concern the 2018 Code. Defendants even acknowledged this timing of the heist. *See* Dkt. 61, ¶¶ 10-12 (stating that the accused FIT software was transferred to Dr. Bojkovic on January 20, 2016); *see also* **Exhibit 2**, at 14 (same). This corresponds to the time-period relevant to HealthPlan's claims. *See* FAC, ¶ 56 ("In early 2014, . . . HealthPlan severed all ties with E-Integrate, and terminated Dixit's employment"); ¶ 58 ("Within months of his termination, Dixit carried out a scheme to use the HealthPlan IP to deceive others . . . into investing in the development of Focus IT, LLC . . . [a]s detailed at length in the pending [*Bojkovic* Action]."); ¶¶ 65-66 (Defendants "derived Fit system presentations ('Infringing Works')" and "displayed the Infringing Works to Dr. Michael Bojkovic"); ¶ 101 ("displaying of the Infringing Works to at least Dr. Michael Bojkovic, beginning in or around late 2014"). Any analysis of the 2016 heist cannot necessitate a review of the 2018 Code.

- Whether or not a *later* version of the source code has the time bomb removed is of no moment to the allegation that Dixit maliciously embedded such a threat in an *earlier* version.

The Motion fails to connect the time-bomb allegation to the 2018 Code to show that discovery of the requested trade secrets is necessary in this action.

- Similarly, whether a *later* version of the source code is "completely different" or worked differently than an *earlier* version is <u>not</u> relevant to HealthPlan's claims (or Defendants' counterclaim) for breach of the contract that was set to *terminate in 2014* (Dkt. 83, ¶ 49 at p. 25 (stating in their counterclaims that "The HPS-EI Agreement was supposed to '**continue in effect through December 31, 2014'** (*i.e.*, the '**Term**')") (no emphasis added)), much less the counterclaim concerning an alleged collusion between Ultramatics, Inc. and HealthPlan *in 2014*. *See* Dkt. 83, ¶ 82 at p. 30; *see also* ¶ 35 at p. 22 (noting in their counterclaims that "The final step of Ultramatics's [*sic*] and HPS's scheme was the filing of a lawsuit on October 30, 2013"). Clearly, the lawsuit concerning Ultramatics—which commenced in 2013—did not concern the 2018 Code. The Motion fails to show that the discovery of the performance of any versions source code is necessary to the action.

- The accused FIT software must be compared with the misappropriated version of the source code. Defendants stated that the accused FIT software was transferred on January 20, 2016 … well before 2018. *See* Dkt. 61, ¶¶ 10-12; Exhibit 2, at 14. Thus, the comparison between the asserted software and the accused software cannot necessitate a review of the 2018 Code. Indeed, Defendants have argued that the FIT software does not even exist anymore — so no such comparison is even possible! *Id.*

- While Defendants claim that the accused FIT software was not similar in build specifications and code, Defendants contradict themselves by arguing that "FIT was built using (*among other things*) Defendants' '**Pre-existing Property**,' knowledge, and '**Residuals**.'"

8

Motion, at 10 (no emphasis added). First, the pre-existing property includes source code that was "used to perform the Service under [the HealthPlan-EI Agreement] and incorporated into the Exchange Code" with HealthPlan's consent. Dkt. 37-1, at 11 (emphasis added). The term "Pre-existing Property" is limited to materials developed before November 14, 2011 that were used in connection with the ExchangeLink® software *and* listed in exhibit F of HealthPlan's 2014 agreement with E-Integrate. Second, the term "'Residuals' means know-how and skills developed by Consultant's employees during the course of performance of the Services." *Id*., at 12 (emphasis added). Thus, Defendants' argument that the accused FIT software was not similar to the asserted 2014 code of the ExchangeLink® software is disingenuous. Further, the 2014 agreement—which was set to terminate in 2014 (Dkt. 83, ¶ 49 at p. 25)—did not concern the 2018 Code. Moreover, a comparison of the 2018 Code with the accused FIT software would have no effect on the comparison of the 2014 code with the accused FIT software.

### D. Contrary To The Misleading Statements Advanced In The Motion, The 2018 Code Is Not Relevant To This Action

Not only does the Motion fail to show that the 2018 Code is not necessary in this action, but the Motion misrepresents the alleged relevancy of the 2018 Code in this action by misstating the time-periods set forth in the pleadings. The date range for the versions of source code at issue in this action is well pled by the FAC.

"Between 2011 and 2014, HealthPlan developed ExchangeLink®, a powerful healthcare-related software system." FAC, ¶ 1. Defendants "E-Integrate and Dixit were among the contractors hired by HealthPlan in the development of the ExchangeLink® system." *Id*., ¶ 18. "As a result of their software code development work at HealthPlan, E-Integrate and

Dixit gained complete access to every aspect of the ExchangeLink® system." *Id.*, ¶ 19. Defendants Dixit, E-Integrate, Knowmentum, Inc., and Media Shark Productions, Inc. (collectively, "Dixit Defendants") "[a]dmitted that HealthPlan terminated Dixit's employment and ceased conducting business with E-Integrate." Dkt. 80, at 14.

There is no dispute that that HealthPlan severed ties with E-Integrate in 2014. *See* Dkt. 83, ¶ 55 at p. 25; Dkt. 98, ¶ 55 at p. 6. Accordingly, the source code asserted in this action concerns versions developed from 2011 thru 2014, while E-Integrate and Dixit worked for HealthPlan. Indeed, the FAC defines the term "Source Code" as the coding components of HealthPlan's ExchangeLink® system that Dixit worked on as HealthPlan's employee in 2013. *See* FAC, ¶¶ 39, 16.

### i. Defendants Mischaracterize The FAC's Allegations

Defendants' Motion misleads the Court by improperly parsing and misstating allegations to obscure their unambiguous meaning. For example, the Motion replaces the pronoun "their" (as used in the FAC to reference E-Integrate and Dixit) with the pronoun "its" (incorrectly used in the Motion to reference HealthPlan) to improperly broaden the scope of the allegation concerning "[E-Integrate's and Dixit's] software code development *work at HealthPlan* [until their termination]" to include all of HealthPlan's software code development—even beyond 2014. *Compare* FAC, ¶ 19 (emphasis added) *with* Motion, at 2.

The Motion's introduction includes citations to paragraph numbers from the FAC, which do not support Defendants' broadened interpretation of HealthPlan's allegations and Defendants' contrived "need" for HealthPlan's 2018 Code:

- FAC, ¶ 28(i) concerns HealthPlan's *ownership* of "extensive trade secrets relating to at least . . . ExchangeLink® coding." While HealthPlan owns all versions of its source code, this paragraph does not concern an allegation of *misappropriation* of the 2018 Code.

- FAC, ¶ 33(e-g) concerns copyright registration for works that do *not* contain source code. The copyrighted "scripts" are not computer scripts, but include material used during *marketing presentations*. *See* FAC, ¶¶ 62-63, 67. For example, the ServiceLink Portal Script sets forth the voiceover used in the copyrighted videos.

- FAC, ¶ 58 concerns Dixit's scheme to use the HealthPlan IP to deceive others, which was carried out "[w]ithin months of his termination" … not in 2018.

- FAC, ¶ 61 concerns Dixit' and Kutsomarkos' rebranding of "their illicit copy of the ExchangeLink® system as 'Fit'" which was used by Defendants to "deceive[] others into investing in the development of Focus IT, LLC . . . [a]s detailed at length in the pending [*Bojkovic* Action]." *See* FAC, ¶ 58. Clearly, the *Bojkovic* Action—which commenced in 2016—did not concern the 2018 Code. *See* Dkt. 61, ¶¶ 10-12 (stating that the accused FIT software was transferred to Dr. Bojkovic on January 20, 2016); Exhibit 2, at 14 (same).

- FAC, ¶ 73 concerns HealthPlan's *ownership* and *possession* of trade secrets, including the Source Code and confidential business information. Again, while HealthPlan owns and possesses all versions of its source code, this paragraph does not concern an allegation of *misappropriation* of the 2018 Code.

- FAC, ¶ 99 concerns HealthPlan's *ownership* and *authorship* of the Source Code as well as the HealthPlan Copyrighted Materials, which do not include source code. This paragraph also does not assert *misappropriation* of the 2018 Code.

Likewise, Defendants misplace their reliance on the paragraphs of the FAC referenced in the bullet points set forth by Defendants on pages 4-6 of the Motion:

- FAC, ¶ 1 concerns HealthPlan's development of the ExchangeLink® system "[b]etween 2011 and 2014" … not in 2018.

- FAC, ¶ 18 concerns HealthPlan's hiring of E-Integrate and Dixit to contribute to the development of the ExchangeLink® system software code, which took place until their termination in 2014.

- FAC, ¶ 20 concerns HealthPlan's investment in commercializing, marketing and promoting the ExchangeLink® system, including scripts, videos and presentations. This paragraph concerns *marketing* efforts, as opposed to the development or use of any code.

- FAC, ¶ 34 concerns HealthPlan's engagement of Ultramatics, Inc. "[i]n late 2011" … not 2018.

- FAC, ¶¶ 37-38 concern HealthPlan's hiring of Dixit "[i]n late 2013" and his tasks prior to his termination in 2014.

- FAC, ¶¶ 21-24 concern HealthPlan's hiring of Media Shark for "the development of extensive media and marketing materials" as opposed to the development or use of any code. Further, Media Shark's was involved in the unlawful "repackaging of ExchangeLink® as 'Fit,'" which occurred well before 2018. FAC, ¶ 62; *see also* FAC, ¶ 58 and Dkt. 61, ¶ 10.

- As noted above, FAC, ¶ 73 concerns HealthPlan's *ownership* and *possession* of the Source Code. Again, while HealthPlan owns and possesses all versions of its source code, this paragraph does not concern an allegation of *misappropriation* of the 2018 Code.

- FAC, ¶ 81 concerns Defendants' continuing misappropriation of HealthPlan's trade

secret information, which relates to the defined term "Source Code" that includes the coding components of HealthPlan's ExchangeLink® system that Dixit work on in 2013.  *See* FAC, ¶¶ 34, 39, 16.  Moreover, the Motion merely states that "[i]n 2018, HealthPlan claims" the misappropriation continues to benefit Defendants and harm HealthPlan unless Defendants are enjoined.  *See* Motion, at 5.  The misappropriation of HealthPlan's trade secret information dating back from 2014 is an ongoing concern.  Defendants' use of illicit copies of HealthPlan's 2014 code has caused harm to HealthPlan from 2014 to the present … not just in 2018.

- FAC, ¶ 82 similarly concerns HealthPlan's ongoing harm caused by Defendants' continuing unlawful conduct, which dates back to 2014.  Again, the Motion merely states that, "[i]n 2018, HealthPlan seeks" injunctive relief from this ongoing harm.

- FAC, ¶ 89 concerns the harm caused by the delivery of work products by Knowmentum, which delivered the FIT demonstration package that was derived from HealthPlan's copyrighted scripts and videos.  *See* FAC, ¶ 62.  That presentation took place no later than 2016 … well before 2018.  *See* Dkt. 61, ¶¶ 10-12 (stating that Knowmentum transferred the accused FIT software to Dr. Bojkovic on January 20, 2016); *see also* Exhibit 2, at 3-4 (verifying that Knowmentum's single client was Dr. Bojkovic of Perfect Clarify, LLC, which was serviced during the 2015-2016 time frame), 10-11 (same) and 14 (verifying that the accused FIT software was provided to Dr. Bojkovic on January 20, 2016).  Once again, the Motion merely states that, "[i]n 2018, HealthPlan claims" it was further harmed.

- FAC, ¶ 112 concerns the continuing infringement of the HealthPlan Copyrights, HealthPlan's ongoing harm, and its entitlement to injunctive relief.  HealthPlan's ongoing

harm is caused by Defendants' continuing unlawful conduct, which dates back to 2014, and the Motion merely states that, "[i]n 2018, HealthPlan claims" the same.

### ii. Defendants Distort The Allegations Of Their Own Counterclaims

Like the FAC, the counterclaim allegations do not concern the 2018 Code. Defendants assert that E-Integrate's counterclaim "spans more than eight years (2011 to 2019)," but there is no reference to the 2015-2019 years. Motion, at 6. The Motion accuses HealthPlan of waiting "*more than four (4) years*" to file suit, which includes a counterclaim for breach of the same contract that E-Integrate similarly waited over four years to assert. Motion, at 7 (no emphasis added). Defendants clearly understand that both the FAC and the counterclaims relate to events that occurred back in 2014. Defendants acknowledge that the term of the HealthPlan-EI Agreement was set to terminate on December 31, 2014. *Id*., at 6; *see also* Dkt. 37-1 at 6 ("This Agreement shall . . . continue in effect through December 31, 2014, unless it is terminated earlier as provided herein"). "In early 2014, HealthPlan severed all ties with EI in breach of the HealthPlan-EI Agreement." Motion, at 6. Defendants have not, and cannot, tie their counterclaims to the 2018 Code. Therefore, the Court should deny the Motion.

### E. Defendants Mischaracterize Case Law To Support Their False Narrative

"Defendants assert that there are additional reasons for the production of the 2014 and 2018 versions of ExchangeLink, which are not apparent yet,"[2] and that Rule 26 should be "construed broadly to encompass any matter that bears on, or that reasonably could lead to another matter that could bear on any issue that is or may be in the case." Motion, at 10 (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 (1978)). "This standard was enunciated

---

[2] As such, Defendants candidly request an improper fishing expedition.

in [*Oppenheimer Fund*] as part of the Supreme Court's interpretation of a previous version of Federal Rule of Civil Procedure 26(b)(1), which defined the scope of discovery as any matter that is "relevant to the subject matter involved in the pending action." *Moore v. Superway Logistics, Inc.*, No. 1:17-cv-01480-DAD-BAM, 2019 U.S. Dist. LEXIS 90111, at *21-22 (E.D. Cal. May 28, 2019). "However, the 'subject matter' standard was removed by the 2000 amendments to the Rule and replaced by the current standard of relevance to the parties' claims and defenses." *Id*. at *22, citing Fed. R. Civ. P. 26 Advis. Comm. Notes to 2000 Amendment, and *San Diego Unified Port Dist. v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, 2017 U.S. Dist. LEXIS 143389, 2017 WL 3877731, at *1 (S.D. Cal. Sept. 5, 2017) ("[T]he *Oppenheimer Fund* definition, like the version of Rule 26(b)(1) that preceded the 2015 amendments, is now relegated only to historical significance."). "Notwithstanding these amendments, the *Oppenheimer Fund* standard only encompasses matters that 'bear on' or 'could bear on' a party's 'claim or defense.'" *Id* ; *see also Sentry Select Ins. Co. v. Seatruck, Inc.*, No. 09-23566-civ-Altonaga-Brown, 2010 U.S. Dist. LEXIS 151244, at *4 (S.D. Fla. June 15, 2010) ("Not surprisingly, claimant cites for support a Supreme Court case issued prior to the 2000 change in the scope of discovery."). Thus, the Motion's description of the *Oppenheimer Fund* case is misleading, in view of the 2000 amendment to Rule 26.

### F. Defendants Are Improperly Seeking Discovery In This Action For Information Purportedly Relevant In An Unrelated State Court Action

The Rule 26 amendment, however, did not affect a distinct holding of *Oppenheimer Fund*: "when the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery properly is denied." *Oppenheimer Funds*, 437 U.S. at 352 n.17. The Motion suggests that the requested expert review of the 2018 Code would be

used to resolve issues in the pending *Bojkovic* Action. *See* Motion, at 8-9. In fact, upon filing their Motion, Defendants' counsel immediately forwarded a copy of the Motion to plaintiff's counsel in the *Bojkovic* Action—to ask whether "anything else from the federal action" is needed in the *Bojkovic* Action. *See* **Exhibit 3** (plaintiff's counsel responded and asked "Why do [Defendants] need the '18 code?"). Given Defendants' improper motivation to seek the 2018 Code for use in another case, the Motion should be denied.

## IV. CONCLUSION

The 2018 Code is a highly protected trade secret that is not relevant and necessary to this action because the pleadings do not include any allegations concerning the 2018 Code, and the claims and defenses do not depend on any analysis of such code. Accordingly, the harm of the code's disclosure greatly outweighs the contrived "need" asserted in the Motion, and HealthPlan requests an order denying Defendants' request for an expert review of the 2018 Code.

Dated: September 18, 2019

Respectfully Submitted,

*/s/ Stephen J. Leahu*
Alejandro J. Fernandez (FBN: 32221)
Board Certified in Intellectual Property Law
Stephen J. Leahu (FBN: 0054037)
Board Certified in Intellectual Property Law
**BRINKS GILSON & LIONE**
SunTrust Financial Centre, Suite 3500
401 E. Jackson Street
Tampa, FL 33602
afernandez@brinksgilson.com
sleahu@brinksgilson.com
Telephone: (813) 275-5020
Facsimile: (813) 275-5021

16

Andrew J. Avsec
(IL ARDC No. 6292313)
*Admitted Pro Hac Vice*
William H. Frankel
(IL ARDC No. 3127933)
*Admitted Pro Hac Vice*
**BRINKS GILSON & LIONE**
NBC Tower, Suite 3600
455 N. Cityfront Plaza Drive
Chicago, Illinois 60611
aavsec@brinksgilson.com
wfrankel@brinksgilson.com
Telephone: (312) 321-4200
Facsimile: (312) 321-4299

Evi T. Christou (D.C. Bar No.1600066)
*Admitted Pro Hac Vice*
echristou@brinksgilson.com
**BRINKS GILSON & LIONE, P.C.**
1775 Pennsylvania Avenue, NW
Suite 900
Washington, DC 20006
Telephone No. (202) 296-6923
Facsimile No. (202) 296-8701

*Attorneys for Plaintiff*
*HealthPlan Services, Inc.*

## **CERTIFICATE OF SERVICE**

I HEREBY certify that on September 18, 2019, I electronically filed the foregoing document with the Clerk of the Court CM/ECF, which will send notification of this filing to all counsel of record in this action.

*/s/ Stephen J. Leahu*
