HEALTHPLAN SERVICES, INC.,
     Plaintiff,

v.                          CASE NO.: 8:18-cv-02608-SDM-AAS

RAKESH DIXIT, *et al*.,
     Defendants.

_____/

## PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

Plaintiff, HealthPlan Services, Inc. ("HPS" or "Plaintiff"), hereby moves this Court for entry of an order of default judgment against the Defendants in the instant proceedings. Month after month, hearing after hearing, Defendants falsely promised, gamed, abused, deceived, and unjustifiably refused to abide by the Federal Rules, Local Rules, numerous Court orders, and admonishments from this Court. This unchecked misconduct has caused irreparable harm to HPS insofar as it has completely prevented it from advancing its meritorious claims and defenses in this case, while grossly multiplying litigation expenses.

At this time, Defendants are in violation of at least a *dozen* court orders. Moreover, as explained below, a forensics investigation of computer hard drives has uncovered evidence that Defendants have misled this Court during testimony under oath and committed spoliation.[1] This Court should no longer tolerate Defendants' willful disregard of its orders and bad faith, and should enter default judgment in the instant proceedings. This severe sanction is appropriate given that lesser sanctions, including repeated unpaid monetary sanctions, have failed to make the Defendants comply with this Court's Orders.

---

[1] In support of this motion, HPS submits the Declaration of Russel Brown ("Brown Decl.") and Supplemental Declaration of Russel Brown ("Brown Supp. Decl.") as Exhibits A and B, respectively. Mr. Brown is a Forensic Senior Consultant at Epiq. His CV is attached to the Brown Decl.

## I.    BACKGROUND

### A.  DEFENDANTS' ONGOING VIOLATIONS OF COURT ORDERS

As this Court is well aware, since the outset of the case, Defendants have deployed an array of strategies to delay the case, hide the ball in discovery, shirk their own discovery obligations, ignore numerous court orders, and multiply the expense of litigation for HealthPlan. The sanctions already imposed have failed to deter this conduct.

The litany of abuses cannot be recited within the present space limitations, but are detailed in at least the following documents:  Dkt. 68 and 81 (*Healthplan's Motions To Compel Amended Initial Disclosures*); Dkt. 168 (*Plaintiff's First Motion for Sanctions*); Dkt. 190 (*Plaintiff's Second Motion for Sanctions*); Dkt. 226 (*Plaintiff's Third Motion for Sanctions*); Dkt. 244 (*Plaintiff's Opposition to Emergency Motion for Withdrawal*); Dkt. 248 (*Plaintiff's Expedited Opposed Amended Motion To Compel Compliance With Order 233*).

As summarized below, Defendants[2] remain in noncompliance and disregard of at least a dozen Court Orders (without double or triple counting the orders that the Court has issued multiple times on the same issues):

- Dixit Defendants failed to pay HPS Attorneys' fees in the amount of $36,490.00. – Order, Dkt. 234.
- Dixit Defendants failed to pay sanctions in the amount of $5,800.00. – Order, Dkt. 252.
- Dixit Defendants failed to work with the permanent lead counsel that they designated after using attorney substitution as a litigation strategy. – Order, Dkt. 141 and 257.
- Dixit Defendants failed to amend their initial disclosures. – Order, Dkt. 93, 141 and 200.
- Dixit Defendants failed to supplement interrogatories answers. – Order, Dkt. 141 and 200.
- Dixit Defendants falsified amended responses to discovery. – Order, Dkt. 141 and 200.
- Dixit Defendants failed to supplement production. – Order, Dkt. 141 and 200.
- Dixit Defendants failed to produce a privilege log. – Order, Dkt. 200.
- Dixit Defendants failed to meet and confer on paying HPS's reasonable expenses in chasing down the laptop. – Order, Dkt. 233.

---

[2] Defendant Kutsomarkos is not in violation of many of these orders, as the majority are directed towards the Dixit Defendants.  However, Defendant Kutsomarkos has benefited from, and been complicit in, the litigation misconduct, including the spoliation of the Laptop as detailed below.

- Defendants accessed the Kutsomarkos Laptop in violation of the Court's Order. – Order, Dkt. 200.
- Defendants failed to produce the original backup hard drive, but rather created a new backup hard drive. – Order, Dkt. 200.
- Corporate Dixit Defendants failed to hire substitute counsel. – Order, Dkt. 258.
- Defendants failed to comply with "**all**" discovery orders (Docs. 93, 141, 200, 234, 252)" by the February 21, 2020 deadline. – Order Dkt. 258.

The Court set a deadline of February 21, 2020, 5:00 PM, requiring that "the Dixit defendants must comply with **all** discovery orders (Docs. 93, 141, 200, 234, 252)." Order, Dkt. 258 (emphasis in original). The Court issued another Order on the same day, characterizing this deadline as "**one final opportunity** to comply with numerous discovery orders prior to fashioning appropriate sanctions, including possibly recommending case-dispositive sanctions." Dkt. 257, (emphasis added). That deadline has come and gone. Defendants have failed to meet their obligations and have blown their "one final opportunity."

## B. DEFENDANTS RENDER LAPTOP INACCESSIBLE AND EFFECTIVELY DESTROY KEY EVIDENCE

The Court is no doubt familiar with the history relating to the Kutsomarkos Laptop. On September 11, 2019, during the course of records custodian depositions, HPS learned that Ms. Kutsomarkos used a Macbook laptop in connection with her work for Defendant Media Shark and for her work for HPS. Ex. C (Kutosmarkos Sept. 11, 2019 Dep. Tr.), 20:13-21:23, 62:5-18. After Ms. Kutsomarkos self-collected and produced a set of documents in this case, Ms. Kutsomarkos gave the laptop to Defendant Rak Dixit in July or August of 2019. *Id*. at 15:16-16:13, 92:13-97:3. She understood that her laptop, which contained her production, HPS files, emails, and Media Shark files, would then be "wiped" or "reset" by Rak Dixit. *Id*. at 16:9-17:12. Mr. Rakesh Dixit testified later that same day that " I understand from [the Kutosmarkos] testimony earlier today that there may be a gold mine on there, so I'm going to go look for myself." Ex. D (Rakesh Dixit Sept. 11, 2019 Media Shark Dep. Tr.), 36:19-22. HPS' counsel

contacted all of Defendants' counsel and indicated that Defendants had apparently failed to preserve documents, and specifically warned them that "it should go without saying that your clients and you must not tamper with either the Kutsomarkos or Knowmentum laptops or hardware in any way so as to preserve them in their current conditions." *See* Ex. E (Email from Fernandez to S. Dixit and Deese, Sept. 17, 2019). Defendants, as detailed below, created partial backups and bricked the Laptop in the hopes of covering their tracks.

1.      **Current State of the Kutsomarkos Laptop**

As the Court will recall, after four Orders (Dkt. 195, 200, 233, 238), the Kutsomarkos Laptop (Ser. No. C02QN1G9G8WM – herein the "Laptop") was finally provided to HPS for forensic inspection on December 23, 2019. However, HPS' forensics expert found that the laptop had been "bricked." Specifically, the "Laptop is encrypted with an encryption software known as Apple FileVault 2. FileVault 2 requires either a username and password, or a decryption key ("Credentials") to decrypt the contents of the Laptop." *See* Ex. A (Brown Decl.), ¶¶ 10-11. Dixit's – literally unbelievable – story is that after the October 16, 2019 hearing, he auto-generated a new password, wrote it down on a single Post-It note, and gave it to his counsel, Johnny Hightower, without keeping a copy of this critical information. Hearing Tr., Jan. 24, 2020, at 19:5-22:5. Dixit's counsel, both Hightower and Deese, refuted Mr. Dixit and informed HPS counsel and this Court that Dixit provided no such note. *Id*. at 7:8-9:9, 10:25-13:2.

Without Credentials, the Laptop contents are inaccessible. Ex. A (Brown Decl.), ¶ 13. Critically, this includes any underlying data files, such as .fseventsd, which would track user activity such as the deletion of documents from the Laptop. *Id*. at ¶¶ 24-25. Since Dixit changed the access Credentials for the Laptop immediately before producing it, and cannot locate the Laptop Credentials, **HPS and this Court will never be able to determine conclusively what**

**files were deleted or moved from the Laptop**.  See *Id*. at ¶¶ 13-14.  For all practical intents and purposes, Defendants destroyed this evidence.

### 2.  Dixit's Partial Backups Evidence Defendants' Spoliation

To date, Mr. Dixit has produced two external hard drives:  (1) The "October Backup" – an external hard drive, Ser. No. WXC1A69556K5, which was created on October 19, 2019 with a backup of certain files from the Laptop, and was produced to HPS by Mr. Deese on December 23, 2019; and (2) The "September Backup" –an external hard drive, Ser. No. NAB1816C, which was created on September 19, 2019 with a backup of certain files from the Laptop, and was produced to HPS by Mr. Dixit on January 28, 2020.  The forensic review was conducted by Russel Brown, a Senior Forensic Consultant with 15 years of forensic experience.  See Ex. A, ¶ 3.  As explained below, the "October Backup" and "September Backup" are both partial backups of the Laptop; their differences strongly indicate that spoliation has occurred.  HPS provided the Laptop and Backup drives to Epiq for forensic inspection.

### a.  Dixit Falsely Represents the Nature and Content of the October Backup to the Court.

The Court initially addressed the Laptop during the October 16, 2019 Hearing.  The Court had required Mr. Dixit to appear in the face of ongoing discovery abuses.  Mr. Dixit reassured the Court not to worry about his access to the Laptop, because he had backed up the Laptop.

> THE COURT: Where is all of the information backed up?
>
> MR. RAKESH DIXIT: Probably at my house.
>
> THE COURT: But on what? On a hard drive?
>
> MR. RAKESH DIXIT: Hard drive, yeah. Yeah, I'm sorry. Yeah, it's on a device.
>
> THE COURT: It's on a different device. So you copied the hard drive of the laptop onto this other hard drive is what you're saying.
>
> MR. RAKESH DIXIT: That's what I did.

THE COURT: Okay.

MR. RAKESH DIXIT: That's what it is.

THE COURT: So the hard drive, let's – and otherwise, the laptop, did you clean the -- did you clean the laptop otherwise of everything that --

MR. RAKESH DIXIT: I had to actually put in a new hard drive.

Hearing Tr., Oct. 16, 2019, 86:1-21.  Those statements – made under oath – were false.

There is no dispute that Rak Dixit received the Kutsomarkos Laptop in July or August of 2019, after Kutsomarkos produced PDFs from the Kutsomarkos Laptop. *See* Ex. C (Kutsomarkos Dep. Tr.), 96:20-97:3, and Hearing Tr., Oct. 16, 2019, at 83:13-84:12.  Following the custodian deposition and at the October 16 Hearing, HPS requested, and the Court ordered, that Dixit produce the original hard drive (which Mr. Dixit initially testified that he removed from the Laptop, but he subsequently changed his story) and the backup.  Hearing Tr., Oct. 16, 2019, at 90:1-91:1; *compare* Hearing Tr., Jan. 24, 2020, at 17:6-18:11.  The purpose of the exercise was to compare the purported backup that Dixit had created before removing the original hard drive.  Hearing Tr., Oct. 16, 2019, at 90:1-91:1.  Following the October 16 hearing, the Court issued an order on October 18, 2019, based on Dixit's false testimony, which stated in pertinent part:

a. Based on the testimony, Mr. Dixit retained the laptop but backed up the hard drive to an external hard drive because of the age of the original hard drive. Mr. Dixit then replaced the original hard drive in the computer with a new hard drive, and Mr. Dixit continues to use the computer.

b. Mr. Dixit must turn over the external hard drive containing the backup of the original hard drive to his counsel, Dustin Deese or John Hightower, by **noon on Saturday October 19th.**

c. Mr. Dixit must use his best efforts to locate the original hard drive and turn it into his counsel no later than **noon on Saturday October 19th.** Mr. Dixit must document his efforts and provide that documentation, through his counsel, to Mr. Fernandez.

d. Mr. Dixit must not access any data on the external hard drive or the original hard drive.

6

Dkt. 200 (emphasis in original). As Mr. Dixit would later admit, this is not what happened. Mr. Dixit eventually provided the Laptop (Ser. No. C02QN1G9G8WM) and an external hard drive (Ser. No. WXC1A69556K5) on December 23, 2019. HPS sent the Laptop, which apparently still contained the original hard drive, and the external drive to its forensic expert, Epiq.

As detailed in Dkt. 248, Epiq reported that Mr. Dixit rendered the Laptop inaccessible by encrypting it and password protecting it with Credentials. Defendants have not provided the Credentials to HPS and claim they no longer exist. *See* Hearing Tr., Jan. 24, 2020, 20:21-22:24, 27:22-28:2; *accord* 7:8-9:9, 12:9-13:2. Without the Credentials, Epiq can glean only limited information from the Laptop. For example, the Laptop had been powered up on October 18, 2019, at 8:33 PM. *See* Ex. A (Brown Decl.), ¶¶ 14-19. Incredibly, the October 18 access was *after* the October 16 Hearing and the October 18 Order, in which the Court instructed Mr. Dixit *not to* "*access any data on the external hard drive or the original hard drive.*" Dkt. 200.

The October Backup included Apple Time Machine backups that were created on *October 19, 2019* (Ex. A (Brown Decl.), ¶ 20), again, **AFTER** the Court's order to produce the *original* hard drive and the backup that he claimed he had created during the October 16 hearing. Dkt. 200. In short, Dixit violated the Order (Dkt. 200) in a number of ways, including: (1) Mr. Dixit accessed the data on the original hard drive of the laptop to add a password, which in blatant violation, directly caused the data on the Laptop to be rendered inaccessible; and (2) Mr. Dixit did not produce the backup about which he originally testified, but rather produced a *different*, new backup, created *after* the October hearing. As described below, the October Backup was carefully curated to exclude materials relevant to this proceeding.

        **b.**      **Dixit Falsely Represents the Nature and Content of the September Backup to the Court**

On January 24, 2020, the Court held another hearing, at which Mr. Dixit changed his story. He no longer claimed that he removed the original hard drive from the laptop. *See* Hearing Tr., January 24, 2020, at 17:6-18:11. However, rather than come clean to the facts from the outset, namely, that he had created a new carefully curated backup after the Court's October 18 order (Dkt. 200; *see* Ex. B (Brown Supp. Decl.), ¶¶ 11-12), he continued to misrepresent under oath that what he had provided to HPS was created *prior to* the October hearing:

> THE COURT: So the first time -- so did you ever take the hard drive out of the laptop? That was my understanding of your prior testimony, was you had removed the original hard drive from the laptop.
>
> **RAKESH DIXIT: I created an image of the hard drive as it was then. That's the drive I was referring to when I said I made changes to the drive so that I could upgrade it and update it to do the native file extraction.**
>
> **THE COURT: So then was the backup hard drive -- are you saying that that is the image of what the hard drive was when you first received it?**
>
> **RAKESH DIXIT: That is correct.**
>
> **THE COURT: Did you password protect the backup hard drive?**
>
> **RAKESH DIXIT: I did.**
>
> **THE COURT: When?**
>
> **RAKESH DIXIT: When I was making arrangements to drop it off with Mr. Hightower.**
>
> THE COURT: Why?
>
> RAKESH DIXIT: Why what?
>
> THE COURT: Why did you -- why did you password protect it?
>
> RAKESH DIXIT: Well, I'm not sure what normal other people's practice is, but mine is if I have any data on a computer or a drive, I always secure it with a password.[3]
>
> THE COURT: Do you remember me telling you at the time of the last hearing to keep it pristine?
>
> RAKESH DIXIT: I don't understand what you mean by "pristine" by putting a password to it.

---

[3] This piece of Dixit's testimony is also a fabrication. Neither of the external drives provided to HPS was password protected. Ex. B (Brown Supp. Decl.), ¶ 16. Only the laptop is password protected and rendered permanently inaccessible. Ex. A (Brown Decl.), ¶ 13.

Hearing Tr., Jan. 24, 2020, at 18:4-19:8.  Again, that would be proven false later in the hearing.

Only after being confronted with the forensic expert's declaration (Ex. A) did Mr. Dixit disclose

to the Court that he had made the backup of the hard drive that he gave to Mr. Hightower *after*

the October 16 hearing.  Caught red-handed, Mr. Dixit pivoted.  He stated that his intent in

creating a <u>new</u> backup, while passing it off as the original backup, was not to cover the tracks of

spoliation, but rather a noble effort to preserve the facts:

> THE COURT: So what about these backups that you're saying you may have now, when were they made?
>
> RAKESH DIXIT: Any time between when I created the -- or updated the disk to do the native file production to the time I delivered the laptop. It's not exactly a fast process, so whenever time was available.
>
> THE COURT: Why were you making the backups?
>
> RAKESH DIXIT: Why?
>
> THE COURT: Why do you have these multiple backups?
>
> RAKESH DIXIT: Well, the first time I actually looked at everything that was on the computer was when I was doing the native file production, and I found a ton of information on there highlighting fraud from HPS that I wanted to make sure I had secured and made available for future use.
>
> THE COURT: So that was the first time. What about after that?
>
> RAKESH DIXIT: I didn't get around to doing all of that until later, until you said to produce the hard drive and the backup.
>
> THE COURT: You didn't get around to doing what?
>
> **RAKESH DIXIT: Making the additional -- all the additional backups.**
>
> **THE COURT: So you made those after my – after the October 16th hearing?**
>
> **RAKESH DIXIT: Correct.**
>
> **THE COURT: So what was the purpose of making additional backups at that time?**
>
> **RAKESH DIXIT: To make sure I have all of the original data.**
>
> **THE COURT: When you say "original data," so you mean the data that was on the laptop at the time that you received it from Feron Kutsomarkos?**
>
> **RAKESH DIXIT: Yes.**
>
> **THE COURT: So this backup that you have, at least one backup that you have in your possession, that one should be -- should basically be a mirror image of what was on the computer at the time that you received it from Feron Kutsomarkos?**

**RAKESH DIXIT: I believe so. I don't save things like applications and things like that on images, but otherwise the data would be there.**

*Id*. at 40:2-41:19 (emphasis added).

Based on Mr. Dixit's representation that numerous backups that were a "mirror image" had been created after the October 24 hearing, the Court ordered that Mr. Dixit search for and produce <u>all</u> back-up hard drives.  Dkt. 252.  Despite Dixit claims that he made "additional backups" following the October 16 hearing, Mr. Dixit only produced one backup after the January 24 hearing: a single Backup Plus Ultra Touch Seagate Rescue Edition hard drive, Serial No. NAB1816C, which HPS then sent to Epiq for forensic examination.  *See* Dkt. 256.

The forensic examination disclosed that the September Backup was created on September 19 (not after the October 16 hearing).  Dixit created the September Backup on September 19, 2019, shortly after the Kutsomarkos Deposition disclosing the Laptop and the "wiping"  (Ex. B (Brown Supp. Decl.), ¶ 4) and after HPS warned Defendants not to destroy evidence.  (Ex. E).  Like the October Backup, the September Backup does not represent a complete backup, "mirror" image, or forensic image of the original hard drive of the Laptop.  *Id*. at ¶ 5.  Rather, the September Backup is a backup of select subfolders of the Documents folder, as it existed on September 19, 2019.  *Id*.

Notably, the September Backup indicates that numerous files are NOT contained on the October Backup, demonstrating that Dixit's claim that he created a "mirror image" in creating the October Backup is false.  *Id*. at ¶ 6.  A comparison showing the differences between the two backups below lists the October Backup first and the September Backup second:

| Name ^ | Folders | Files | Size |
|---|---|---|---|
| G:\wip0002 WD Exported Documents folder\12_Time Machine Backups\Documents\ | 761 | 4,957 | 50.8 GB |
| G:\wip002 Seagate Exported Documents folder\21_Untitled\Documents\ | 4,231 | 37,284 | 66.0 GB |

52101203;1

*Id.* Indeed, although the October Backup contains files outside of the Documents folder, the overall file size is over 15 Gigabytes smaller than the September Backup. *Id.*

Drilling down to the differences in content, the screen capture below shows an image of the Laptop Documents folder, including the subfolders, under the feronikikutsomarkos profile, as they appeared on September 19, 2019, at the time that backup was created:

| Name ^ | Folders | Files | Size |
|---|---|---|---|
| Clients | 366 | 1,674 | 11.5 GB |
| Cool Stuff | 0 | 10 | 6.7 MB |
| Dashboard - Monitoring | 2,562 | 16,405 | 1.0 GB |
| Decks | 3 | 30 | 426.5 MB |
| Demo Scripts | 1 | 30 | 2.1 MB |
| Design Assets | 7 | 13 | 12.5 MB |
| **HPS ADS** | **348** | **2,244** | **45.0 GB** |
| HPS Carrier Demo Documents | 310 | 2,562 | 5.7 GB |
| HPS MS Email Production | 42 | 1,566 | 612.8 MB |
| MediaShark | 35 | 212 | 576.6 MB |
| Microsoft User Data | 541 | 12,531 | 1.2 GB |
| My ConceptDraw | 4 | 5 | 715.9 KB |
| _.DS_Store | 0 | 1 | 18.0 KB |
| _.localized | 0 | 1 | 0 Bytes |

Seagate External
s/n: NAB1816C
Backup 9/19/2019

Ex. B, ¶ 7. By comparison, the screen capture below shows an image of the Laptop Documents folder, including the subfolders, under the feronikikutsomarkos profile, as they appeared on October 19, 2019, at the time that backup was created:

| Name ^ | Folders | Files | Size |
|---|---|---|---|
| _.evernote | 97 | 127 | 6.2 MB |
| General Healthcare Industry Info | 1 | 8 | 7.4 MB |
| **HPS ADS** | **348** | **2,244** | **45.0 GB** |
| HPS Carrier Demo Documents | 311 | 2,576 | 5.7 GB |
| _.DS_Store | 0 | 1 | 10.0 KB |
| _.localized | 0 | 1 | 0 Bytes |

WD External
s/n: WXC1A69556K5
Backup 10/19/2019

*Id.* This comparison shows that Dixit **intentionally excluded** the following subfolders from the October Backup: HPS MS Email production, Clients, Cool Stuff, Dashboard - Monitoring, Decks,

Demo Scripts, Design Assets, HPS MS Email Production, Media Shark, Microsoft User Data, and My ConceptDraw. *Id*. at ¶¶ 7, 11-12. Moreover, the October Backup contains some folders in common with the September Backup, but it is clear that at least some of these files in those common folders have been altered. For example, the HPS Carrier Demo Documents folder in the October Backup contains one additional folder and at least 14 additional files than the HPS Carrier Demo Documents folder in the September Backup, indicating that the Laptop was accessed and files were moved. *See id*. at ¶ 7. Again, despite the attempt to cover their tracks by bricking the Laptop, the high level differences between the two backups provide clear indications that Defendants modified the Laptop's contents after being on notice that he must preserve all ESI.

In short, Dixit created a new imposter backup following the October 16 hearing and then testified under oath that it was a "mirror image" of the Laptop. However, the forensic examination of the September Backup proves Dixit's testimony false and instead demonstrates that the Laptop files had been altered and critical files had been excluded from the October Backup.

c. **Comparison of October Backup and September Backup Evidences Spoliation**

As the infomercial says, "But Wait, There's More!" As discussed above, following the Court's Order to produce the backup drives (Dkt. 200), Dixit specifically excluded certain files on the Laptop when creating the October Backup. Ex. B (Brown Supp. Decl.), ¶¶ 11-12. Referring to the backups created **after** the October 16 hearing, the Court explicitly asked Dixit, "this backup that you have, at least one backup that you have in your possession, that one should be -- should basically be a mirror image of what was on the computer at the time that you received it from Feron Kutsomarkos?" Mr. Dixit's response was "I believe so," and then he commented that some applications may have been excluded, but "otherwise the data would be there." Hearing Tr., Jan.

24, 2020, at 41:12-19.  To the contrary, as shown below, the forensics expert was able to determine the specific list of files that Dixit purposefully excluded from the October Backup:

| Key | Type | Value |
|---|---|---|
| 📄 LastConfigurationTraceDate | Date | 2019-10-15 21:34:54 |
| 📄 LastDestinationID | String | 02FE38BC-1FC4-48A2-9141-D1F87E0AC748 |
| 📄 LocalizedDiskImageVolumeName | String | Time Machine Backups |
| 📄 PreferencesVersion | Number | 4 |
| ⊟ 📄 SkipPaths | Array | (24 items) |
| 📄 Item 0 | String | ~feronikikutsomarkos/Documents/Oregon JAD |
| 📄 Item 1 | String | ~feronikikutsomarkos/Documents/My ConceptDraw |
| 📄 Item 2 | String | ~feronikikutsomarkos/Documents/MediaShark |
| 📄 Item 3 | String | ~feronikikutsomarkos/Documents/Adobe |
| 📄 Item 4 | String | ~feronikikutsomarkos/Documents/Microsoft User Data |
| 📄 Item 5 | String | ~feronikikutsomarkos/Documents/Surety |
| 📄 Item 6 | String | ~feronikikutsomarkos/Documents/Dixit Law Firm |
| 📄 Item 7 | String | /Users/Shared/adi |
| 📄 Item 8 | String | ~feronikikutsomarkos/Documents/Demo Scripts |
| 📄 Item 9 | String | ~feronikikutsomarkos/Documents/CodeStreet |
| 📄 Item 10 | String | ~feronikikutsomarkos/Documents/Design Assets |
| 📄 Item 11 | String | ~feronikikutsomarkos/Documents/Dashboard : Monitoring |
| 📄 Item 12 | String | ~feronikikutsomarkos/Documents/Cool Stuff |
| 📄 Item 13 | String | /Applications |
| 📄 Item 14 | String | ~feronikikutsomarkos/Documents/MS_INBOX_ARCHIVE.mbox |
| 📄 Item 15 | String | ~feronikikutsomarkos/Documents/Decks |
| 📄 Item 16 | String | ~feronikikutsomarkos/Documents/Personal |
| 📄 Item 17 | String | ~feronikikutsomarkos/Documents/BA Stuff |
| 📄 Item 18 | String | ~feronikikutsomarkos/Documents/ADS |
| 📄 Item 19 | String | ~feronikikutsomarkos/Documents/Receipts |
| 📄 Item 20 | String | ~feronikikutsomarkos/Documents/Clients |
| 📄 Item 21 | String | ~feronikikutsomarkos/Documents/Ultramatics |
| 📄 Item 22 | String | ~feronikikutsomarkos/Documents/Dataspect Consulting |
| 📄 Item 23 | String | ~feronikikutsomarkos/Documents/HP5 MS Email Production |

*Id*. at ¶¶ 11-12.  The above highlighted folders are found in the September Backup, but were specifically excluded from the October Backup.  *Id*.  What may be more concerning are the folders that are not highlighted in the chart.  The non-highlighted folders represent folders that were (a) specifically excluded from the October Backup *and* (b) not included in the September Backup.  *Id*. at ¶ 13.  Stated another way, neither the October Backup nor the September Backup contain the folders that are not highlighted.  *Id*.  These folders that were on the Laptop, but were excluded from both the September Backup and the October Backup include at least the following:  Oregon JAD, Adobe, Surety, Dixit Law Firm, "Users/Shared/adi", Codestreet, "Applications", MS_INBOX_Archive.mbox, Personal, BA Stuff, ADS, Receipts, Ultramatics,

13

and Dataspect Consulting.  *Id.*  **These folders, to the extent they still exist, are *only* on the Laptop, which Dixit has rendered inaccessible.**

Notably, several file folders appear certain to have documents responsive to this matter. For instance, Ultramatics is named throughout the pleadings.  Ultramatics, Inc. is a software developer hired by HPS in connection with the development of the ExchangeLink® software, which is the underlying software and IP at issue in this case.  *See* Dkt. 37 (First Amended Complaint), p.9.  As part of Media Shark, Ms. Kutsomarkos and E-Integrate performed contacting services for HPS through Ultramatics.  See, e.g., Dkt. 37, Ex. 7 (Kutsomarkos deposition in Bojkovic v. Dixit), 17:7-20:16.  Ultramatics is referenced throughout the complaint.  Moreover, Defendants' counterclaim is almost entirely based on interactions between Ultramatics and E-Integrate. See Dkt, 53, Counterclaim at ¶¶ 9-13, 16-22, 24, 26-39, 41-42, 44, 69, Ex. C. Accordingly, any information on Ms. Kutsomarkos' laptop within a folder labelled "Ultramatics" would appear to be of direct relevance to the instant proceedings as it would be directly related to Ms. Kutsomarkos' and Media Shark's dealings with HPS through Ultramatics.

Another almost certainly relevant folder that Defendants have concealed is ADS.  ADS is referenced in the First Amended Complaint, ¶ 33.f., as one of the HPS Copyrighted Materials asserted in this case. The contents of this folder are likely directly relevant to the creation of the copyrighted work as well as the scope of the infringing activities.  Another example of a potentially important folder is MS_INBOX_Archive.mbox, which is a folder in which email archive files are typically stored.  Ex. B (Brown Supp. Decl.), ¶ 14.  Of course, any of these excluded folders may have relevant information.  To the extent that defendants have used HPS code, trade secrets, and copyrighted materials to further their other business activities, as alleged in the Complaint, the other folders are also very likely to contain evidence related to the scope of defendants'

misappropriation and infringement. To HPS's knowledge, Kutsomarkos did not produce documents from these folders and instead turned over the Laptop to defendant Rakesh Dixit, with or without knowledge of her attorney Shyamie Dixit, and defendant Rakesh Dixit then wiped files from the Laptop drive. Moreover, even for the folders from which Kutsomarkos did produce documents, those self-collected documents may have been carefully selected and the damaging documents deleted. Owing to the spoliation, there is no way to be sure.

Moreover, neither the September Backup nor the October Backup contain artifact files that would show what files were deleted prior to the Backups. Ex. B, ¶ 15. For example, the .fseventsd files were excluded from the Backups. *Id*. Forensically, the ".fseventsd" file/folder is important because it logs detailed information about historical file system activity. *Id*. This activity information includes, but is not limited to: logging the names and locations of any file, folder, or external device that is created, removed, moved to the trash, modified, renamed, or has its permissions changed. *Id*. The ".fseventsd" file/folder will also log and display information for user profile activity, browser activity, download activity, device connection/mounting activity, email activity, and DropBox activity. *Id*.

In sum, the September Backup and October Backup contain select folders that Defendants decided that they would permit HPS to see. They do not contain several folders relevant to this litigation. They do not contain artifact files that would show what files were deleted or otherwise moved prior to the creation of the September Backup and October Backup. **Because Defendants bricked the Laptop, the content of these folders and the Defendants' activities on the Laptop will forever remain inaccessible and effectively destroyed.** We can assume from their conduct that these actions were taken to cover their trail of deception, misappropriation, infringement, and discovery abuse.

## II. STANDARD OF LAW

A court may award sanctions pursuant to its inherent authority. *People for the Ethical Treatment of Animals v. Dade City's Wild Things*, 2018 U.S. Dist. LEXIS 8761, at *2 (M.D. Fla., Jan. 19, 2018). "Courts have the inherent authority to control the proceedings before them, which includes the authority to impose 'reasonable and appropriate' sanctions." *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) (citations omitted).

Federal Rule of Civil Procedure 37 provides that a court shall award sanctions, up to and including default judgment against a disobedient party, if that party (1) fails to comply with discovery orders or (2) fails to preserve electronically stored information ("ESI"). *See* Fed. R. Civ. P. 37(b)(2)(A)(vi) and 37(e)(2)(C).

The intent behind Rule 37 sanctions is both "to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent." *Taser Int'l, Inc. v. Phazzer Elecs., Inc.*, No. 6:16-cv-366, 2017 WL 3584906 (M.D. Fla. July 21, 2017), *Aff'd, Phazzer Elecs., Inc. v. Taser Int'l*, Inc., 754 F. App'x 955 (Fed. Cir. 2018) (*citing Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 763-64 (1980). This deterrence is necessary because "it is not the court's function to drag a party kicking and screaming through discovery." *Taser*, at *2 (*citing Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 134 (S.D. Fla. 1987)). Defendants' egregious conduct satisfies either prong.

### A. Egregious Discovery Misconduct; Repeated and Ongoing Failures to Obey Court Orders as Grounds for Default Judgment under Rule 37(b)

Courts enjoy broad discretion to fashion appropriate sanctions, including default judgment, for discovery order violations. *See, e.g., Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1542 (11th Cir. 1993) (upholding default judgment as proper when defendant repeatedly failed to comply with discovery orders). When the court finds that less drastic sanctions would

16

be ineffective, "Rule 37 does not require the vain gesture of first imposing those ineffective lesser sanctions." *Malautea*, 987 F.2d at 1544; *see also Bank of Mong. v. M&P Global Fin. Servs.*, 2010 U.S. Dist. LEXIS 151804 (S.D. Fla. 2010) (entering default judgment after repeated violations of court discovery orders and when repeated impositions of monetary sanctions have failed to make defendants willing to comply).

In this case, the threat of, and issuance of severe monetary sanctions, over $70,000 in costs and fees once the award from Dkt. 258 is added, has done absolutely nothing to deter defendants. If anything, defendants have doubled down on their obstruction and duplicity. The Court acknowledged that "monetary sanctions is what the Court commonly issues, but when those aren't being complied with, when discovery orders aren't being complied with, you get to the point where you're leaving the Court with no other choice." Hearing Tr., Jan. 24, 2020, at 88:4-8.

### 1. Default is the Appropriate Remedy For Egregious Discovery Misconduct; Repeated and Ongoing Failures to Obey Court Orders

Default judgment is appropriate when a party's failure to comply with its discovery obligations is due to willfulness, bad faith or fault. *Phipps v. Blakeney*, 8 F.3d 788, 790 (11th Cir. 1993) (*citing National Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639 (1976)). Bad faith may be found through "delaying or disrupting the litigation or hampering enforcement of a court order." *Eagle Hosp. Physicians, LLC V. SRG Consulting, Inc*., 561 F.3d 1298, 1306 (11th Cir. 2009). Defendants' conduct fits (and far exceeds) the fact pattern of cases in which Courts have issued default judgments. As detailed above, Defendants' discovery abuses are egregious. Defendants have at least a dozen outstanding violations of Court Orders (without double or triple counting multiple violations of the same order). Moreover, Defendants lied, repeatedly, under oath about the existence and nature of the September Backup and October Backup.

### 2. Defendants' Willful Repeated and Ongoing Failure to Comply with Court Discovery Orders Warrants Default Judgment

*Bank of Mongolia* is instructive and has many parallels to the present case. U.S. Dist. LEXIS 151804. In the *Bank of Mongolia* case, the defendants repeatedly disregarded court orders compelling responses to the plaintiff's requests for discovery. *Id.* at 16. In this case, the defendants are currently in violation of at least one dozen orders. *See* Section I-A, *supra*. Similar to the present case, the *Bank of Mongolia* defendants also repeatedly lied under oath about the number of computers and email accounts that could contain relevant documents. *Id.* at 9. The *Bank of Mongolia* defendants then agreed, as a sanction, to pay for the computer experts required to obtain the documents, but then failed to provide payment, pleading poverty. *Id.* at 20. In this case, the defendants simply refuse to pay any sanction or even confer on the matter. *See* Section I-A, *supra*.

The court found these actions to be indicative of willful non-compliance and to exhibit sufficient bad faith to warrant entry of default judgment. *Id.* at 21. Further, the Court found that "[t]hese defendants also have demonstrated that the repeated imposition of monetary sanctions has failed to make them willing to comply with Court Orders, including paying the sanctions award." *Id.* Accordingly, the magistrate judge recommended, and the Court entered, default judgment against the defendants.

In much the same manner as in *Bank of Mongolia*, the instant defendants have likewise repeatedly disregarded this Court's discovery orders. The Defendants' most recent disregard of this Court's discovery orders illuminates the Defendants' willfulness in that the Defendants chose to disregard the January 28 order requiring compliance with **all** pending discovery orders by February 21 – after multiple chances and fair warning. Dkt. 258. Their willfulness is particularly evident in that they failed to comply, despite the discovery order (Dkt. 258) being expressly characterized as the "**one final opportunity** to comply with numerous discovery orders prior to

fashioning appropriate sanctions, including possibly recommending case-dispositive sanctions," Dkt. 257; *see also* Hearing Tr., Jan. 23, 2020, at 87:24-88:19, 94:13-96:9. In the light of such threats by the Court, the Defendants' obstinate refusal to comply with the January 28 order (Dkt. 258) showcases their willful non-compliance and exhibits ample bad faith to warrant entry of default judgment.

This Court recently entered defendant judgment against defendants in a similar, but less egregious, case of discovery obfuscation and obstruction. *Taser Int'l, Inc. v. Phazzer Elecs., Inc.*, No. 6:16-cv-366, 2017 WL 3584906 (M.D. Fla. July 21, 2017) *Aff'd, Phazzer Elecs., Inc. v. Taser Int'l, Inc.*, 754 F. App'x 955 (Fed. Cir. 2018). In *Taser*, the Defendant similarly refused to participate in discovery and used a variety of creative strategies to delay the case. *Id*. This Court then issued an order compelling the Defendants to participate in discovery, and expressly warning them that failure to comply with that order may result in entry of default judgment. *Id.* The Defendant subsequently failed to comply with that order. The Court found that "it appears that Phazzer, with the assistance of its counsel, is attempting in bad faith to further delay this litigation." *Id*. at *2. This Court then entered default judgment against the Defendants (also awarding treble damages and attorney's fees).

In much the same manner, the current Defendants have willfully, and in bad faith, failed to comply with this Court's various orders. Again, like the order in *Taser*, the January 28th orders in this case expressly warn the Defendants that failure to comply with **all** of the outstanding discovery orders may result in entry of default judgment. Dkt. 257, 258; *see also* Hearing Tr., Jan. 24, 2020, at 87:24-88:19, 94:13-96:9. Defendants' failure once again to comply with the orders by the February 21 deadline (the "one final opportunity"), particularly in light of these warnings, shows a willful disregard for this Court's orders. Combined with Defendants' numerous other delay tactics and evidence of spoliation, this Court should rely on

52101203;1

its holding in *Taser* (which was affirmed by the Federal Circuit) to find that the Defendants' actions are at least as egregious as in *Taser* and likewise warrant entry of Default Judgment.

### 3. The Defendants' Willful Failure to Appoint New Counsel and Unwillingness to Work With Their Current Counsel Warrants Default Judgment.

The Dixit Defendants have acted willfully and in bad faith by undermining the counsel that they selected as permanent lead counsel. *See* Dkt. 236 ("Emergency Motion for Withdrawal"). Showing plainly his motive to disrupt and circumvent the Court's order (Dkt. 141), the Dixit Defendants instructed Mr. Deese to "make the position with the court that all actions, including the handing over of any personal items of mine [i.e., the Kutsomarkos Laptop and hard drive], are suspended, while you move to withdraw, by your own decision, and I retain replacement counsel." Dkt. 236.

Still to date, the Dixit Defendants have failed to appoint substitute counsel, but yet refuse to work with their appointed permanent lead counsel in willful violation of this Court's Order. Dkt. 141. Indeed, the Dixit Defendants are playing the same game that led to the Court's order requiring them to appoint "permanent lead counsel." Because the corporate defendants cannot proceed without counsel, see Local Rule 2.03(e), M.D. Fla., yet refuse to work with or replace their current counsel, the corporate defendants are in essence left without counsel.[4]

Dixit Defendants' willful failure to comply with this Court's order (Dkt. 141) to work with their appointed permanent lead counsel is made in bad faith to further delay these proceedings. As such, this case is essentially at a standstill while the Dixit Defendants attempt to hold this Court

---

[4] Dixit's willful failure to work with his appointed permanent counsel, and failure to appoint any replacement counsel, is tantamount to the corporate Dixit Defendants operating without counsel, a situation this court has warned could result in severe consequences such as entry of a clerk's default. Hearing Tr., Jan. 24, 2020, at 95:4-10.

hostage with their actions (or inaction) regarding its counsel. The Court is left with no recourse but to enter default judgment. Lesser sanctions have failed, and will continue to fail to move the Dixit Defendants to comply with this Court's orders, or to make any progress in the case, leaving default judgment as the only appropriate sanction here.[5]

### B. Spoliation as Grounds for Default Judgment under Rule 37(e)

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Graff v. Baja Marine Corp.*, 310 Fed.Appx. 298, 301 (11th Cir. 2009) (*citing West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)); *see also Swofford v. Eslinger*, 671 F. Supp. 2d 1274, 1279-80 (M.D. FL 2009). Sanctions for spoliation of evidence are "intended to prevent unfair prejudice to litigators and to insure the integrity of the discovery process." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005), *cert. denied*, 548 U.S. 903 (2006).

"Sanctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information." *Advantor Sys. Corp. v. DRS Tech. Servs.*, 6:14-cv-533-Orl-31DAB, 2015 U.S. Dist. LEXIS 9721, at *17 (M.D. Fla. Jan. 28, 2015)(citations omitted). Default judgment should be exercised when there is a showing of bad faith and when lesser sanctions will not suffice. *See Flury*, 427 F.3d at 944-45. "The appropriate sanction when a party fails to preserve evidence in its custody depends on the willfulness or bad faith of the party responsible." *Id.* Courts do not hesitate to find that the use of password protection to obstruct discovery of relevant evidence –

---

[5] Indeed, this Court recognizes that the corporate Dixit Defendants' failure to appoint new counsel by the February 25th hearing would place them in default posture. Hearing Tr., Jan. 24, 2020, at 95:4-10.

52101203;1

particularly after court orders to produce such documents – is bad faith. *Wyndham Vacation Ownership, Inc. et al v. American Consumer Credit, LLC et al*, 9-18-cv-80095, U.S. Dist. LEXIS 149624, at *14 (S.D. Fla. Aug. 30, 2019). In these same circumstances, courts have not hesitated to enter default in such situations. *Id*.

All Defendants engaged in the acts of spoliation. After self-selecting and producing a limited set of documents (and excluding folders such as Ultramatics, ADS, backup emails, etc.), Kutsomarkos testified that she gave the Laptop to Rak Dixit, assuming that it would be "wiped". Ex. C, 16:9-17:12. When the risk of spoliation came to light, HPS' counsel immediately contacted all of Defendants' counsel and indicated that Defendants had apparently failed to preserve documents, and specifically warned them that "it should go without saying that your clients and you must not tamper with either the Kutsomarkos or Knowmentum laptops or hardware in any way so as to preserve them in their current conditions." *See* Ex. E (Email from Fernandez to S. Dixit and Deese, Sept. 17, 2019).

True to Kutsomarkos' understanding and HPS's concerns, Rak Dixit took the Laptop and rendered it inaccessible. *See* Section I.B,1, *supra*. The partial and misleading September Backup and October Backup were created to conceal relevant folders, and then the Laptop was bricked to cover Defendants' tracks. Dixit then repeatedly misled this Court and HPS, including by stating that he had made a mirror image backup. Hearing Tr., Jan. 24, 2020, at 41:12-19. Critically, the backups exclude any artifact files that would allow HPS to determine what activities took place on the Laptop prior to it being rendered inaccessible. *See* Section I.B.2.c., *supra*.

Defendants' conduct is not a comedy of mishaps and errors. The carefully curated October Backup that excluded significant files and folders was created at the same time Dixit rendered the Laptop permanently inaccessible. It would be naïve to assume those events happened on the same

day coincidentally. As Kutsomarkos admitted, these were calculated activities, planned prior to the September 11, 2019 deposition. Ex. C, 16:9-17:12. All Defendants are culpable. There is simply no reason to believe that HPS has received critical evidence relevant to its case, and every reason to believe that Defendants have executed a plan to keep that evidence from HPS. As detailed above, the excluded folders are certain to include not just relevant, but critical, evidence to HPS's case. See pp. 14-15, *supra*.

The Southern District of Florida case *Wyndham* is instructive here. *Wyndham*, 2019 U.S. Dist. LEXIS 149624. In *Wyndham*, the court entered a default judgement for spoliation of ESI under Rule 37(e) (separately and in addition to default judgement for failure to comply with discovery orders under Rule 37(b)). *Id*. at 19. In entering this judgment, the Court found that the defendant had notice of the requirement to preserve the ESI, but lost the ESI because it failed to take reasonable steps to preserve it. *Id.* at 17. For example, the *Wyndham* defendants gave away their computers after this lawsuit was initiated, and documents previously stored in the cloud were deleted and could not be recovered or replaced. *Id*. The Court found that the defendant knowingly and unreasonably failed to preserve ESI and had acted in bad faith. The Court also found that the plaintiff was greatly prejudiced by the loss of ESI as it was unable to review the core evidence regarding claims of fraud and deception that are at the heart of the matter.

The Defendant had, willfully and in bad faith, repeatedly failed to comply with Orders directed to Plaintiff's discovery requests and had failed to preserve ESI. The Court found that default judgment was appropriate and that lesser sanctions would be insufficient.

Here, like in *Wyndham*, it is apparent that Dixit failed to take reasonable steps to prevent the loss of ESI, particularly with regard to the entire image of the data on the laptop. In fact, as discussed above, this case is more egregious, as Dixit intentionally sabotaged these efforts by

"bricking" the laptop. In much the same way, Dixit testified that, as matter of routine, he always password protects devices with any data on them: "Well, I'm not sure what normal other people's practice is, but mine is if I have any data on a computer or a drive, I always secure it with a password." Hearing Tr., Jan. 24, 2020, at 19:1-4. However, Dixit failed to apply any passwords to the other two drives that have been produced (the October backup and the September backup), demonstrating that he obviously was only concerned about HPS being able to access the Laptop.

Like the Court in *Wyndham*, this Court should afford Defendants' testimony in these regards no weight, and instead find that Dixit engaged in intentional spoliation efforts to withhold and destroy relevant ESI on the laptop by "bricking" the laptop. Accordingly, like the *Wyndham* court, this Court should find Dixit's actions to be executed in bad faith to deprive HPS of this ESI. This Couth should therefore enter default judgment – a lesser sanction will not remedy the injustice to HPS.

## III.   CONCLUSION

For the forgoing reasons, HPS respectfully submits that default judgment is the only appropriate remedy. HPS requests that this Court enter default judgment on all claims and defenses and award the relief requested in the First Amended Complaint.

### Local Rule 3.01(g) Certification

Undersigned counsel certifies that Plaintiff's counsel has attempted to confer with counsel for the Defendants regarding this motion. Attorneys Deese and Dixit failed to respond.

Dated: February 24, 2020                         Respectfully submitted,

                                          By:   *Alejandro J. Fernandez*
                                                Alejandro J. Fernandez
                                                Board Certified in Intellectual Property Law
                                                FL. Bar No.: 32221
                                                E-mail: alejandro.fernandez@akerman.com
                                                Stephen J. Leahu

Board Certified in Intellectual Property Law
FL. Bar No. 54037
E-mail: stephen.leahu@akerman.com
**Akerman LLP**
401 E. Jackson Street, Suite 1700
Tampa, FL 33602
Telephone No.: (813) 209-5055
Facsimile No.: (813) 218-5413

William H. Frankel (IL ARDC No. 3127933)
*Admitted Pro Hac Vice*
Andrew J. Avsec (IL ARDC No. 6292313)
*Admitted Pro Hac Vice*
**BRINKS GILSON & LIONE, P.C.**
NBC Tower, Suite 3600
455 N. Cityfront Plaza Drive
Chicago, Illinois 60611
Email: wfrankel@brinksgilson.com
Email: aavsec@brinksgilson.com
Telephone No. (312) 321-4200
Telefacsimile No. (312) 321-4299

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY certify that on February 24, 2020, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court via the CM/ECF system which transmitted it via electronic mail to all counsel of record.

By: _____*Alejandro J. Fernandez*_____
Alejandro J. Fernandez
Board Certified in Intellectual Property Law
FL. Bar No.: 32221
E-mail: alejandro.fernandez@akerman.com
Stephen J. Leahu
Board Certified in Intellectual Property Law
FL. Bar No. 54037
E-mail: stephen.leahu@akerman.com
**Akerman LLP**
401 E. Jackson Street, Suite 1700
Tampa, FL 33602
Telephone No.: (813) 209-5055
Facsimile No.: (813) 218-5413

52101203;1