## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**HEALTHPLAN SERVICES, INC.,**

     **Plaintiff,**

**v.**                           **Case No. 8:18-cv-2608-T-23AAS**

**RAKESH DIXIT, FERON
KUSTOMARKOS, E-INTEGRATE,
INC., KNOWMENTUM, INC, and
MEDIA SHARK PRODUCTIONS, INC.,**

     **Defendants.**

_____/

## REPORT AND RECOMMENDATION

HealthPlan Services moves for entry of default judgment against all the defendants. (Doc. 273). Separately, HealthPlan requests other sanctions, show cause orders, and attorney's fees against Mr. Dixit, Media Shark Productions, and Knowmentum (the Dixit defendants) (Doc. 226), and requests Mr. Dixit's compliance with a prior court order and sanctions (Doc. 248).[1] Mr. Dixit opposes the motions. (Doc. 285-1). No other defendant responded, and the corporate defendants, in violation of Local Rule 2.03(e), have been without counsel since March 2, 2020.

## I.    BACKGROUND

### A.    The Parties

HealthPlan provides software applications to insurance and managed care industries. (Doc. 37, ¶ 15). HealthPlan alleges it developed "the most technologically

---

[1] A January 24, 2020 order adjudicated part of the motion. (Doc. 252).

advanced software platform available to the insurance and managed care industries."
(*Id.* at ¶ 16).

HealthPlan hired Rakesh Dixit and his company, E-Integrate, to help develop
the software platform. (*Id.* at ¶ 18). HealthPlan hired Feron Kutsomarkos[2] and Media
Shark to commercialize, market, and promote the software platform. (*Id.* at ¶ 21).
Ms. Kutsomarkos owned Media Shark, but now Mr. Dixit owns Media Shark. (*Id.* at
¶ 14). Mr. Dixit used his software development company, Knowmentum, to market
HealthPlan's software platform as his own. (*Id.* at ¶¶ 13, 62–65). Mr. Dixit controls
E-Integrate, Media Shark, and Knowmentum. (Doc. 281, 7:18–24).

Mr. Dixit has cycled through five lawyers and, despite numerous assurances
new counsel would appear, is proceeding pro se. Ms. Kutsomarkos discharged her
counsel (Mr. Dixit's brother) and is now proceeding pro se. At a February 25, 2020
hearing, both Mr. Dixit and Ms. Kutsomarkos testified that Mr. Dixit has sole
authority for retaining counsel for the three corporate defendants. Because new
counsel has not appeared, the corporate defendants can no longer appear and be
heard. *See* Local Rule 2.03(e), M.D. Fla.

## B.   Discovery Violations

On April 19, 2019, HealthPlan moved to compel all the defendants to amend
their initial disclosures. (Doc. 81, pp. 2–3). HealthPlan also identified ten disputed

---

[2] Ms. Kutsomarkos filed for bankruptcy on March 13, 2020 in the Eastern District of
Michigan. (Doc. 286-1). As a result, an automatic stay went into effect for Ms.
Kutsomarkos. 11 U.S.C. § 362(a). A July 8, 2020 bankruptcy order allows HealthPlan
to pursue, obtain, and enforce injunctive relief in this case against Ms. Kutsomarkos.
*In re Kutsomarkos*, 20-43741-MAR (July 8, 2020).

requests for production for Mr. Dixit, eight disputed requests for production for Knowmentum, and five disputed requests for production for Media Shark. (*Id.* at pp. 3–23). Before a May 3, 2019 hearing, HealthPlan stated that despite receiving a production of documents and amended initial disclosures from the Dixit defendants, HealthPlan's motion to compel remained unresolved. (Doc. 89, p. 3). HealthPlan said the produced documents lacked metadata and had confusing Bates prefixes and ranges. (*Id.*).

A May 3, 2019 order (after a hearing) required the defendants to amend their initial disclosures by May 10, 2019. (Doc. 93, ¶ 2). HealthPlan's remaining requests (Doc. 81) were taken under advisement (Doc. 93, ¶ 2) pending continuation of the hearing to May 23, 2019 so the parties could meet and resolve or narrow the remaining discovery disputes (Doc. 93, ¶ 1).

At the May 23, 2019 hearing, HealthPlan and the Dixit defendants announced they resolved HealthPlan's motion by the Dixit defendants agreeing to amend their discovery responses and productions. (Doc. 111, 7:18–8:7). A May 23, 2019 order granted in part HealthPlan's motion and granted the parties' joint request for a post-production discovery hearing in July 2019. (Docs. 108, 109, 111).

At the July 29, 2019 hearing, the court and the parties spent over two hours addressing discovery disputes. (Doc. 128). A July 30, 2019 order required the Dixit defendants to designate lead counsel to address discovery issues and communicate with opposing counsel, provide amended responses to HealthPlan's interrogatories, amend their responses to HealthPlan's requests for production, present a reasonable

estimated time frame for production of documents responsive to HealthPlan's requests, fix the Bates prefixes and numbers on documents responsive to HealthPlan's discovery requests, and produce a privilege log. (Doc. 141). The court granted the parties' request for another discovery hearing and required Mr. Dixit and Ms. Kutsomarkos to attend. (*Id.* at ¶ 12).

The Dixit defendants designated lead counsel (Doc. 150) but did not comply with the rest of the July 30th order so HealthPlan moved for sanctions (Doc. 168). HealthPlan also argued designated lead counsel failed to act as lead counsel. (*Id.* at pp. 4–7). HealthPlan sought attorney's fees and a show cause order. (*Id.* at p. 8). The Dixit defendants argued their designated lead counsel was conferring with HealthPlan as required and had addressed the discovery issues. (Doc. 184).

On September 26, 2019, HealthPlan again moved for sanctions against the Dixit defendants. (Doc. 190). HealthPlan indicated the Dixit defendants still had not complied with the July 30th order even after extensions. (*Id.* at pp. 4–9). HealthPlan renewed its requests for attorney's fees and a show cause order. (*Id.* at pp. 9–11). The Dixit defendants did not respond.

At an October 16, 2019 hearing, HealthPlan stated the Dixit defendants still had not complied with the July 30th order. (Doc. 203; *see also* Doc. 191, pp. 3–10). After an almost three-hour hearing, an October 18, 2019 order required the Dixit defendants to complete all previously ordered discovery by October 31, 2019, HealthPlan to review the discovery and identify any remaining deficiencies by November 15, 2019, the Dixit defendants to cure those deficiencies by November 22,

4

2019, and HealthPlan to renew their motion for sanctions if the Dixit defendants failed to cure the deficiencies by December 6, 2019, with the Dixit defendants to respond by December 13, 2019. (Doc. 200). Additionally, the October 18, 2019 order granted HealthPlan's motions for sanctions (Docs. 168, 190) to the extent that the Dixit defendants must pay HealthPlan's reasonable attorney's fees and costs.[3] (Doc. 200, ¶ 2).

Due to the parties' penchant for filing discovery motions without properly conferring, a separate order required counsel to meet weekly in person. (Doc. 199, ¶¶ 2–3). The parties' weekly joint notice to the court would outline any discovery disputes addressed, any agreements or resolutions, and the progress of discovery. No party could file a discovery motion until a dispute was discussed at two meetings. (*Id.* at ¶ 4).

At an October 30, 2019 meeting, the Dixit defendants represented their amended discovery responses would be timely completed by October 31, 2019 and they would provide a privilege log. (Doc. 207, pp. 2, 4–5). But on November 1, 2019, the Dixit defendants successfully sought an extension. (Doc. 209). At a November 8, 2019 meeting, HealthPlan acknowledged receiving the production, but the documents were the same as what was produced on June 17, 2019 and did not comply with the electronically stored information (ESI) order. (Doc. 213, p. 3). Additionally, the amended discovery responses had little to no substantive changes. (*Id.* at p. 4). The

---

[3] HealthPlan requested $54,163.25 in attorney's fees and costs. (Doc. 206). A December 20, 2019 order awarded $36,490.00. (Doc. 234).

Dixit defendants' counsel (not lead counsel) stated he sent the wrong version and would send the "better version" that day or the next. (*Id.*).

At a November 13, 2019 meeting, HealthPlan followed up on the "better version" of the amended responses for production, and the Dixit defendants' counsel (not lead counsel) stated he would send the "better version" by Friday November 15, 2019. (Doc. 214, p. 3). HealthPlan sought an update on native versions of documents produced on June 17, 2019 reproduced on November 4, 2019, but counsel (again not lead counsel) did not have an update. (*Id.* at pp. 5–6).

At a November 20, 2019 meeting, the Dixit defendants had not provided a "better version" of the amended responses to requests for production, but HealthPlan agreed to a let them provide the "better version" by November 29, 2019. (Doc. 219, pp. 7–8). The Dixit defendants did not know the status of the native versions of documents produced in June 17, 2019 and again on November 4, 2019. (*Id.* at pp. 10–12). After a November 26, 2019 meeting, HealthPlan advised there were no new discovery disputes, but the parties were at an impasse on the same discovery disputes they have been litigating since June. (Doc. 222, p. 4).

On December 5, 2019, HealthPlan renewed its motion for sanctions. (Doc. 226). HealthPlan asked the court to require the Dixit defendants to certify compliance with the October 18, 2019 order, and if not fully complaint, enter default against the Dixit defendants; enter a finding of litigation misconduct by the Dixit defendants; require the Dixit defendants and their counsel to show cause why they should not be held in contempt; and require the Dixit defendants to pay HealthPlan's fees and expenses.

(*Id.* at p. 2). After the Dixit defendants sought multiple extensions to respond to HealthPlan's renewed motion (Docs. 231, 232, 235, 239, 240), a December 30, 2019 order required the Dixit defendants' lead counsel and Mr. Dixit to respond to HealthPlan's motion at the January 24, 2020 hearing (Doc. 241).

At the January 24th hearing, the court addressed HealthPlan's motion for sanctions related to outstanding discovery. (Doc. 268, 73:2–5). The Dixit defendants' lead counsel pointed to his pending motion to withdraw and his concerns of a conflict of interest. (*Id.* at 74:1–75:4). A January 28, 2020 order continued the hearing to February 25, 2020 and gave the Dixit defendants until February 21, 2020 to comply with all prior orders. (Doc. 258, ¶¶ 3, 7). If the Dixit defendants did not comply with the prior orders, the hearing would become a show cause hearing. (Doc. 268, 94:13–95:3; Doc. 258, ¶ 1, 4).

The day before the February 25th hearing, HealthPlan moved for default judgment against all the defendants. (Doc. 273). In that motion and at the February 25th hearing, HealthPlan effectively outlined how the Dixit defendants still had not complied with the prior discovery orders.

A February 25, 2020 order extended the deadline for Mr. Dixit and Ms. Kutsomarkos to respond in writing to HealthPlan's motion for default judgment. (Doc. 276; Doc. 281, 13:7–23). Mr. Dixit, proceeding pro se,[4] timely responded in writing and opposed the motion. (Doc. 285-1). Ms. Kutsomarkos did not respond.

---

[4] A March 2, 2020 order permitted all counsel to withdraw and again cautioned that corporate defendants cannot proceed without counsel. (Doc. 279).

### C.      Laptop Spoliation

During Ms. Kutsomarkos's deposition on September 11, 2019, HealthPlan learned Ms. Kutsomarkos searched her own laptop for documents and emails responsive to HealthPlan's production requests. (Doc. 191, p. 10). Then Ms. Kutsomarkos converted those documents to PDFs without preserving the metadata, failed to forensically preserve the contents of the laptop, and gave the laptop to Mr. Dixit. (*Id.*). HealthPlan sought immediate inspection of the laptop. (*Id.* at p. 11).

At the October 16th hearing, Mr. Dixit admitted he received the laptop from Ms. Kutsomarkos. (Doc. 203, 84:2–8). He testified that, because the laptop "was junk," he upgraded the operating system and replaced the hard drive after copying everything Ms. Kutsomarkos had on the laptop. (*Id.* at 85:14–86:17).

Because Mr. Dixit testified that he was still using the laptop with a new hard drive after wiping the laptop's prior data, an October 18, 2019 order required him to produce the hard drive containing a copy of what had been on Ms. Kutsomarkos's laptop. (Doc. 200). Mr. Dixit was not to access the hard drive or download information from the hard drive. (Doc. 203, 87:2–88:7; Doc. 200, ¶ 6(d)). That order required Mr. Dixit to provide the hard drive to his counsel the next day, so counsel could transfer the hard drive to HealthPlan for an approved vendor's forensic examination. (Doc. 203, 87:11–88:15; Doc. 200, ¶ 6(b)). The order also required Mr. Dixit to give the original "junk" hard drive to his counsel or document his efforts to locate the original hard drive if he could not locate it. (Doc. 203, 88:22–90:23; Doc. 200, ¶ 6(c)). The order required Mr. Dixit's counsel to inform HealthPlan when he received the hard drives

and to file a notice of compliance. (Doc. 200, ¶ 6(e)–(f)). The Dixit defendants' counsel (not lead counsel) filed a timely notice stating he "was in receipt of each hard drive." (Doc. 201).

At an October 30, 2019 meeting, according to HealthPlan, the Dixit defendants' lead counsel refused to discuss scheduling the forensic laptop inspection and insisted on negotiating a written protocol beyond what the October 18th order required. (Doc. 207, pp. 3–4). HealthPlan timely disclosed a forensic expert and sought to schedule the inspection for the week of November 11. (*Id.* at p. 3).

At a November 8, 2019 meeting, the Dixit defendants' counsel (not lead counsel) insisted on a different process for inspection of the hard drives. (Doc. 213, pp. 2–3). Because the parties could not resolve the forensic imaging issues after two meetings, HealthPlan requested court intervention. (Doc. 218). A December 19, 2019 order required lead counsel to turn over the hard drives to HealthPlan's counsel by 5 p.m. on Monday December 23, 2019. (Doc. 233, ¶ 3). The order also directed the Dixit defendants to pay HealthPlan's reasonable expenses incurred for the two meetings about this issue and for preparing the motion but denied HealthPlan's remaining requests for sanctions. (*Id.* at ¶ 2).

On December 22, 2019, the day before the Dixit defendants' lead counsel was required to turn over the hard drive, he moved to withdraw from representing the Dixit defendants and E-Integrate. (Doc. 236). Because of the motion to withdraw and Mr. Dixit telling lead counsel that "all actions, including the handing over of any person items of mine, are suspended," lead counsel sought direction from the court on

how to proceed. (*Id.* at p. 2). A December 23, 2019 order took the motion to withdraw under advisement and required lead counsel to turn over the hard drives by December 23, 2019. (Doc. 238). HealthPlan received a laptop and a single, external back-up hard drive. (Doc. 248, p. 3).

Apparently, however, Mr. Dixit "bricked" the laptop by encrypting it without providing a way to access the laptop. (*Id.* at pp. 1–2). Therefore, HealthPlan sought an order to require immediate production of the original hard drive; provide all encryption keys and credentials to access the laptop, original hard drive, and external hard drive; require a payment of a daily sanction of $1,000; find Mr. Dixit is in contempt for violating the October 18, 2019 and December 19, 2019 orders; make Mr. Dixit immediately pay HealthPlan the $5,800.00 in reasonable attorneys' fees awarded in the December 19, 2019 order; and award additional reasonable attorney's fees and costs incurred by HealthPlan with the present motion. (*Id.* at p. 2).

Despite Mr. Dixit testifying at the October 16th hearing that he put a new hard drive in the laptop after backing up the original hard drive (Doc. 203, 86:8–17), at a January 24th hearing, Mr. Dixit testified:

> THE COURT: In terms of the – let's talk about each item separately. So the laptop that was in the garage, what hard drive was in that laptop?
> RAKESH DIXIT: What do you mean what laptop -- hard drive. The hard drive that was in it when I received it was the hard drive that was in it.
> THE COURT: When you received it from whom?
> RAKESH DIXIT: When Feron [Kutsomarkos] dropped it off at the warehouse.
> THE COURT: So you had never removed that hard drive from the laptop?
> RAKESH DIXIT: No.

(Doc. 268, 17:7–17). Rather, he "created an image of the hard drive as it was then. That's the drive I was referring to when I said I made changes to the drive so that I could upgrade it and update it to do the native file extraction." (*Id.* at 18:8–11).

Despite being told to keep the hard drive pristine at the October 16th hearing, Mr. Dixit admitted during the January 24th hearing that he accessed and password protected the hard drive before giving it to his attorney. (*Id.* at 18:16–19:6). Mr. Dixit testified that, after being ordered to turn over the hard drive, he added a system-generated password for the hard drive and the laptop. (*Id.* at 19:16–21).

Mr. Dixit testified he wrote the system-generated password on a Post-It note and took the hard drive and the Post-It Note to his counsel (not lead counsel). (*Id.* at 20:23–25). Mr. Dixit maintained he gave the Post-It note to his counsel but did not explain the importance of the Post-It note. (*Id.* at 21:5–24). Mr. Dixit claimed he did not write the system-generated password down anywhere else. (*Id.* at 22:3–5).

At the January 24th hearing, counsel (not lead counsel) stated he received an external hard drive and a laptop containing the original hard drive from Mr. Dixit. (*Id.* at 11:9–11). Once counsel received both the laptop and the hard drive, he took photos and put them in a cabinet drawer until he transferred them to lead counsel. (*Id.* at 11:21–12:2). Counsel never turned on either device and was unaware of any encryption code or password required to access either device. (*Id.* at 12:3–12). Counsel credibly represented he did not receive a Post-It note when receiving the laptop and hard drive from Mr. Dixit. (*Id.* at 12:20–24).

Lead counsel also credibly represented that when he received the laptop and

11

hard drive from his co-counsel, he did not receive any Post-It note with an encryption key or password. (*Id.* at 8:1–3, 9:2–9). Lead counsel left the laptop and hard drive on a shelf in his office and did not touch either until he gave them to HealthPlan on December 23, 2019. (*Id.* at 8:16–9:1, 9:18–22).

HealthPlan's forensic expert explained the laptop is encrypted. (Doc. 273-1, ¶ 10). The encryption software requires either a username and password or a decryption key to allow full access to the laptop. (*Id.* at ¶ 11). Despite the encryption, HealthPlan's expert accessed limited information showing Mr. Dixit powered up the laptop on September 25, 2019 and October 18, 2019. (*Id.* at ¶¶ 14–18). As for the hard drive, HealthPlan's expert stated the hard drive included three back-ups of the laptop's data and each back-up was created on October 19, 2019 (October Back-Ups). (*Id.* at ¶ 20). HealthPlan's expert concluded none of the October Back-Ups represent a complete forensic image of the laptop's original hard drive because files were excluded. For example, a folder containing artifacts about the system and user activity was excluded. (*Id.* at ¶¶ 22–24). HealthPlan's expert also noted files under the folder labeled "Media Shark" were excluded from the October Back-Ups. (*Id.* at ¶ 25).

After HealthPlan argued spoliation, Mr. Dixit surprisingly testified that he has at least one more (previously undisclosed) back-up hard drive at home that contains the same data and is password protected. (Doc. 268, 28:9–21). When questioned about this previously undisclosed back-up hard drive, Mr. Dixit testified:

THE COURT: So this backup that you have, at least one backup that

you have in your possession, that one should be -- should basically be a
mirror image of what was on the computer at the time that you received
it from Feron Kutsomarkos?

RAKESH DIXIT: I believe so. I don't save things like applications and
things like that on images, but otherwise the data would be there.

(*Id.* at 41:12–19). Mr. Dixit stated he can determine whether it is a complete back-up

when he reviews the hard drive. (*Id.* at 44:5–6). The court instructed Mr. Dixit not to

access the hard drive for any reason. (*Id.* at 44:7–10).

A January 24, 2020 order granted HealthPlan's motion to compel compliance

and ordered Mr. Dixit to locate all additional back-up hard drives and to deliver those

back-up hard drives to HealthPlan's attorney by January 28, 2020. (Doc. 252, ¶¶ 1–

2). The order required Mr. Dixit to write down any passwords, put the passwords in

a sealed envelope, and provide that envelope with the additional back-up hard drives

to HealthPlan's law firm.[5] (Doc. 268, 46:19–23; Doc. 252, ¶ 5). By January 29, 2020,

Mr. Dixit had to notify the court how many hard drives he turned over and affirm

that he did not access the hard drives. (Doc. 252, ¶ 9; Doc. 268, 50:18–25).

Because the court previously granted HealthPlan's reasonable attorney's fees

incurred for meetings about the laptop issue (Doc. 233, ¶ 2(b)), a January 24, 2020

order awarded $5,800.00 in reasonable attorney's fees to be paid by February 25, 2020

(Doc. 252, ¶ 11). The order also awarded HealthPlan its attorney's fees and costs,

including reasonable charges from its expert, incurred in preparing the motion to

---

[5] Even though Mr. Dixit said the back-up hard drive had a password, Mr. Dixit did
not provide a password when dropping off the single, additional back-up hard drive
and nothing prevented HealthPlan's expert from accessing this hard drive. (Doc. 256,
¶ 4; Doc. 273, p. 24).

compel compliance.[6] (*Id.* at ¶ 12). The court took the remaining sanctions under advisement. (*Id.* at ¶ 13).

HealthPlan's expert stated the additional hard drive produced by Mr. Dixit was created on September 19, 2019 (September Back-Up). (Doc. 273-2, ¶ 4). The September Back-Up included over 15 gigabytes and 30,000 files more than the October Back-Ups. (*Id.* at ¶ 6). HealthPlan's expert determined the September Back-Up and October Back-Ups are incomplete copies of the information on the laptop. (*Id.* at ¶¶ 8–9). HealthPlan's expert determined fourteen folders were specifically excluded from the October Back-Ups and not included in the September Back-Up. (*Id.* at ¶¶ 12–13). Like the October Back-Ups, the September Back-Up did not include files that log detailed information about the system and user activity. (*Id.* at ¶ 15).

## II.   ANALYSIS

HealthPlan moves for default judgment on two grounds. (Doc. 273, pp. 16–24). On the first ground, HealthPlan seeks default judgment against Mr. Dixit and his corporate entities for failure to comply with the discovery orders. (*Id.* at pp. 16–21). In a footnote, HealthPlan explains it does not seek a default judgment against Ms. Kutsomarkos for failure to comply with discovery orders. (*Id.* at p. 2, n.2). On the second ground, HealthPlan seeks default judgment against all the defendants, including Ms. Kutsomarkos, for the spoliation of ESI on Ms. Kutsomarkos's laptop. (*Id.* at pp. 21–24).

In his written response, Mr. Dixit argues he complied with all discovery orders

---

[6] A March 3, 2020 order awarded HealthPlan $29,967.07. (Doc. 280).

and has no discovery left to produce. (Doc. 285-1, p. 1). Mr. Dixit contends Ms. Kutsomarkos produced everything requested and only testified that she thought Mr. Dixit would wipe the laptop because it was no longer in working order. (*Id.* at pp. 2–3). Mr. Dixit argues he produced the credentials for the laptop and blames his prior counsel for not providing those credentials to HealthPlan. (*Id.* at p. 3). Mr. Dixit contends he "made it clear to the court prior to being ordered to produce any additional partial backups in his possession, that what he had in his possession was not the same as what was originally produced." (*Id.*).

Ms. Kutsomarkos did not respond to HealthPlan's motion for default judgment.

## A.   Default Judgment Against Knowmentum, E-Integrate, and Media Shark

On November 1, 2019, E-Integrate's counsel moved to withdraw, and less than two months later, on December 22, 2019, Mr. Dixit's lead counsel moved to withdraw from representing Knowmentum, E-Integrate, and Media Shark. (Docs. 208, 236). At the January 24th discovery hearing, the court cautioned that counsel must represent the corporate defendants. (Doc. 268, 86:9–25). A January 28, 2020 order denying the motions to withdraw repeated that corporate defendants must have counsel to be heard. (Doc. 257).

Then, with Mr. Dixit present at the February 25th hearing, the court stated:

> Let me make one more point clear, to the extent that it hasn't been clear from my prior orders. As I've already indicated in this hearing, corporate entities must be represented in order to proceed in this Court. That's one of our local rules. At this point there has been plenty of time for the defendants to have hired new counsel, for the entities to hire new counsel, so they've been on notice for months now, so it's not a matter of

15

delaying the March 20th deadline because now the corporate entities
need more time to hire new counsel. There has been plenty of that.

(Doc. 281, 36:23–37:8). Both Mr. Dixit and Ms. Kutsomarkos stated Mr. Dixit controls
the corporate entities. Since December, Mr. Dixit repeatedly assured the court that
counsel would appear for the corporate entities. Yet Knowmentum, E-Integrate, and
Media Shark remain unrepresented months later.

A corporation can defend against a plaintiff's claims only through licensed
counsel. *Palazzo v. Gulf Oil Corp.,* 764 F.2d 1381, 1385 (11th Cir. 1985) ("The rule is
well established that a corporation is an artificial entity that can only act through
agents, cannot appear pro se, and must be represented by counsel."); Local Rule
2.03(e), M.D. Fla. By not obtaining new counsel, the corporation has failed to
"otherwise defend" against the lawsuit, and the court can enter default judgment.
*Global Tech LED, LLC v. Hilumz Int'l Corp.*, No. 3:15-cv-553-FtM-29CM, 2018 WL
2126956, at *4 (M.D. Fla. May 9, 2018); *see also McPartland v. ISI Inv. Servs., Inc.,*
890 F. Supp. 1029, 1032 (M.D. Fla. 1995).

Because Knowmentum, E-Integrate, and Media Shark lack counsel as required
by the Local Rule 2.03(e) and can no longer defend this action, the Clerk should enter
default. HealthPlan should be granted leave to file a legal memorandum and evidence
to establish the truth of its allegations and the amount of damages.

## B.   Default Judgment Against Mr. Dixit and Ms. Kutsomarkos

HealthPlan argues Mr. Dixit failed to comply with discovery orders under Rule
37(b) and Mr. Dixit and Ms. Kutsomarkos failed to preserve electronically stored

information (ESI) under Rule 37(e). Mr. Dixit's conduct warrants entry of default judgment on both grounds. Ms. Kutsomarkos's conduct does not warrant additional sanctions and certainly not the extreme sanction of default judgment.

### 1.    Rule 37(b) Sanctions Against Mr. Dixit

A district court has broad authority under Rule 37 to control discovery. *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997). "Rule 37 sanctions are imposed not only to prevent unfair prejudice to the litigants but also to [ensure] the integrity of the discovery process." *Aztec Steel Co. v. Fla. Steel Corp.*, 691 F.2d 480, 482 (11th Cir. 1982).

Federal Rule of Civil Procedure 37(b) authorizes the court to impose such sanctions "as are just" against a party that disobeys a discovery order. Fed. R. Civ. P. 37(b)(2). Possible sanctions include, in relevant part: "dismissing the action or proceeding in whole or in part," or "rendering a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A)(v)–(vi). "Instead of or in addition to [such sanctions], the court *must* order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C) (emphasis added).

Although default judgment is a sanction of "last resort," such a heavy sanction is appropriate when the disobedient party's noncompliance with a discovery order is willful, flagrant, or in bad faith. *Malautea v. Suzuki Motor, Co., Ltd.*, 987 F.3d 1536, 1542 (11th Cir. 1993); *Adolph Coors Co. v. Movement Against Racism and the Klan*,

17

777 F.2d 1538, 1543 (11th Cir. 1985) (citations omitted). The disobedient party's noncompliance with a discovery order cannot result from simple negligence, a misunderstanding, or the inability to comply. *Malautea*, 987 F.3d at 1542. And available less drastic sanctions must not be effective in ensuring compliance with the court's orders. *Id.* But when the noncompliant party shows "a flagrant disregard for the court and the discovery process," the "severe" sanction of default is not an abuse of discretion. *Aztec Steel Co.*, 691 F.2d at 481.

### a. Mr. Dixit's Conduct Was Willful, Flagrant, and in Bad Faith

Mr. Dixit repeatedly failed to comply with this court's discovery orders. Although Mr. Dixit contends he amended his discovery responses and claims he complied with the discovery orders, Mr. Dixit's discovery responses and production fall far short of what the orders required.

First, Mr. Dixit failed to comply with the court's order requiring production of the original hard drive from Ms. Kutsomarkos's laptop. (Doc. 200). At the October 16th hearing, when the court asked Mr. Dixit about the laptop, the following exchange occurred:

> MR. RAKESH DIXIT: So I have actually had to make significant upgrades because it is -- it was junk, quite frankly, it was -- the screen wouldn't stay lit. She testified in the deposition that it was -- I was having a tough time even doing the work that she was trying to do on it, and I made sure that I took the native files off carefully, I did an upgrade of the operating system, and everything else that she had on the notebook I backed up, they can have that, I don't care for it, and -- because I knew this would come up, and you want to give it to somebody, give it to somebody, but the laptop is now fixed, working and I want to keep using it.

THE COURT: Where is all of the information backed up?
MR. RAKESH DIXIT: Probably at my house.
THE COURT: But on what? On a hard drive?
MR. RAKESH DIXIT: Hard drive, yeah. Yeah, I'm sorry. Yeah, it's on a device.
THE COURT: It's on a different device. So you copied the hard drive of the laptop onto this other hard drive is what you're saying.
MR. RAKESH DIXIT: That's what I did.
THE COURT: Okay.
MR. RAKESH DIXIT: That's what it is.
THE COURT: So the hard drive, let's -- and otherwise, the laptop, did you clean the -- did you clean the laptop otherwise of everything that –
MR. RAKESH DIXIT: I had to actually put in a new hard drive.

\*     \*     \*

THE COURT: And you said, Mr. Rak Dixit, that you replaced the hard drive. Do you have the old hard drive that is no longer being used in the laptop?
MR. RAKESH DIXIT: I'll check, but there was no reason to keep it.
THE COURT: If you do have it –
MR. RAKESH DIXIT: Sure.
THE COURT: -- provide it with the external hard drive that you downloaded everything onto, provide both to your attorneys, and clearly mark which one is which, just to make it easier for everybody.
MR. RAKESH DIXIT: Okay.

(Doc. 203, 85:14–90:17).

In summary, Mr. Dixit had to produce both the back-up hard drive and the original hard drive, which was supposedly no longer in the laptop. Mr. Dixit was not to access the data on the hard drives. Despite Mr. Dixit testifying at the October 16th hearing that the laptop had a new hard drive, at the January 24th hearing, Mr. Dixit changed his testimony:[7]

THE COURT: In terms of the – let's talk about each item separately. So

---

[7] Despite being placed under oath at the October 16th and January 24th hearings, Mr. Dixit's testimony was inconsistent—even within the same hearing. (*See* Doc. 268, 14:11–16; Doc. 203, 4:21–25).

the laptop that was in the garage, what hard drive was in that laptop?
RAKESH DIXIT: What do you mean what laptop -- hard drive. The hard drive that was in it when I received it was the hard drive that was in it.
THE COURT: When you received it from whom?
RAKESH DIXIT: When Feron [Kutsomarkos] dropped it off at the warehouse.
THE COURT: So you had never removed that hard drive from the laptop?
RAKESH DIXIT: No.

(Doc. 268, 17:6–17).

Even though Mr. Dixit ultimately produced the laptop, HealthPlan's expert explained the laptop is encrypted and cannot be accessed without an encryption key or the username and password. (Doc. 273-1, ¶¶ 10, 12). When confronted with this information, Mr. Dixit explained the encryption software was already on the computer, but, because the laptop had his personal password, he changed the password to a system-generated password, put the new password on a Post-It note, and gave the Post-It note to his counsel (not lead counsel) with the laptop. His counsel, however, credibly stated that Mr. Dixit did not give him any Post-It note and Mr. Dixit mentioned nothing to him about a Post-It note.

Mr. Dixit not only failed to tell his counsel about the new system-generated password or the Post-It note, but Mr. Dixit did not alert the court to a possible password that could be on the devices. Additionally, the October 19, 2019 order directed Mr. Dixit not to access the laptop and hard drive. Yet, at the January 24th hearing, when asked if he accessed the laptop, Mr. Dixit said, "It's my laptop. Of course it's okay to access my laptop." (Doc. 268, 23:16–17). Rather than seek clarification from his counsel or the court, Mr. Dixit accessed the laptop and changed

20

the password from his personal password to a system-generated password. When

asked about the October 18, 2019 order, the following exchanged occurred:

> THE COURT: Would it surprise you that my order specifically stated,
> Mr. Dixit must not access any data on the external hard drive or the
> original hard drive? Would that surprise you?
> RAKESH DIXIT: Why would that surprise me?
> THE COURT: Well, I don't think it should, considering I was very clear
> about that during the hearing as well, so I'm asking you does it surprise
> you.
> RAKESH DIXIT: No.
> THE COURT: But yet you decided to access the hard drive and the
> computer?
> RAKESH DIXIT: You specifically said the data, and I did not.

(*Id.* at 26:21–27:18). Not only would HealthPlan's experts later determined that Mr.

Dixit had accessed the data, but by changing the password, Mr. Dixit made the laptop

inaccessible.

Second, Mr. Dixit failed to comply with the court's order requiring production

of the back-up hard drive from Ms. Kutsomarkos's laptop. (Doc. 200). At the October

16th hearing, Mr. Dixit testified:

> THE COURT: Where is all of the information backed up?
> MR. RAKESH DIXIT: Probably at my house.
> THE COURT: But on what? On a hard drive?
> MR. RAKESH DIXIT: Hard drive, yeah. Yeah, I'm sorry. Yeah, it's on a
> device.
> THE COURT: It's on a different device. So you copied the hard drive of
> the laptop onto this other hard drive is what you're saying.
> MR. RAKESH DIXIT: That's what I did.

(Doc. 203, 86:1–10). After HealthPlan's expert examined the October Back-Ups,

HealthPlan's expert stated the hard drive was created three days after that

testimony—on October 19, 2019.[8] (Doc. 273-1, ¶ 20). This timeline directly contradicts Mr. Dixit's testimony and also further showed Mr. Dixit accessed the data on the laptop to create the more limited October Back-Ups after being ordered not to access the laptop and the data on the laptop. Mr. Dixit also testified that he backed up everything from the laptop onto the hard drive, but HealthPlan's expert stated none of the October Back-Ups represent a complete back-up of the hard drive from the laptop because files and folders are missing. (*Id.* at ¶¶ 22–25).

When Mr. Dixit testified at the January 24th hearing about having another back-up (i.e., the September Back-Up), the following exchange occurred:

> THE COURT: . . . Mr. Dixit, the backup that you're saying -- the backup hard drive that you're saying that you have, at what time did you create[] that backup hard drive?
> RAKESH DIXIT: I don't recall when – there's several backups. The one I believe I gave was the one that was originally made when I was doing the native file production.
> THE COURT: So what about these backups that you're saying you may have now, when were they made?
> RAKESH DIXIT: Any time between when I created the -- or updated the disk to do the native file production to the time I delivered the laptop. It's not exactly a fast process, so whenever time was available.
> THE COURT: Why were you making the backups?
> RAKESH DIXIT: Why?
> THE COURT: Why do you have these multiple backups?
> RAKESH DIXIT: Well, the first time I actually looked at everything that was on the computer was when I was doing the native file production, and I found a ton of information on there highlighting fraud from HPS that I wanted to make sure I had secured and made available for future use.
> THE COURT: So that was the first time. What about after that?
> RAKESH DIXIT: I didn't get around to doing all of that until later, until you said to produce the hard drive and the backup.
> THE COURT: You didn't get around to doing what?

---

[8] Of note, Mr. Dixit's creation of the September Back-Up would not come to light until the January 24th hearing—over four months after the back-up was created.

> RAKESH DIXIT: Making the additional -- all the additional backups.
> THE COURT: So you made those after my -- after the October 16th hearing?
> RAKESH DIXIT: Correct.
> THE COURT: So what was the purpose of making additional backups at that time?
> RAKESH DIXIT: To make sure I have all of the original data.
> THE COURT: When you say "original data," so you mean the data that was on the laptop at the time that you received it from Feron Kutsomarkos?
> RAKESH DIXIT: Yes.
> THE COURT: So this backup that you have, at least one backup that you have in your possession, that one should be -- should basically be a mirror image of what was on the computer at the time that you received it from Feron Kutsomarkos?
> RAKESH DIXIT: I believe so. I don't save things like applications and things like that on images, but otherwise the data would be there.

(Doc. 268, 39:20–41:19). Based on this testimony, the court ordered Mr. Dixit to produce any remaining back-up hard drives. Mr. Dixit produced the September Back-Up.

HealthPlan's expert stated the September Back-Up was created on September 19, 2019 and contained additional files and folders not on the October Back-Ups. Neither hard drive, however, is a complete forensic image of the laptop. Again, HealthPlan's expert's review of the hard drive contradicts Mr. Dixit's testimony further showing Mr. Dixit is not credible.

Third, Mr. Dixit failed to comply with the court's multiple orders to amend his written responses to requests for production, to produce documents, and to provide a privilege log for any documents withheld from production. (Docs. 141, 200). HealthPlan received Mr. Dixit's first responses to requests for production on February 8, 2019. (Doc. 62-1). Even though Mr. Dixit's counsel agreed to amend the

responses, the May 31, 2019 amended written responses were still deficient. As a result, HealthPlan successfully compelled Mr. Dixit to amend his responses, which HealthPlan received on November 4, 2019. However, a comparison of the first amended responses dated May 31, 2019 with the court-ordered responses dated November 4, 2019 show the responses are identical to each other even showing the same June 17, 2019 production date. (Docs. 226-1, 226-2). Mr. Dixit never served amended responses.

Mr. Dixit states "[t]here is nothing left to produce," but HealthPlan argues the supplemental production contained no new documents and instead just re-produced previously produced documents. (Doc. 226, p. 2; Doc. 285-1). Additionally, Mr. Dixit failed to identify which produced documents responded to which requests for production. The second amended responses show only two requests for production have responsive documents with identifiable Bates numbers. (*See* Doc. 226-2). Mr. Dixit also failed to identify on a privilege log what documents were withheld as privileged but were otherwise responsive to Requests for Production Nos. 9, 45, 46, 48, 50.

Fourth, Mr. Dixit failed to comply with the court's multiple orders requiring him to amend his interrogatory answers. (Docs. 141, 200). At the July 29th discovery hearing, Mr. Dixit learned HealthPlan sought amended interrogatory answers. (Doc. 162, 93:1–6). Despite Mr. Dixit's representations that he amended his interrogatory answers, a comparison of the July 29, 2019 interrogatory answers with the October 31, 2019 interrogatory answers reveal little substantive changes. Mr. Dixit provided

24

a ten-page rambling narrative to Interrogatory No. 1(a). For his remaining interrogatory answers, Mr. Dixit repeatedly referred to his deficient answer to Interrogatory No. 1(a). (*See* Doc. 226-3).

Finally, Mr. Dixit failed to comply with the court's order to designate lead counsel who would remain lead counsel for the rest of the case. (Doc. 141). Despite designating lead counsel, Mr. Dixit refused to cede control and instead undermined lead counsel's efforts to professionally manage and respond to discovery. Then, when Mr. Dixit did not want to comply with court orders, he discarded lead counsel.

Mr. Dixit acted in bad faith and engaged in egregious discovery misconduct. He repeatedly violated the court's discovery orders. He lied under oath about Ms. Kutsomarkos's computer and the back-up hard drives he created. He undermined his lead counsel's attempt to comply with discovery orders and prevent discovery delays. Mr. Dixit's discovery antics warrant the most severe sanction of default judgment.

Mr. Dixit should pay HealthPlan's reasonable expenses, including attorney's fees, caused by Mr. Dixit's failure to comply with court orders. Mr. Dixit's failure to comply with numerous court orders since July 2019 was not substantially justified and other circumstances do not make an award of expenses against Mr. Dixit unjust. *See* Fed. R. Civ. P. 37(b)(2)(C).

### b.    The Prejudice to HealthPlan and the Court Is Significant

Mr. Dixit's blatant disregard and willful noncompliance with the court's orders has denied HealthPlan the ability to promptly resolve its claims. *See* Fed. R. Civ. P.

25

1 ("These rules . . . should be construed and administered to secure the just, speedy, and inexpensive determination of every action."). "In some cases, the speedy resolution of a case may be compromised for the sake of ensuring a just result or sparing some expense," but Mr. Dixit's unreasonable and unjustified refusal to engage in discovery and comply with the court's discovery orders "hindered the just resolution of this cause and increased the cost of the proceedings to all concerned." *See Marcelle v. Am. Nat. Delivery, Inc.*, No. 3:09-cv-82-J-34MCR, 2011 WL 1655531, at *2 (M.D. Fla. Jan. 12, 2010), report and recommendation adopted in part by 2010 WL 1655537 (M.D. Fla. Apr. 23, 2010).

Central to this litigation is Mr. Dixit's and Ms. Kutsomarkos's alleged misappropriation and use of HealthPlan's online software exchange platform. (*See* Doc. 37). Any computers or electronics used by Mr. Dixit and Ms. Kutsomarkos for their work with HealthPlan are relevant to whether the individual defendants saved trade secret information from HealthPlan on those devices. Mr. Dixit's actions to make Ms. Kutsomarkos's laptop inaccessible prevent HealthPlan from proving whether Mr. Dixit and Ms. Kutsomarkos misappropriated and used HealthPlan's trade secret information. Even though the laptop is inaccessible, HealthPlan's expert determined several folders existed on the laptop that are not on the hard drives. For example, one inaccessible folder labeled "ADS" on the laptop is in HealthPlan's amended complaint as part of HealthPlan's copyrighted materials. (Doc. 37, ¶ 33(f)). The contents of the folder are directly relevant to HealthPlan's claims of copyright infringement, but, because Mr. Dixit made the laptop inaccessible, HealthPlan

cannot access this evidence to determine whether it supports HealthPlan's prima facie case.

Additionally, Mr. Dixit's discovery strategy to deprive his counsel of authority and to provide deficient discovery responses and productions has succeeded in depriving HealthPlan of evidence. In addition to thwarting HealthPlan's ability to discover facts to prove its case, Mr. Dixit's conduct caused HealthPlan to incur extensive and unnecessary attorney's fees and expenses. HealthPlan incurred attorney's fees and expenses for the many discovery motions, five long discovery hearings before the court, and many court-ordered attorney meetings. Also, HealthPlan incurred additional expenses associated with hiring an expert to forensically examine Ms. Kutsomarkos's laptop and the two hard drives.

Mr. Dixit's actions also upended the court's ability to efficiently manage its own docket. Since March 2019, the parties filed over 200 filings relating to discovery disputes and not to the merits of the case. The time spent on those matters was time diverted from other litigants and cases.

### c.   Imposing Lesser Sanctions Than Default Judgment Would Be Futile

HealthPlan asks the court to enter a default judgment against Mr. Dixit on all claims and defenses. Given the egregious nature of Mr. Dixit's discovery violations and his flagrant disregard for the court's orders and the judicial process, the entry of default judgment is appropriate. This harsh sanction is warranted under these facts. Prior lesser sanctions have not stopped Mr. Dixit's ongoing violations of court orders.

Rule 37(b)(2) provides for imposing lesser sanctions ranging from staying the proceedings until the disobedient party obeys the court's orders, taking the matters addressed in the order as established, or imposing monetary sanctions designed to make the moving party whole. Rule 37(b)(2), however, broadly applies to *any* failure to comply with a court order or failure to provide or permit discovery. An offending party's non-compliance with an order could result from more defensible conduct ranging from an inability to comply with a discovery order to a misunderstanding to simple negligence. Courts must correlate the appropriate sanction with the disobedient party's conduct.

The court spent significant time trying to guide this case through discovery only to have the parties in the same position after nine months of Mr. Dixit's obstruction. Prior orders tried imposing lesser sanctions on Mr. Dixit without success. Twelve court orders gave Mr. Dixit additional time to respond to discovery motions or to produce already ordered discovery. (*See* Docs. 71, 119, 126, 159, 172, 175, 179, 210, 216, 225, 232, 239). The court also ordered Mr. Dixit to select lead counsel who would remain lead counsel for the rest of the case to handle all meetings, hearings, and negotiations with HealthPlan. (Doc. 141, ¶ 1). Additionally, the court ordered Mr. Dixit to attend the discovery hearings. (*Id.* at ¶ 12).

Despite requiring Mr. Dixit's presence at the discovery hearings, Mr. Dixit misrepresented facts at those hearings and still failed to comply with discovery orders. Three court orders then imposed monetary sanctions. (*See* Docs. 234, 252, 280). Even with monetary sanctions, Mr. Dixit continued to ignore court orders and

even directed his attorney not to comply with a court order. (*See* Doc. 236). Mr. Dixit never paid the monetary sanctions[9] or provided evidence of an inability to pay.

Considering Mr. Dixit's willful, flagrant, and prejudicial conduct, the entry of a default judgment and attorney's fees are warranted. Mr. Dixit's failure to comply with numerous court orders was not substantially justified and other circumstances do not make an award of expenses against Mr. Dixit unjust. Lesser sanctions have not cured the prejudice, have not ensured compliance with court orders, and have not adequately punished Mr. Dixit's bad faith disobedience.

### 2.   Rule 37(e) Sanctions Against Mr. Dixit and Ms. Kutsomarkos

"'Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 301 (11th Cir. 2009) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). "[S]anctions for discovery abuses are intended to prevent unfair prejudice to litigants and to [ensure] the integrity of the discovery process." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005).

To determine whether sanctions under Rule 37(e) are appropriate, the court must determine whether (1) the discovery sought constitutes ESI; (2) the ESI "should have been preserved in the anticipation or conduct of litigation"; (3) the ESI "is lost because a party failed to take reasonable steps to preserve it"; and (4) the ESI "cannot

---

[9] Mr. Dixit has failed to pay the $72,257.07 in attorney's fees that the court previously ordered. (*See* Docs. 234, 252, 280).

be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). "Once these threshold elements are satisfied, sanctions may be appropriate if the Court finds prejudice or finds that a party acted with the intent to deprive the moving party of the ESI at issue." *Wyndham Vacation Ownership, Inc., et al., v. American Consumer Credit, LLC, et al.*, No. 18-80095-CIV-RUIZ/REINHART, 2019 WL 4748328, at *5 (S.D. Fla. Aug. 30, 2019). Default judgment should be ordered only when lesser sanctions will not suffice. *See Flury*, 427 F.3d at 944–45.

### a.    Default Judgment Is Not Appropriate for Ms. Kutsomarkos

HealthPlan argues Ms. Kutsomarkos engaged in acts of spoliation by self-selecting and producing a limited set of documents before turning over the laptop to Mr. Dixit. (Doc. 273, p. 22). In 2017, Ms. Kutsomarkos used the laptop when she and her company Media Shark worked for HealthPlan. (Doc. 268, 55:18–20). Despite Ms. Kutsomarkos receiving the summons in November 2018, Ms. Kutsomarkos turned over the laptop to Mr. Dixit around July or August 2019. (Doc. 191-6). Thus, Ms. Kutsomarkos had a duty to preserve the laptop and the evidence on it.

At the January 24th hearing, Ms. Kutsomarkos testified she used the laptop to access HealthPlan's systems through a subset of their system that could not otherwise be accessed. (Doc. 268, 55:16–56:4). Ms. Kutsomarkos used the platform the entire time she worked for HealthPlan and used the log-in provided by HealthPlan. (*Id.* at 56:12–20). When HealthPlan terminated Ms. Kutsomarkos's contract, HealthPlan did not ask for the laptop or any information she created or

30

produced on HealthPlan's platform. (*Id.* at 58:24–59:6). Additionally, Ms. Kutsomarkos believed she completed her discovery production and gave the laptop over to Mr. Dixit because of technical problems with the laptop, not to deprive HealthPlan of any data. (*See* Doc. 191-6).

Ms. Kutsomarkos did not act in bad faith in turning over the laptop to Mr. Dixit who had acquired Media Shark, and HealthPlan did not seek the laptop until after Ms. Kutsomarkos gave it to Mr. Dixit. (Doc. 268, 57:5–10). Ms. Kutsomarkos' role in failing to preserve the laptop and the ESI was not sufficiently willful or in bad faith to warrant entry of default judgment against her.

The court previously ordered Ms. Kutsomarkos to attend multiple discovery hearings. (Doc. 141, ¶ 12). Despite residing in Michigan and incurring substantial costs to travel to Tampa, Ms. Kutsomarkos faithfully showed up and participated at the October 16th, January 24th, and February 25th hearings. (*See* Docs. 203, 268, 281). Ms. Kutsomarkos's testimony was credible and honest at the hearings. Further, nothing from her testimony, HealthPlan's arguments at the discovery hearings, and the briefs indicates Ms. Kutsomarkos schemed with Mr. Dixit. Rather, all the issues related to the laptop stem from Mr. Dixit's conduct.

### b.      Default Judgment Is Appropriate for Mr. Dixit

Mr. Dixit works routinely with ESI and has been on notice since receiving his summons in October 2018 of his duty to preserve ESI for litigation. The laptop contains ESI such as emails, documents, and metadata. Mr. Dixit actively concealed the data on the laptop by putting a mystery password on the laptop. HealthPlan's

expert stated the laptop is inaccessible, and the documents and data stored on the laptop, which were not produced on either of the two back-up hard drives, cannot be recovered or replaced. (*See* Doc. 273-2).

As discussed above, Mr. Dixit's actions to make Ms. Kutsomarkos's laptop inaccessible prevent HealthPlan from gathering evidence to support its claims. Whether the laptop is detrimental or helpful to Mr. Dixit's case is irrelevant at this point because no one, other than Mr. Dixit, knows for certain. *See Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 133 (S.D. Fla. 1987). ("[W]hile it is now impossible to determine precisely what or how many documents were destroyed, the bad faith destruction of a relevant document, by itself, 'gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction.'") (citations omitted).

Here, the court is not being asked to infer bad faith from "circumstances of inadvertent destruction of evidence or negligence in losing material data." *Swofford v. Eslinger*, 671 F. Supp. 2d 1274, 1282 (M.D. Fla. 2009). Rather, Mr. Dixit's calculated actions exhibit a "knowing and willful disregard for the clear obligation to preserve evidence solely" within his possession and control, and HealthPlan has no other source to determine the inaccessible laptop's contents. *Id.*

At the October 16th hearing, Mr. Dixit never once mentioned a password despite knowing the laptop was protected by one of his personal passwords. But at the January 24th hearing, Mr. Dixit testified under oath about why he accessed the laptop in the following exchange with HealthPlan's counsel:

32

[MR. FERNANDEZ:] And it was okay in your mind, or in your belief, to access the laptop after the Court instructed you not to access it?

[MR. RAKESH DIXIT:] Nobody would have it if I didn't access it.

[MR. FERNANDEZ:] Okay. You accessed the laptop after October 16th, correct?

[MR. RAKESH DIXIT:] The date that I dropped it off is when I accessed it.

[MR. FERNANDEZ:] And you dropped it off on October 19th?

[MR. RAKESH DIXIT:] I believe so.

[MR. FERNANDEZ:] And you accessed it for the purpose of encrypting the laptop?

[MR. RAKESH DIXIT:] No.

[MR. FERNANDEZ:] What was the purpose of accessing the laptop on October 19th?

[MR. RAKESH DIXIT:] Removing my password, personal password, and using a system generated password.

(Doc. 268, 23:18 – 24:8).

When asked what he did with the system-generated password, Mr. Dixit stated he allegedly wrote the password on a Post-It note. However, when asked about the Post-It note and Mr. Dixit's exchange with his attorney when he dropped off the laptop, Mr. Dixit testified:

THE COURT: When he did that did you say, oh, wait, that's the Post-it, be careful, that's the one password to be able to access all of this data? Did you say anything to him to impress upon him the importance of the Post-it note?

RAKESH DIXIT: It already said I.D. and password on it.

THE COURT: Did you tell him everything had been password protected?

 RAKESH DIXIT: No. I didn't.

THE COURT: Why not?

RAKESH DIXIT: I handed it to him with the Post-it on it, with the I.D. and password on the Post-it, and to me that is not something that needs to be explained.

(*Id.* at 21:11–24). However, both of Mr. Dixit's counsel credibly represented that Mr. Dixit never told them there was a password on the laptop nor did Mr. Dixit provide

any paper containing a password. By changing the password and providing no one with the new password, Mr. Dixit made the laptop inaccessible and deprived HealthPlan of relevant evidence.

Despite Mr. Dixit's remark about the length of time between when he turned over the laptop and hard drive to when HealthPlan determined that credentials were necessary to access the laptop, that length of time resulted from Mr. Dixit's delay tactics. Mr. Dixit gave the laptop to his counsel (not lead counsel) in October, and HealthPlan timely disclosed an expert and sought an inspection of the laptop in early November. (Doc. 202, p. 3). At Mr. Dixit's direction, his counsel did not turn over the laptop but tried to institute new protocols (Docs. 202, 213), until a December 19, 2019 order required counsel to disobey Mr. Dixit and transfer to HealthPlan the laptop and hard drive (Doc. 233). Despite ordering Mr. Dixit's counsel to turn over the laptop and hard drive on December 23, 2019, Mr. Dixit attempted again to prevent this exchange by having lead counsel move to withdraw and Mr. Dixit telling lead counsel not to turn anything over until he had new counsel. (*See* Doc. 236). Mr. Dixit's lead counsel did not turn over the laptop to HealthPlan until a December 23, 2019 order reaffirmed lead counsel's duty to turn over the laptop on December 23, 2019. (Doc. 238).

The Southern District of Florida addressed similar circumstances in *Wyndham*. *See Wyndham*, 2019 WL 4748328. In *Wyndham*, Mr. Dana Micallef, the owner of American Consumer Credit (ACC), allegedly "intentionally deceived Wyndham customers into retaining ACC and defaulting on timeshare contracts they previously entered into with Wyndham." *Id.* at *1. After the court granted

Wyndham's request for relevant documents from ACC and Mr. Micallef, Mr. Micallef tried to prevent Wyndham from receiving the documents by hiring a company to relocate equipment and shred documents. *Id.* at *1, 3. "Only through the intervention of the local police department was Wyndham able to secure the documents." *Id.* at *2. However, Wyndham could not recover any electronic documents and emails because Mr. Micallef had sold the computers. *Id.* at *5. The court found Mr. Micallef acted in bad faith and the only appropriate sanction for his conduct was to enter a default judgment. *Id.* at *5–6.

Mr. Dixit's actions are as flagrant as Mr. Micallef's in *Wyndham*. Mr. Dixit knew HealthPlan wanted to examine Ms. Kutsomarkos's laptop because Mr. Dixit was present at that discovery hearing when HealthPlan requested the forensic imaging and search of the computer. Mr. Dixit knew litigation was ongoing and any evidence showing Mr. Dixit misappropriated HealthPlan's trade secrets was central to the dispute. Knowing these things, Mr. Dixit deliberately concealed the evidence on Ms. Kutsomarkos's laptop that would have been necessary for HealthPlan to prove its prima facie case.

The inherent authority to sanction a party's spoliation of evidence by granting default judgment is a sanction of "last resort" and is appropriate only where lesser sanctions are not adequate. *Malautea*, 987 F.2d 1536, 1542. Here, Mr. Dixit's repeated impermissible actions warrant the ultimate sanction of entry of default judgment.

As already addressed in the Rule 37(b) sanctions section above, the entry of a

default judgment is recommended because none of the lesser sanction previously employed have sufficed. This case is in the same posture as it was more than one year ago. Mr. Dixit has, willfully, flagrantly, and in bad faith, repeatedly changed his story about the now inaccessible laptop and hard drives. Thus, the entry of a default judgment against Mr. Dixit is an appropriate sanction for failing to preserve ESI.

### C.   Motion for Sanctions

Before HealthPlan requested the severe sanction of default judgment, HealthPlan moved for several less severe sanctions. (*See* Docs. 168, 190, 226, 228). Previously, various orders granted additional time for discovery compliance, required attendance of the individual defendants at discovery hearings, ordered weekly in-person discovery meetings, and awarded attorney's fees as a sanction but did not grant contempt or show cause orders (beyond requiring further hearings and progress in advance of those hearings). (Doc. 200, 252).

Even though the court awarded some prior sanctions from HealthPlan's pending motions, HealthPlan still seeks a contempt order for Mr. Dixit, a finding of litigation misconduct, adverse jury instructions, show cause orders, and a daily sanction against Mr. Dixit. (*See* Docs. 226, 248). Additionally, HealthPlan also moves for attorney's fees in its December 5, 2019 motion for sanctions. (*See* Doc. 226). Also within those motions, HealthPlan sought default judgment if Mr. Dixit failed to comply with any request.

As discussed above, entry of default judgment—the most severe sanction—is appropriate against Mr. Dixit because of his conduct. Default judgment against the

36

corporate defendants is appropriate because of their failure to retain new counsel to defend this action. Because this most severe sanction of default is recommended against these four defendants, no additional lesser sanctions are necessary in response to the two earlier motions.

## III.   CONCLUSION

It is **RECOMMENDED:**

1.      HealthPlan's motion for entry of default judgment (Doc. 273) should be

**GRANTED IN PART and DENIED IN PART.**

a.      **Knowmentum, E-Integrate, and Media Shark**

i.       A clerk's default should be entered against E-Integrate, Media Shark, and Knowmentum.

ii.      HealthPlan should be permitted leave to file a renewed motion for default judgment against the corporate defendants that establishes the truth of its allegations and the amount of damages.

iii.     Because E-Integrate cannot proceed without counsel, E-Integrate's counterclaims (Doc. 83) should be dismissed.

b.      **Rakesh Dixit**

i.       Default judgment should be granted as to Mr. Dixit.

ii.      HealthPlan should be permitted leave to supplement the record to establish the truth of its allegations and the amount of damages.

     iii.     HealthPlan should be awarded reasonable attorney's fees and costs.

     iv.     HealthPlan should be permitted leave to supplement the record with necessary documentation including affidavits and fee records.

    c.    **Feron Kutsomarkos**

     i.     Default judgment should be denied as to Ms. Kutsomarkos.

     ii.     HealthPlan and Ms. Kutsomarkos should be ordered to file a joint notice addressing the status of Ms. Kutsomarkos's bankruptcy proceedings.

2.    HealthPlan's motions for sanctions (Doc. 226) should be **DENIED as moot**.

3.    HealthPlan's additional sanctions in its motion to compel compliance (Doc. 248) should be **DENIED as moot**.

**ENTERED** in Tampa, Florida, on July 29, 2020.

AMANDA ARNOLD SANSONE
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

The parties have fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections. 28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1. A party's failure to object timely in accordance with 28 U.S.C. § 636(b)(1) waives that party's right to challenge on appeal the district court's order adopting this report's unobjected-to factual findings and legal conclusions. 11th Cir. R. 3-1.