EXHIBIT C

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

|  |  |  |
|---|---|---|
| | : | |
| **HEALTHPLAN SERVICES, INC.,** | : | **Case No. 8:18-cv-2608-SDM-AAS** |
| Plaintiff, | : | |
| *v.* | : | |
| **RAKESH DIXIT,** | : | |
| **FERON KUTSOMARKOS,** | : | |
| **E-INTEGRATE, INC.,** | : | |
| **KNOWMENTUM, INC., and** | : | |
| **MEDIA SHARK PRODUCTIONS, INC.,** | : | |
| Defendants. | : | |
| | : | |

DECLARATION OF JOHN G. PLUMPE

CONFIDENTIAL

---

# I   INTRODUCTION

**1.** My name is John Plumpe. I am a Managing Director of Epsilon Economics ("Epsilon"), an economic consulting firm. Since 1999, my practice has focused on the analysis of damages, monetary relief, and valuation issues in complex commercial disputes and transactions, including trade secret, copyright, trademark, and patent matters. I have written articles and spoken extensively to various professional organizations and law schools on subjects such as intellectual property damages, defendant's profits, reasonable royalties, and valuation. A copy of my curriculum vitae is attached as Tab 1.

**2.** I have been asked by Brinks Gilson and Lione ("Brinks" or "Counsel"),

counsel to HealthPlan Services, Inc. ("HealthPlan" or "Plaintiff") to provide this dec-
laration in a matter that HealthPlan has brought against Rakesh Dixit, E-Integrate,
Inc. ("E-Integrate"), Knowmentum, Inc. ("Knowmentum"), and Media Shark Pro-
ductions, Inc. ("Media Shark Productions")(collectively, the "Default Judgment De-
fendants"), and Feron Kutsomarkos (collectively, the "Defendants"). I understand
that HealthPlan filed its complaint against Defendants for federal trade secret mis-
appropriation, Florida deceptive and unfair trade practices, common law unfair com-
petition, copyright infringement, and breach of contract.[1] I further understand that
the Court has granted HealthPlan's motion for default judgment against the Default
Judgment Defendants, and has granted HealthPlan leave to "append to the motion
evidence substantiating damages."[2] For the purposes of this declaration, I have been
asked to assume that, due to the default judgment entry against the Default Judgment
Defendants, all of the claims and allegations in Plaintiff's First Amended Complaint
have been found to be true.

    **3.** I have reviewed and considered the information and data provided to me
in this case to date, which form, in part, the basis for the opinions expressed herein.
I have also held discussions with HealthPlan personnel and reviewed the Declaration
of Dennis Prysner.[3] The calculations and opinions described in this declaration may
be supplemented based on additional information or other data that may be made
available to me in the future.

# II   SUMMARY OF OPINIONS

    **4.** For the purposes of this declaration, I have been asked to limited my anal-
ysis, as discussed herein, to the ExchangeLink® software system ("ExchangeLink")
source code, which I understand is only a portion of the ExchangeLink trade secrets.

---

[1] First Amended Complaint, December 17, 2018, page 1.

[2] Order, August 21, 2020, page 3.

[3] Declaration of Dennis Prysner, October 13, 2020.

On the basis of the information made available to me, discussions with HealthPlan
personnel, and analyses described more fully in this declaration, I determined that
the Default Judgment Defendants' avoided development costs associated with only
a portion of the source code of HealthPlan's ExchangeLink software system were *at
least* $2.48 million, during the time period it was misappropriated, ending by approx-
imately June 2018.[4]

5.    The $2.48 million amount establishes a lower bound of the Default Judg-
ment Defendants' avoided costs in this matter for a number of reasons:

- First, the amount is only for HealthPlan expenditures incurred in its inter-
  nally developed software ("IDS") efforts from 2011 to 2015 that were 100%
  attributable to the development of ExchangeLink source code, which I under-
  stand was misappropriated by one or more of the Default Judgment Defendants,
  or unlawfully provided to one or more of the Default Judgment Defendants by
  Ms. Kutsomarkos;

- Second, not included in the amount is any portion of the approximately $16.13
  million in HealthPlan expenditures incurred in its IDS investment from 2011 to
  2015 that included ExchangeLink efforts related to the development of Health-
  Plan's Go-To-Exchange software system, but which were less than 100% at-
  tributable to the development of ExchangeLink source code;

- Third, the amount does not include HealthPlan expenditures incurred in its
  IDS efforts after 2015 related to ExchangeLink;

- Fourth, the amount only includes personnel costs (*i.e.*, HealthPlan employees
  and contractors) incurred in developing ExchangeLink source code, and not, for
  example, purchased third-party software expenses; and

---

[4]I understand from HealthPlan that Ms. Kutsomarkos was terminated in June 2018, and until
that time had access to the HealthPlan trade secrets, including ExchangeLink source code and other
related files.

- Fifth, the amount does not include the development costs of other trade secrets and confidential information that were misappropriated.

**6.** I may be asked to update my analysis in the event that additional financial documents, data, or information are entered into evidence. In connection with any testimony that might be requested of me in this matter, I may use as exhibits various documents which refer or relate to the matters discussed in this declaration. In addition, certain demonstrative exhibits may be created to assist in testimony regarding monetary relief opinions.

**7.** The remainder of this declaration and attached tabs describe the bases and analyses underlying the above conclusion, based on the information and data presently available to me.

# III  ASSIGNMENT

**8.** Epsilon was retained by Brinks on behalf of HealthPlan in this matter. I was asked to compute the Default Judgment Defendants' avoided development costs due to the misappropriations, using HealthPlan's development costs as a proxy, as of the time that the trade secrets were misappropriated by or unlawfully provided to one or more of the Default Judgment Defendants by Ms. Kutsomarkos. The scope of Epsilon's work included reviewing documents and information produced in this matter and interviewing HealthPlan personnel for the purpose of providing this declaration.

**9.** In preparing this declaration, I reviewed various documents and materials, including legal filings, pleadings, and financial information, as well as other publicly available information. A list of materials I considered in forming the opinions set forth herein is attached as Tab 2. I also had discussions with the following HealthPlan personnel:

- Dennis Prysner, Senior Vice President – Healthcare Reform, HealthPlan Services

Confidential                                                                                            5

- Paul Swain, Director, Financial Planning & Analysis, HealthPlan Services

**10.** In conducting this assignment, I have been asked to assume that, due to the default judgment entry against the Default Judgment Defendants, all of the claims and allegations in Plaintiff's Amended Complaint have been found to be true.

**11.** Epsilon is compensated for my work in this matter at the rate of $525 per hour and for the work of other staff members at their hourly rates. Epsilon's compensation for work in this matter is not dependent on the outcome of the case or the substance of my opinions.

# IV  BACKGROUND

## A  HealthPlan

**12.** HealthPlan is a nationwide provider of sales, benefits administration, retention, reform, and technology solutions to the insurance and managed care industries.[5]

**13.** HealthPlan:

... was founded in 1970 and employs 1,500+ associates... Our Go-To-Exchange platform combines the services of ExchangeLink, SalesLink, ServiceLink and LoyaltyLink products to enable the connectivity, enrollment, reconciliation, eligibility, subsidy and premium billing, member services and renewals for over 5.0 million members, including 2.4 million members on public exchanges and over 1.2 million members on private exchanges. HPS connects 6 of the nation's largest insurers to public and state exchanges in 39 states and has a market share of 21%.[6]

---

[5]First Amended Complaint, December 17, 2018, paragraph 15.

[6]<www.healthplan.com>.

### i  ExchangeLink System

**14.** Between at least 2011 and 2015, HealthPlan developed ExchangeLink, a healthcare-related software system that connects organizations to public and private health insurance exchanges.[7] "It aggregates and processes data across multiple healthcare platforms and distribution channels. HealthPlan invested nearly $100 million. . . into developing the ExchangeLink system."[8] In addition, HealthPlan invested heavily in commercializing, marketing and promoting the ExchangeLink system through the development of comprehensive specialized scripts, videos, and presentations to market and promote the system to healthcare insurance and managed care service providers nationwide.[9] Ultimately, many of the largest insurance and managed care providers in the U.S. implemented the ExchangeLink system, and it became the premier software system associated with the Affordable Care Act.[10]

**15.** I understand HealthPlan's trade secrets associated with ExchangeLink include the ExchangeLink coding and confidential business information.[11]

## B  Defendants

**16.** Defendants E-Integrate and Mr. Dixit were among the contractors hired by HealthPlan in the development of ExchangeLink.[12] They had access to all aspects of ExchangeLink, including the software program's source and object code.[13] Defendants Ms. Kutsomarkos and Media Shark Productions were also contracted by HealthPlan, to market and promote ExchangeLink, including on-boarding of new

---

[7]First Amended Complaint, December 17, 2018, paragraph 1.

[8]First Amended Complaint, December 17, 2018, paragraph 1.

[9]First Amended Complaint, December 17, 2018, paragraph 20.

[10]First Amended Complaint, December 17, 2018, paragraph 1.

[11]First Amended Complaint, December 17, 2018, paragraph 28. The confidential business information includes, for example: pricing arrangements, strategies and practices; market intelligence and research; pricing systems; client lists and market research regarding clients and prospective clients; methods for training and educating customers and prospective customers about the strategic use of the ExchangeLink system; process and flow systems used in the onboarding process; and intricacies of enrollment processing.

[12]First Amended Complaint, December 17, 2018, paragraph 18.

[13]First Amended Complaint, December 17, 2018, paragraph 19.

clients.[14]  Ms. Kutsomarkos' had "access to confidential pricing arrangements, lists and the identification of clients and prospective clients, process and flow systems used in the onboarding process, new client rates, the intricacies of how enrollments are processed, as well as the actual scripts and presentations HealthPlan uses to sell and educate prospective clients."[15]

### i  Rakesh Dixit

**17.**  Rakesh Dixit is a former employee of HealthPlan.[16]  Mr. Dixit owned E-Integrate and Knowmentum during the relevant times, and entered into contracts with Media Shark Productions.[17]

### ii  Feron Kutsomarkos

**18.**  Feron Kutsomarkos was an owner of Media Shark Productions during the relevant times.[18]

### iii  E-Integrate

**19.**  E-Integrate was a software development contractor that contracted and subcontracted its services to HealthPlan, and was administratively dissolved for failure to pay dues.[19]

### iv  Knowmentum

**20.**  Knowmentum is a software development company controlled and/or owned by Mr. Dixit.[20]

---

[14]First Amended Complaint, December 17, 2018, paragraphs 21-23.
[15]First Amended Complaint, December 17, 2018, paragraph 23.
[16]First Amended Complaint, December 17, 2018, paragraph 10.
[17]First Amended Complaint, December 17, 2018, paragraph 123.
[18]First Amended Complaint, December 17, 2018, paragraph 125.
[19]First Amended Complaint, December 17, 2018, paragraph 12.
[20]First Amended Complaint, December 17, 2018, paragraph 13.

**v   Media Shark Productions**

**21.** Media Shark Productions is a media and marketing company owned by Ms. Kutsomarkos and/or Mr. Dixit, and contracted its media and marketing services to HealthPlan.[21]

## C   Case Summary and Timeline

**22.** I understand that HealthPlan alleges numerous wrongful acts by Mr. Dixit and the other Defendants, and that these allegations with respect to the Default Judgment Defendants should be assumed to be true due to the default judgment entered in this case. A summary and timeline of select events related to this matter include:

- Mr. Dixit, while an employee of HealthPlan, misappropriated ExchangeLink; required HealthPlan to pay himself and E-Integrate more than $750,000 for the return of ExchangeLink, and wrongfully retained a copy of ExchangeLink;[22]

- In late 2011, HealthPlan engaged Ultramatics (who employed Mr. Dixit) in connection with the development of ExchangeLink;[23]

- In May 2013, HealthPlan hired Mr. Dixit to be its Vice President, Links Core Product Development;[24]

- In 2013, Mr. Dixit directed persons working on the coding components of the HealthPlan project to upload their work (the "Source Code") to cloud-based source code repositories (the "SourceRepo Library"). In late November 2013, Mr. Dixit — while an employee at HealthPlan — restricted HealthPlan's access

---

[21] First Amended Complaint, December 17, 2018, paragraph 14.
[22] First Amended Complaint, December 17, 2018, paragraph 2.
[23] First Amended Complaint, December 17, 2018, paragraph 34.
[24] First Amended Complaint, December 17, 2018, paragraph 37.

to the Source Code on the SourceRepo Library. As a result, Mr. Dixit took
exclusive control of the ExchangeLink platform;[25]

- On December 5, 2013, written demands were made to both E-Integrate and
  Mr. Dixit for production of all account information that would enable Health-
  Plan to access the SourceRepo Library and/or otherwise gain access to the
  Source Code;[26]

- On December 6, 2013, counsel for HealthPlan demanded that E-Integrate relin-
  quish administrative control. E-Integrate refused, and claimed that Ultramatics
  owed it more than $500,000 and required that HealthPlan pay E-Integrate the
  entire amount in return for releasing ExchangeLink. Despite his position as a
  Vice President of HealthPlan and having control over the Source Code, Mr. Dixit
  refused to release to HealthPlan the Source Code because it "would not be in
  the best interest of E-Integrate;"[27]

- In early 2014, HealthPlan severed ties with E-Integrate, and terminated Mr.
  Dixit's employment;[28]

- Instead of returning or destroying all copies of the Source Code, Mr. Dixit and
  E-Integrate retained one or more copies of the Source Code, as well as numerous
  additional HealthPlan trade secrets;[29] and

- Within months of his termination, Mr. Dixit carried out a scheme to use the
  HealthPlan trade secrets to deceive others.[30]

**23.** I have also been asked to assume that following Mr. Dixit's termination
from HealthPlan in early 2014,[31] Ms. Kutsomarkos provided him with HealthPlan

---

[25]First Amended Complaint, December 17, 2018, paragraphs 39-40.
[26]First Amended Complaint, December 17, 2018, paragraph 41.
[27]First Amended Complaint, December 17, 2018, paragraphs 44-46.
[28]First Amended Complaint, December 17, 2018, paragraph 56.
[29]First Amended Complaint, December 17, 2018, paragraph 59.
[30]First Amended Complaint, December 17, 2018, paragraph 58.
[31]First Amended Complaint, December 17, 2018, paragraph 56.

trade secrets, confidential information, and other copyrighted material, until her termination from HealthPlan in June 2018.[32]

# V   CALCULATION OF MONETARY RELIEF

## A   Misappropriation of Trade Secrets

**24.**  Although HealthPlan alleges that Defendants have committed acts of copyright infringement, trade secret misappropriation, other torts, and multiple breaches of contract, I have been asked in this declaration to consider monetary relief for trade secret misappropriation. I understand that the 2016 Defend Trade Secrets Act ("DTSA") established a federal cause of action for trade secret misappropriation.

**25.**  I understand that monetary relief in federal trade secret misappropriation cases is governed by the DTSA, which states:[33]

> (b)(3) Remedies...with respect to the misappropriation of a trade secret, a court may − ...(B) award −
>
> (i)(I) damages for actual loss caused by the misappropriation of the trade secret; and
>
> (i)(II) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or
>
> (ii) in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret;

**26.**  Further, "if the trade secret is willfully and maliciously misappropriated,

---

[32]First Amended Complaint, December 17, 2018, paragraph 71; and discussions with HealthPlan personnel.
[33]18 U.S. Code § 1826(b)(3)(B).

award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B)."[34] Moreover, "if a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, a motion to terminate an injunction is made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated, award reasonable attorney's fees to the prevailing party."[35]

## B   Default Judgment Defendants' Unjust Enrichment

**27.**  I have been asked by Counsel to quantify monetary relief relating to the Default Judgment Defendants' unjust enrichment in the form of their avoided development costs, as of the time that the trade secrets were misappropriated by or provided to the Default Judgment Defendants.

**28.**  I understand that courts may award the equitable remedy of unjust enrichment *in lieu* of, or in addition to, actual damages (*e.g.*, lost profits).  I understand that unjust enrichment (also referred to as ill-gotten gains) can include various economic measures such as the defendant's increased revenues/profits, decreased production costs, avoided development costs, and/or advantages associated with a head start in the marketplace, among other things.

**29.**  Trade secrets are generally developed through investments in time, research, and development.  The misappropriation of trade secrets by another party generally eliminates or reduces the misappropriator's initial investment in development and enables it to develop new products/services, or improve existing products, at a lower cost and/or in a decreased time frame.  In this matter, I understand that the Default Judgment Defendants re-packaged HealthPlan's ExchangeLink as "Fit," and attempted to use this and other of HealthPlan's trade secrets to their economic benefit in competing against HealthPlan.[36]

---

[34]18 U.S. Code § 1826(b)(3)(C).
[35]18 U.S. Code § 1826(b)(3)(D).
[36]First Amended Complaint, December 17, 2018, paragraphs 4 and 58.

**30.** To quantify the Default Judgment Defendants' avoided development costs, I analyzed HealthPlan's historical development expenditures associated with only certain of the misappropriated trade secrets. Due to limits in HealthPlan's historical cost accounting records, only certain activities relating to the development of ExchangeLink are included in the analysis described in this declaration. Therefore, the avoided costs discussed and quantified in this declaration are specific to a subset of the totality of trade secrets that the Default Judgment Defendants have been found to have misappropriated. This renders the avoided cost calculations in this report conservative (*i.e.*, understated).[37]

**31.** These actual development expenditures serve as a proxy to assess the development costs avoided by the Default Judgment Defendants due to their misappropriations. The avoided development costs represent the value of the misappropriated trade secrets during the time period they were misappropriated. I understand that the trade secrets were misappropriated over a period of time, potentially up until the time when Ms. Kutsomarkos was terminated by HealthPlan in June 2018.

**32.** In developing this declaration, I reviewed HealthPlan's IDS-related financial information; reviewed corresponding supporting information; reviewed the Declaration of Dennis Prysner, October 13, 2020; and had discussions with Mr. Swain and Mr. Prysner of HealthPlan.

---

[37]For example, the avoided development costs quantified herein:

- Are only for HealthPlan expenditures incurred in its IDS efforts from 2011 to 2015 that were 100% attributable to the development of ExchangeLink source code;

- Do not include HealthPlan expenditures incurred in its IDS efforts from 2011 to 2015 that included ExchangeLink efforts related to the development of HealthPlan's Go-To-Exchange software system, but which were less than 100% attributable to the development of ExchangeLink source code;

- Do not include HealthPlan expenditures incurred in its IDS efforts after 2015 related to ExchangeLink;

- Are only for personnel expenditures (*i.e.*, HealthPlan employees and contractors) incurred in developing ExchangeLink source code; and

- Do not include the development expenditures for other trade secrets and confidential information that were misappropriated.

**33.** I requested HealthPlan to provide historical development costs for the misappropriated trade secrets. In response, HealthPlan provided information for 2011 to 2015 regarding all of its historical IDS personnel-related expenditures based on archived employee/contractor project time tracking and hourly cost data, from which accounting "journal entries" were created and entered into HealthPlan's general ledger.[38] These data, summarized by year and by project/task, are presented in Tab 3, and are the actual expenditures for personnel labor that HealthPlan incurred to develop ExchangeLink source code.

**34.** I understand from discussions with HealthPlan that these personnel costs include the salaries and benefits (or in the case of contractors, hourly rates) necessary to pay the people who developed ExchangeLink, which I understand to be, in part, the misappropriated trade secrets.[39] I understand from HealthPlan that the provided IDS data are based on accounting data that were collected, compiled, and maintained by HealthPlan in the normal course of operating its business, and further, these data formed the basis of HealthPlan's financial results audited by the accounting firm PricewaterhouseCoopers.[40]

**35.** Next, HealthPlan personnel identified which specific IDS projects/tasks were 100% attributable to developing ExchangeLink source code (highlighted in green in Tab 3).[41] I understand that the costs identified for these projects/tasks represent only a portion of the personnel labor costs incurred by HealthPlan to develop the trade secrets that the Default Judgment Defendants have been determined to have misappropriated. HealthPlan personnel also identified which specific IDS projects/tasks were partially attributable to developing ExchangeLink source code (highlighted in

---

[38]Declaration of Dennis Prysner, October 13, 2020, paragraphs 16-21. A general ledger represents the record-keeping system for a company's financial data with debit and credit account records validated by a trial balance. The general ledger provides a record of each financial transaction that takes place.

[39]*See also*, Declaration of Dennis Prysner, October 13, 2020, paragraph 18.

[40]*See also*, Declaration of Dennis Prysner, October 13, 2020, paragraphs 12-14.

[41]*See also*, Declaration of Dennis Prysner, October 13, 2020, paragraph 23 and Annex 2.

yellow in Tab 3).[42] Those yellow-highlighted IDS developing projects/tasks were not considered as part of the analysis in this declaration.

**36.** The projects/tasks for which 100% of the IDS expenditures were attributable to the development of ExchangeLink source code from 2011 to 2015 are:[43]

- GoTo Exchange Exchange Link — $1.15 million. Time billed to this project included the majority of the foundational work of the ExchangeLink development efforts and included data transformation, business rules, file management, etc.;

- EMC (ExchangeLink Management Console) — $0.82 million. Time billed to this project was associated with the development of the User Interface Tool — ExchangeLink Management Console, which served as the primary means to view, manage, resolve discrepancies, and report daily transaction file activity between the Public & Private Exchanges and HealthPlan;

- Transformation - Exchange Link (Multiprotocol B2B Gateway) — $0.54 million. Time billed to this project related directly to the efforts to design a key ExchangeLink system component that was required to receive, translate and send messages to and from other systems. This was a requirement of being able to transact enrollment and financial files with federal and state government entities, as well as carrier clients; and

- Enrollment Enhancements (11060) — relatively small negative dollars, which I understand are associated with a timing-related "credit" to another general ledger account.[44] Time billed to this project related to necessary enhancements, due to ExchangeLink, to the core enrollment engines and databases to support the ingestion of new codes and business rules developed by the government (Centers for Medicare Services).

---

[42] *See also*, Declaration of Dennis Prysner, October 13, 2020, paragraph 24 and Annex 2.
[43] Declaration of Dennis Prysner, October 13, 2020, paragraph 23; and Tab 3.
[44] Based on discussions with Mr. Prysner and Mr. Swain.

**37.** I considered adjusting the above development costs to account for the notion that software and software platforms do not, in general, have perpetual useful lives, and thus their economic value may decay over time. Based on discussions with Mr. Prysner and my review of his declaration, I understand that the ExchangeLink IDS projects and related source code that I quantified as avoided costs are all in use today largely as originally developed, and that HealthPlan continues to generate significant economic benefits through the use of ExchangeLink as originally coded.[45] Also, HealthPlan developed ExchangeLink add-ons post 2015, but prior to the termination of Ms. Kutsomarkos, at additional costs (not included in my avoided cost quantification) that created additional value to ExchangeLink.[46] Further, economic inflation would increase the "today" value of the historical investment dollars. Therefore, the specific facts of this case indicate that an adjustment to the quantified avoided costs to account for software obsolescence is not warranted.

**38.** As shown in Tab 3, based on my analysis of the documents reviewed and discussions with HealthPlan personnel, HealthPlan incurred $2.48 million in IDS expenses from 2011 to 2015 that are 100% attributable to developing ExchangeLink source code, and this represents a lower bound of the Default Judgment Defendants' avoided costs during the time of the misappropriation.

# VI   CONCLUSION

**39.** For the purposes of this declaration, I have been asked to limited my analysis, as discussed herein, to the ExchangeLink® software system ("ExchangeLink") source code, which I understand is only a portion of the ExchangeLink trade secrets. On the basis of the information made available to me, discussions with HealthPlan personnel, and analyses described more fully in this declaration, I determined that the Default Judgment Defendants' avoided development costs associated with only

---

[45] *See also*, Declaration of Dennis Prysner, October 13, 2020, paragraph 25.
[46] *See also*, Declaration of Dennis Prysner, October 13, 2020, paragraph 25.

a portion of the source code of HealthPlan's ExchangeLink software system were *at least* $2.48 million, during the time period it was misappropriated, ending by approximately June 2018.[47]

**40.** The $2.48 million amount establishes a lower bound of the Default Judgment Defendants' avoided costs in this matter for a number of reasons:

- First, the amount is only for HealthPlan expenditures incurred in its internally developed software ("IDS") efforts from 2011 to 2015 that were 100% attributable to the development of ExchangeLink source code, which I understand was misappropriated by one or more of the Default Judgment Defendants, or unlawfully provided to one or more of the Default Judgment Defendants by Ms. Kutsomarkos;

- Second, not included in the amount is any portion of the approximately $16.13 million in HealthPlan expenditures incurred in its IDS investment from 2011 to 2015 that included ExchangeLink efforts related to the development of HealthPlan's Go-To-Exchange software system, but which were less than 100% attributable to the development of ExchangeLink source code;

- Third, the amount does not include HealthPlan expenditures incurred in its IDS efforts after 2015 related to ExchangeLink;

- Fourth, the amount only includes personnel costs (*i.e.*, HealthPlan employees and contractors) incurred in developing ExchangeLink source code, and not, for example, purchased third-party software expenses; and

- Fifth, the amount does not include the development costs of other trade secrets and confidential information that were misappropriated.

---

[47] I understand from HealthPlan that Ms. Kutsomarkos was terminated in June 2018, and until that time had access to the HealthPlan trade secrets, including ExchangeLink source code and other related files.

Confidential                                                                    17

**41.**  I may be asked to update my analysis in the event that additional financial documents, data, or information are entered into evidence.  In connection with any testimony that might be requested of me in this matter, I may use as exhibits various documents which refer or relate to the matters discussed in this declaration.  In addition, certain demonstrative exhibits may be created to assist in testimony regarding monetary relief opinions.

**42.**  I may supplement the calculations and opinions described in this declaration based on additional information, expert reports, deposition transcripts, or other data that may be made available to me in the future.


John G. Plumpe

October 13, 2020

Tab 1



## John G. Plumpe
### Managing Director

Epsilon Economics                                  Office:  312.637.2943
111 South Wacker Drive; 50th Floor                 Mobile:  773.213.3962
Chicago, Illinois 60606

jplumpe@epsiloneconomics.com

## Summary

John Plumpe is a Managing Director of Epsilon Economics.  Mr. Plumpe specializes in analyzing the economic aspects of intellectual property, and provides litigation and valuation expert services involving trademarks/trade dress, false advertising, patents, trade secrets, copyrights, and other intangible assets. Since 1999 he has worked with plaintiffs and defendants in the analysis and reporting of lost profits, defendant's profits, reasonable royalties, brand value, and other forms of monetary relief in intellectual property infringement, breach of contract, and related matters. Mr. Plumpe has testified at trial in federal district court, in deposition, and in arbitration on issues including intellectual property damages, monetary relief, and valuation; breach of contract damages; licensing; business valuation; false advertising monetary relief; defamation damages; economic aspects of irreparable harm; and commercial success.


Mr. Plumpe also consults on engagements involving the valuation of businesses and intellectual property for financial reporting, mergers and acquisitions, joint ventures, licensing transactions, bankruptcy proceedings, transfer pricing, financing, and tax purposes. In addition, he assists clients in developing and implementing strategies and processes for managing and commercializing their intellectual property portfolios.


Mr. Plumpe is the author of several published articles regarding intellectual property valuation, due diligence, and monetary relief. He has also spoken to legal organizations and taught law school classes on these subjects.



Prior to joining Epsilon Economics, Mr. Plumpe was a Principal in the intellectual property practice of Charles River Associates. Previously, he worked in the management consulting practice of a Big Four public accounting firm, assisting an Internet startup with a new product strategy. In addition, he worked for two national engineering and architecture firms, helping clients optimize the energy efficiency of their buildings and campuses through the analysis and design of HVAC systems. He has published two papers in technical research journals regarding the fluid dynamics of multiphase flows.

Mr. Plumpe is on the Board of Directors of the Lawyers for the Creative Arts. Lawyers for the Creative Arts provides pro bono legal assistance to clients in all areas of art, culture, media, and entertainment, including the visual, literary, and performing arts.

## Education

- M.B.A., University of Chicago Booth School of Business

- M.S., Mechanical Engineering, University of Illinois

- B.S., Mechanical Engineering, University of Illinois

## Professional Affiliations

- International Trademark Association: Enforcement Committee (Discovery Practices & Procedures Subcommittee), Government Officials Education & Training Committee, Leadership Development Committee, Brand Valuation Project Team, Building Bridges Committee (Chair of Financial and Standard-Setting Subcommittee)

- Intellectual Property Owners Association: U.S. Trademark Law Committee (Chair of Monetary Relief working group)

- Lawyers for the Creative Arts: Board of Directors



## Professional Experience

- **Epsilon Economics**
  2017 – present

- **Charles River Associates / InteCap, Inc.**
  1999 - 2017

## Expert Testimony

- Deckers Outdoor Corporation v. Target Corporation
  Case No. 2:19-cv-06215
  United States District Court, Central District of California
  Deposition Testimony

- Club Champion LLC v. True Spec Golf LLC
  Case IPR2019-01148
  United States Patent and Trademark Office, Patent Trial and Appeal Board
  Deposition Testimony

- American Society of Home Inspectors, Inc. v. International Association of Certified Home Inspectors, *et al.*
  Case No. 1:18-cv-01797
  United States District Court, District of Colorado
  Deposition Testimony

- Bluetooth SIG, Inc. v. FCA US LLC
  Case No. 2:18-cv-01493
  United States District Court, Western District of Washington
  Deposition Testimony

- Jonathan Otto v. Hearst Communications, Inc.
  Case No. 1:17-cv-04712
  United States District Court, Southern District of New York
  Trial Testimony

- True Spec Golf LLC, *et al.* v. Club Champion LLC
  Case No. 1:19-cv-00633
  United States District Court, Southern District of New York
  Deposition Testimony (second)

- adidas America, Inc., *et al.* v. Forever 21, Inc., *et al.*
  Case No. 3:17-cv-00377
  United States District Court, District of Oregon
  Deposition Testimony



- Universal Standard Inc. v. Target Corporation, *et al.*
  Case No. 1:18-cv-06042
  United States District Court, Southern District of New York
  Deposition Testimony

- Mahindra & Mahindra Ltd, *et al.* v. FCA US LLC
  Case No. 2:18-cv-12645
  United States District Court, Eastern District of Michigan
  Deposition Testimony

- True Spec Golf LLC, *et al.* v. Club Champion LLC
  Case No. 1:19-cv-00633
  United States District Court, Southern District of New York
  Deposition Testimony (first)

- Syntel Sterling Best Shores Mauritius Limited, *et al.* v. The TriZetto Group, Inc., *et al.*
  Case No. 1:15-cv-00211
  United States District Court, Southern District of New York
  Deposition Testimony

- Car-Freshner Corporation, *et al.* v. Energizer Holdings, Inc., *et al.*
  Case No. 5:17-cv-171
  United States District Court, Northern District of New York
  Deposition Testimony

- Deckers Outdoor Corporation v. Romeo & Juliette, Inc., *et al.*
  Case No. 2:15-cv-02812
  United States District Court, Central District of California
  Trial Testimony

- FUJIFILM North America Corporation v. Abesons Corp, *et al.*
  Case No. 1:16-cv-05677
  United States District Court, Eastern District of New York
  Deposition Testimony

- Arizona Family Florists, LLC, *et al.* v. 1-800-FLOWERS.COM, Inc., *et al.*
  Case No. 2:16-cv-2638
  United States District Court, Eastern District of New York
  Deposition Testimony

- Computer Programs and Systems, Inc. and Evident, LLC v. Wazu Holdings, Ltd. and Evident, Inc.
  Case No. 1:15-cv-00405
  United States District Court, Southern District of Alabama
  Deposition Testimony



- Express Homebuyers USA, LLC v. WBH Marketing, Inc.
  Case No. 1:17-cv-00736
  United States District Court, Eastern District of Virginia
  Deposition Testimony

- NST Global, LLC d/b/a SB Tactical v. KAK Industry LLC, *et al.*
  Case No. 8:15-cv-00935
  United States District Court, Middle District of Florida
  Deposition Testimony

- Car-Freshner Corporation, *et al.* v. Crocs, Inc.
  Case No. 7:16-cv-0068
  United States District Court, Northern District of New York
  Deposition Testimony

- adidas America, Inc., *et al.* v. TRB Acquisitions LLC, *et al.*
  Case No. 3:15-cv-02113
  United States District Court, District of Oregon
  Deposition Testimony

- Norvax, LLC v. Access Clinical Partners, LLC
  Case No. 1:16-cv-00550
  United States District Court, Southern District of New York
  Deposition Testimony

- U.S. Footwear, LLC v. JRA Trademark Company, Ltd.
  Claim No. 01-16-00001-3444
  American Arbitration Association
  Arbitration Testimony

- adidas America, Inc., *et al.* v. Skechers USA, Inc.
  Case No. 3:15-cv-01741
  United States District Court, District of Oregon
  Deposition Testimony

## Speeches and Publications

- "Recent Trends in Monetary Relief in Lanham Act Litigation Matters in the United States,"
  International Trademark Association -  Annual Meeting, May 2019.

- "Recent Trends in Monetary Relief in Lanham Act Litigation Matters in the United States,"
  International Trademark Association -  Annual Meeting, May 2018.

- "Show Me The Money! A Primer on Lanham Act Damages," New York Intellectual Property Law Association, November 2016.

- "Litigation Strategies: New U.S. Federal Trade Secrets Law," Meritas U.S./Canada Litigation and Labor & Employment Group Joint Fall Meeting, October 2016.

- "Current Trends and Topics on Monetary Relief in Lanham Act Litigation in the United States," International Trademark Association -  Annual Meeting, May 2016.

- "An Introduction to Trademark Valuation and Infringement Damages," presented to Chicago-Kent College of Law, Trademarks and Unfair Competition Class, March 2016.

- "The Rise of SVOD: How the Growth of Subscription Video-on-Demand Impacts Copyright Holders," with Ben W. Sheppard, Landslide, ABA Section of Intellectual Property Law, September/October 2015.

- "Federal Circuit Provides Guidance on Jury Instructions on Apportionment of Patent Damages," with Kimberly J. Schenk, New York State Bar Association Intellectual Property Section Bright Ideas, Spring/Summer 2015.

- "Calculation of Damages in Trademark Infringement Cases," International Trademark Association - Annual Meeting, May 2015.

- "Monetary Relief Under the Lanham Act," presented to the John Marshall Law School, Advanced Trademark Law Class, March 2015.

- "An Introduction to Trademark Valuation and Infringement Damages," presented to Chicago-Kent College of Law, Trademarks and Unfair Competition Class, March 2015.

- "Profit Apportionment in Intellectual Property Damages: The Unique Case of Design Patents," with Kimberly J. Schenk, NYIPLA Bulletin, December 2014/January 2015.

- "An Introduction to Trademark Valuation and Infringement Damages," presented to Chicago-Kent College of Law, Trademarks and Unfair Competition Class, April 2014.

- CRA Insights: Intellectual Property, co-editor, Charles River Associates quarterly newsletter, 2014- 2016.

- "Recent Trends in Trademark Damages Awards in the United States," International Trademark Association -Annual Meeting, May 2013.

- "Intellectual Property Valuation," presented to the John Marshall Law School, Trademark Transactions Class, April 2013.



- "Monetary Relief Under the Lanham Act," presented to the John Marshall Law School, Advanced Trademark Law Class, November 2012.

- "Recent Trends in Trademark Damages Awards in the United States," International Trademark Association - Annual Meeting, May 2012.

- "Monetary Relief in Lanham Act Cases," presented to the John Marshall Law School, Trademark Litigation Class, April 2012.

- "Assessing Damages in Intellectual Property Cases," panel presentation to the Chicago Bar Association Intellectual Property Law Committee, April 2012.

# Tab 2

# List of Materials Considered

***Reports and Declarations, Including Exhibits and Appendices Therein***

1. Declaration of Dennis Prysner, October 13, 2020.

***Pleadings and Other Court Documents***

1. Complaint, October 23, 2018.

2. Defendant Knowmentum Inc.'s Amended Responses and Objections to Plaintiff's First Request for Production of Documents, May 31, 2019.

3. Defendant Knowmentum Inc.'s Amended Responses and Objections to Plaintiff's First Set of Request for Production of Documents, May 31, 2019.

4. Defendant Knowmentum Inc.'s Objections and Answers to Plaintiff's First Set of Interrogatories, July 28, 2019.

5. Defendant Media Shark Productions, Inc.'s Amended Responses and Objections to Plaintiff's First Request for Production of Documents, May 31, 2019.

6. Defendant Media Shark Productions, Inc.'s Amended Responses and Objections to Plaintiff's First Set of Request for Production of Documents, May 31, 2019.

7. Defendant Media Shark Productions, Inc.'s Objections and Answers to Plaintiff's First Set of Interrogatories, July 28, 2019.

8. Defendant Rakesh Dixit's Amended Responses and Objections to Plaintiff's First Request for Production of Documents, May 31, 2019.

9. Defendant Rakesh Dixit's Amended Responses and Objections to Plaintiff's First Set of Request for Production of Documents, May 31, 2019.

CONFIDENTIAL

Tab 2

10. Defendant Rakesh Dixit's Objections and Answers to Plaintiff's First Set of Interrogatories, July 28, 2019.

11. E-Integrate, Inc.'s Second Amended Response to Plaintiff's First Set of Request for Production of Documents and Things (Relating to Defendant's Financials), August 25, 2019.

12. First Amended Complaint, December 17, 2018.

13. Order, August 21, 2020.

14. Report and Recommendation, July 29, 2020.

### Data and Documents

1. CapEx Research 8-13-2019 BLDPv2.xls.

### Discussions

1. Dennis Prysner, Senior Vice President – Healthcare Reform, HealthPlan Services.

2. Paul Swain, Director, Financial Planning & Analysis, HealthPlan Services.

### Financial Information

1. HPH Holdings Corp. and Subsidiaries and Affiliates, Combined Financial Statements, December 31, 2013 and 2012.

2. HPH Holdings Corp. and Subsidiaries and Affiliates, Combined Financial Statements, December 31, 2015 and 2014.

3. HPH Holdings Corp. and Subsidiaries and Affiliates Combined Financial Statements for the Year Ended December 31, 2012 and for the Period August 18, 2011 Through December 31, 2011 (Successor) and Consolidated Financial Statements for the Period January 1, 2011 Through August 17, 2011 (Predecessor).

4. Wipro Limited, Form 20-F, for the fiscal year ended March 31, 2017.

## *Websites*

1. <www.healthplan.com>.

## *Books, Articles, and Other Information*

1. 18 U.S. Code § 1826.

2. Elizabeth A. Evans, Joseph J. Galanti, and Daniel G. Lentz, "Developing Damages Theories and Models," in: Roman L. Weil, Daniel G. Lentz, and David P. Hoffman, Litigation Services Handbook: The Role of The Financial Expert, Fifth Edition, John Wiley & Sons, Inc., 2012.

3. Elizabeth Evans and Peter Simon, "Economic Analysis of Nonpatent Intellectual Property Rights and Damages Measures," in: Roman Weil, Daniel Lentz, and David Hoffman, Editors, Litigation Services Handbook: The Role of the Financial Expert, Sixth Edition (John Wiley & Sons), 2017.

4. Mark Allen, Robert Hall, and Victoria Lazear, "Reference Guide on Estimation of Economic Damages," in: Federal Judicial Center and National Research Council, Reference Manual on Scientific Evidence, Third Edition, Washington, D.C.: The National Academies Press, 2011.

**Tab 3**

# HealthPlan Service, Inc.
## *Internally Developed Software ("IDS") Expenses*

| Project Description [1] | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| **IDS Expenses 100% Tied to Developing Exchange Link Source Code** | | | | | | |
| GoTo Exchange Exchange Link | $0 | $687,844 | $354,883 | $109,625 | $0 | $1,152,351 |
| EMC | $0 | $0 | $0 | $821,833 | $0 | $821,833 |
| Transformation - Exchange Link (Multiprotocol B2B Gateway) | $0 | $535,515 | $0 | $0 | $0 | $535,515 |
| EMC – On HIX | $0 | $0 | $0 | $0 | $0 | $0 |
| Enrollment Enhancements (11060) | $0 | -$27,763 | $0 | $0 | $0 | -$27,763 |
| *Sub-Total* | | | | | | *$2,481,937* |
| **IDS Expenses In Part Tied to Developing Exchange Link Source Code** | | | | | | |
| GoTo Exchange HIX Onboarding | $0 | $401,456 | $6,453,520 | $169,685 | $0 | $7,024,660 |
| GoTo Exchange Infrastructure | $0 | $169,337 | $2,512,540 | $365,064 | $0 | $3,046,941 |
| Security & Compliance | $0 | $0 | $734,197 | $1,780,159 | $0 | $2,514,356 |
| G2E Roadmap | $0 | $0 | $0 | $0 | $891,186 | $891,186 |
| G2E Reg | $0 | $0 | $0 | $0 | $877,015 | $877,015 |
| IT Transformation | $587,171 | $0 | $0 | $0 | $0 | $587,171 |
| GoTo Exchange | $0 | $570,403 | $0 | $0 | $0 | $570,403 |
| Configurators | $0 | $0 | $0 | $195,741 | $0 | $195,741 |
| G2E Reconciliation | $0 | $0 | $0 | $177,330 | $0 | $177,330 |
| Mainframe Stabilization | $0 | $0 | $0 | $130,294 | $0 | $130,294 |
| Batch Optimization | $0 | $0 | $0 | $91,483 | $0 | $91,483 |
| GoTo Exchange Reform Readiness Infrastructure | $0 | $16,057 | $0 | $0 | $0 | $16,057 |
| GoTo Exchange Carrier Onboarding | $0 | $3,126 | $0 | $0 | $0 | $3,126 |
| Growth - Batch Optimization | $0 | $0 | $0 | $1,897 | $0 | $1,897 |
| Mainframe Upgrade | $0 | $0 | $0 | $580 | $0 | $580 |
| *Sub-Total* | | | | | | *$16,128,239* |

| Project Description [1] | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| **IDS Expenses Not Considered For Analysis** | | | | | | |
| Various Projects | | | | | | |
| *Sub-Total* | | | | | | *$22,359,305* |
| **Total** | $3,510,056 | $7,982,470 | $18,059,262 | $7,053,140 | $4,364,552 | **$40,969,481** |
| Internally Developed Software Capitalized Costs [2] | $5,600,000 | $12,200,000 | $21,700,000 | $11,500,000 | $5,300,000 | **$56,300,000** |

**Sources:**

[1] Category data from HealthPlan Services accounting databases used in the originally course of business. Compiled in "CapEx Research 8-13-2019 BLDPv2.xls."
See also Declaration of Dennis Prysner, October 13, 2020, Annex 2.

[2] Reports of Independent Certified Public Accountants (PricewaterhouseCoopers, LLP):

HPH Holdings Corp. and Subsidiaries and Affiliates, Combined Financial Statements, December 31, 2015 and 2014, page 12.
HPH Holdings Corp. and Subsidiaries and Affiliates, Combined Financial Statements, December 31, 2013 and 2012, page 11.
HPH Holdings Corp. and Subsidiaries and Affiliates Combined Financial Statements for the Year Ended December 31, 2012 and for the Period August 18, 2011 Through December 31, 2011 (Successor) and Consolidated Financial Statements for the Period January 1, 2011 Through August 17, 2011 (Predecessor), page 12.

Tab 3