UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**HEALTHPLAN SERVICES, INC.,**

      **Plaintiff,**

v.                              **Case No. 8:18-cv-2608-SDM-AAS**

**RAKESH DIXIT, FERON
KUSTOMARKOS, E-INTEGRATE,
INC., KNOWMENTUM, INC, and
MEDIA SHARK PRODUCTIONS, INC.,**

      **Defendants.**
_____/

## REPORT AND RECOMMENDATION

HealthPlan Services, Inc. (HealthPlan) moves for default judgment, monetary damages, and a permanent injunction against Rakesh Dixit, E-Integrate, Inc., Knowmentum, Inc., and Media Shark Productions, Inc. (the Dixit defendants). (Doc. 306, Ex. 1). HealthPlan also requests its attorney's fees and expenses. (Doc. 306, Ex. 4). The undersigned recommends HealthPlan's motion be **GRANTED in part** and **DENIED in part.**

## I.    BACKGROUND

### A.    Procedural History

In the original complaint, HealthPlan alleges Mr. Dixit, Ms. Feron Kutsomarkos, E-Integrate, Media Shark, and Knowmentum violated the

1

Defend Trade Secrets Act and the Florida Deceptive Unfair Trade Practices Act, and engaged in unfair competition and copyright infringement in violation of the Copyright Act. (Doc. 1, ¶¶ 73–115). HealthPlan asserts Mr. Dixit and Ms. Kutsomarkos engaged in vicarious acts of copyright infringement, and they induced the copyright infringement of E-Integrate, Media Shark, and Knowmentum. (*Id.* at ¶¶ 116–37). HealthPlan alleges E-Integrate and Media Shark breached their respective contracts with HealthPlan. (*Id.* at ¶¶ 138–51).

In November 2018, Ms. Kutsomarkos and E-Integrate moved to dismiss HealthPlan's complaint for failure to state a claim and failure to join an indispensable party. (Doc. 25). In December 2018, Mr. Dixit, Media Shark, and Knowmentum also moved to dismiss HealthPlan's complaint for failure to state a claim. (Doc. 32). Although HealthPlan responded to the motions to dismiss (Docs. 33, 40), HealthPlan also amended its complaint (Doc. 37).

The amended complaint includes the same eight counts as the original complaint. (Doc. 37). Mr. Dixit, Media Shark, and Knowmentum renewed their motion to dismiss. (Doc. 49). Ms. Kutsomarkos and E-Integrate answered the amended complaint, asserted affirmative defenses, and alleged two counterclaims for breach of contract and unfair and deceptive trade practices. (Doc. 53). HealthPlan moved to strike Ms. Kutsomarkos's and E-Integrate's answers and affirmative defenses and also moved to dismiss their

2

counterclaims. (Docs. 54, 56). An April 4, 2019 order denied Mr. Dixit's, Media Shark's, and Knowmentum's motion to dismiss. (Doc. 76, p. 9). The order also granted in part HealthPlan's motion to strike Ms. Kutsomarkos's and E-Integrate's answers and dismissed Ms. Kutsomarkos's and E-Integrate's breach of contract counterclaim. (*Id.*).

Mr. Dixit, Media Shark, and Knowmentum answered and asserted affirmative defenses. (Doc. 80). Ms. Kutsomarkos and E-Integrate amended their answers, asserted affirmative defenses, and alleged the same two counterclaims. (Doc. 83). HealthPlan answered and asserted affirmative defenses in reply to the counterclaims. (Doc. 98).

As the case proceeded through discovery, the court held multiple discovery hearings to address numerous discovery disputes. (*See* Doc. 289, pp. 2–7 (detailing discovery hearings and motions)). In response to Mr. Dixit's discovery abuses and spoliation of Ms. Kutsomarkos's laptop, HealthPlan moved for default judgment. (Doc. 273). The undersigned recommended the court grant HealthPlan's motion for default and the Clerk enter default against Mr. Dixit and his corporate entities, E-Integrate, Knowmentum, and Media Shark. (Doc. 289). However, the undersigned did not recommend default

against Ms. Kutsomarkos. (*Id.* at pp. 30–31).[1]

An August 21, 2020 order adopted the undersigned's report and recommendation. (Doc. 294). The Clerk entered default against Mr. Dixit and his corporate entities. (Docs. 295, 296, 297, 298). The court gave HealthPlan leave to file a renewed motion for default judgment to substantiate damages. (Doc. 294, p. 3).

HealthPlan timely renewed its motion for default judgment (Doc. 306), which Mr. Dixit opposes (Doc. 314, Ex. 2).

### B.    Facts

HealthPlan is a nationwide provider of sales, benefits administration, retention, reform, and technology solutions to insurance and managed care industries. (Doc. 37, ¶ 15). Beginning in 2011, HealthPlan began to develop ExchangeLink®, a technologically advanced software platform to be used by insurance and managed care companies. (*Id.* at ¶ 14).

HealthPlan owns extensive trade secrets that relate to ExchangeLink® including: (1) ExchangeLink® coding; (2) confidential pricing arrangements, strategies, and practices; (3) market intelligence and research with ExchangeLink® software; (4) pricing systems used with ExchangeLink®

---

[1] Ms. Kutsomarkos filed a petition of bankruptcy in Michigan. (*See* Doc. 286).

software; (5) proprietary client lists and marketing research about clients and prospective clients; (6) methods for training and educating its customers and prospective customers about the strategic use of ExchangeLink® system; (7) process and flow used in the onboarding process; and (8) the intricacies of enrollment processing. (*Id.* at ¶ 28). HealthPlan owns the right, title, and interest in the copyrights for ExchangeLink® software and all the associated marketing and promotional materials (HealthPlan Copyrighted Materials). (*Id.* at ¶ 32). The HealthPlan Copyrighted Materials included seven copyright registrations issued from the United States Copyright Office to HealthPlan. (*Id.* at ¶ 33).

HealthPlan hired many contractors, subcontractors, and employees to help develop this software. The contractors included Ultramatics, Mr. Dixit, and Mr. Dixit's company E-Integrate. (*Id.* at ¶ 18). Mr. Dixit and E-Integrate continued the development of the ExchangeLink® system software code and had complete access to every aspect of ExchangeLink®, including source and object code. (*Id.* at ¶¶ 18–19). In May 2013, HealthPlan hired Mr. Dixit to be Vice President of the Links Core Product Development, and he supervised and managed various aspects of ExchangeLink® development. (*Id.* at ¶¶ 37–38).

In 2013, Mr. Dixit directed those working on the coding components of the project to upload their work to a cloud-based source code library and

restricted HealthPlan's access to the library. (*Id.* at ¶¶ 39–40). This gave Mr. Dixit exclusive control over the entire ExchangeLink® platform. (*Id.* at ¶ 40). In December 2013, HealthPlan demanded access to the source code library, but Mr. Dixit, through his company E-Integrate, refused and stated that HealthPlan owed E-Integrate over $500,000 and he would give HealthPlan access only after HealthPlan paid the money. (*Id.* at ¶¶ 41–45).

E-Integrate then offered to return the source code in exchange for a long-term contract and up-front payments of $775,420.69, which was the amount owed to E-Integrate from Ultramatics. (*Id.* at ¶ 47). HealthPlan had paid Ultramatics in full for the work of E-Integrate. (*Id.* at ¶ 48). In January 2014, HealthPlan and E-Integrate signed a consulting agreement (HealthPlan-EI Agreement) in which Mr. Dixit represented that he had returned the source code and kept no copy of it. (*Id.* at ¶¶ 51–52). The HealthPlan-EI Agreement strictly prohibited Mr. Dixit and E-Integrate from retaining a copy of the source code. (*Id.* at ¶ 54). Shortly after, HealthPlan severed all ties with E-Integrate and terminated Mr. Dixit's employment. (*Id.* at ¶ 56).

Ms. Kutsomarkos[2] and her company Media Shark contracted with

---

[2] The court previously denied HealthPlan's motion for default judgment against Ms. Kutsomarkos. (*See* Docs. 289, 294). Still, Ms. Kutsomarkos's role and actions at HealthPlan are relevant for addressing HealthPlan's claims for default judgment against the Dixit defendants.

6

HealthPlan to commercialize, market, and promote ExchangeLink®. (*Id.* at ¶ 21). Under the Media Shark Agreement, Media Shark could not perform any activities or services for others and could not disclose HealthPlan's confidential information to third parties. (*Id.* at ¶ 137–38). Ms. Kutsomarkos's role afforded her access to HealthPlan's confidential pricing arrangements, lists, and identification of clients and prospective clients; process and flow systems used in the onboarding process; new client rates; the intricacies of how enrollments are processed; and the actual scripts and presentations HealthPlan used to sell and educate prospective clients. (*Id.* at ¶ 23).

After Mr. Dixit's termination, he and E-Integrate retained a copy of the source code and many of HealthPlan trade secrets. (*Id.* at ¶ 60). While still working for HealthPlan, Ms. Kutsomarkos and Media Shark worked with Mr. Dixit to develop a software platform known as "Fit." (*Id.* at ¶¶ 60–61). "Fit" was a rebranding of ExchangeLink®. (*Id.* at ¶ 61). Also, by working with Ms. Kutsomarkos, Mr. Dixit had access to HealthPlan's copyrighted marketing materials and used them in the "Fit" demonstration package. (*Id.* at ¶¶ 62–65). In 2014, after learning of Ms. Kutsomarkos's and Media Shark's involvement with Mr. Dixit, HealthPlan terminated its relationship with Ms. Kutsomarkos

and Media Shark.[3] (*Id.* at ¶ 71).

Mr. Dixit induced Dr. Michael Bojkovic, among others,[4] to invest in his development of "Fit." (*Id.* at ¶ 86). Dr. Bojkovic invested $1,001,325. (Doc. 306, Ex. 1, Annex 1). When Dr. Bojkovic asked questions about the lack of progress on developing "Fit," Ms. Kutsomarkos, at Mr. Dixit's direction, used the same presentation she developed for HealthPlan to assure Dr. Bojkovic the software platform was being developed. (*Id.*). As time progressed, the relationship between Dr. Bojkovic and Mr. Dixit became strained and Dr. Bojkovic asked Mr. Dixit to transfer the project to him. (*Id.*). At Mr. Dixit's direction, Ms. Kutsomarkos lead the project transfer meeting. (*Id.*). However, Dr. Bojkovic never received the "Fit" platform and sued multiple entities, including Mr. Dixit, Knowmentum, Media Shark, and Ms. Kutsomarkos, for this deception and the return of his $1,001,325 investment. (*Id.*).

## II.   LEGAL STANDARD

A defendant who defaults is deemed to have admitted all well-pleaded allegations of fact in a complaint. *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987) (quoting *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*,

---

[3] In April 2018, Ms. Kutsomarkos transferred Media Shark to Mr. Dixit. (Doc. 306, Ex. 1, Annex 3, 4).

[4] Taking the well-pleaded allegations of HealthPlan's complaint as true, Mr. Dixit deceived more investors for hundreds of thousands of dollars. (Doc. 37, ¶ 70).

8

515 F.2d 1200, 1206 (5th Cir. 1975)[5] (internal quotation marks omitted)). Complaints need not contain detailed factual allegations, but there must be "more than an unadorned, the defendant unlawfully harmed me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Frazier v. Absolute Collection Service, Inc.*, 767 F. Supp. 2d 1354, 1362 (N.D. Ga. 2011) (Thrash, J.) (considering declaration testimony, well-pleaded allegations in complaint, and reasonable inferences from such allegations to determine whether a plaintiff stated claims for relief).

Although default judgment on liability accepts well-pleaded allegations as true, allegations about damages are not automatically accepted. *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999) (Bucklew, J.). The court must instead determine the amount and types of damages to award. *Id.* (citation omitted); *see also* Fed. R. Civ. P. 55(b) (stating the court may conduct hearings to determine the amount of damages to award).

The court need not conduct a hearing under Rule 55(b) if the record clearly establishes the amount of damages. *Giovanno v. Fabec*, 804 F.3d 1361, 1366 (11th Cir. 2015) (citations omitted). Detailed affidavits alone can establish the amount of damages. *Adolph Coors Co. v. Movement Against*

---

[5] Decisions by the former Fifth Circuit issued before October 1, 1981, are binding as precedent in the Eleventh Circuit. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

*Racism and the Klan*, 777 F.2d 1538, 1543–44 (11th Cir. 1985) (citations omitted). Here, HealthPlan provides detailed affidavits and records clearly establishing the amount of damages it requests.

"A plaintiff must also establish that the damages sought are reasonable under the circumstances." *Armadillo Distribution Enterprises, Inc. v. Hai Yun Musical Instruments Manufacture Co.*, 142 F. Supp. 3d 1245, 1252 (M.D. Fla. 2015) (Honeywell, J.). The trial judge has "considerable latitude in determining the amount of the damages" when ruling on a motion for default judgment. *Patray v. Nw. Publ'g, Inc.*, 931 F. Supp. 865, 869 (S.D. Ga. 1996) (Edenfield, C.J.).

## III.   ANALYSIS

### A.   Claims

HealthPlan sued the Dixit defendants for violating the Defend Trade Secrets Act (Count I), engaging in common law unfair competition (Count III), and engaging in copyright infringement (Count IV). HealthPlan sued Mr. Dixit, E-Integrate, and Media Shark for violating the Florida Deceptive and Unfair Trade Practices Act (Count II). HealthPlan also sued Mr. Dixit for contributory copyright infringement (Count V) and vicarious copyright infringement (Count VI). HealthPlan sued E-Integrate and Media Shark for breach of contract (Counts VII and VIII). (Doc. 37).

10

### 1. Violation of Defend Trade Secrets Act by the Dixit Defendants (Count I)

#### a. Liability

To prevail on a Defend Trade Secrets Act (DTSA) claim, the plaintiff must show "(1) that the plaintiff possessed a 'trade secret,' (2) that the plaintiff 'took reasonable measures' to protect the trade secret, and (3) that the defendant used or disclosed the trade secret despite a duty to maintain secrecy." *ProV Int'l Inc. v. Lucca*, No. 8:19-cv-978-T-23AAS, 2019 WL 5578880, at *2 (M.D. Fla. Oct. 29, 2020) (Merryday, J.) (quoting *Trinity Graphics, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1293 (M.D. Fla. 2018) (Bucklew, J.)); *see also* 18 U.S.C. § 1836(b)(1).[6]

HealthPlan possesses trade secrets, including the information in the source code and the confidential business information (pricing, marketing strategies, and customer lists). (*See* Doc. 37, ¶¶ 28, 73); *see also Marlite, Inc. v. Eckenrod*, No. 09-22607-Civ, 2011 WL 39130, at *5 (S.D. Fla. Jan. 5, 2011) (concluding customer lists and pricing information are trade secrets), *aff'd sub nom. Marlite, Inc. v. Am. Canas*, 453 F. App'x 938 (11th Cir. 2012); *Advice*

---

[6] Under Section 1836, the trade secret must relate to a product or service used in interstate commerce. 8 U.S.C. § 1836(b)(1). HealthPlan used its trade secrets in services and products sold, shipped, and ordered in interstate commerce. (Doc. 37, ¶ 74). HealthPlan has its principal place of business in Tampa, Florida but serves all fifty states. (*See id.* at ¶ 9).

*Interactive Group v. Web.com Group, Inc.*, No. 3:17-cv-801-J-39MCR, 2017 WL 6554409, at *7 (M.D. Fla. Oct. 20, 2017) (Davis, J.) (concluding software is a trade secret).

HealthPlan requires all contractors and employees to enter into written confidentiality agreements when the contractors and employees have access to HealthPlan's trade secrets. (Doc. 37, ¶¶ 26–27). HealthPlan contracted with E-Integrate and Media Shark. (Doc. 37, Exs. 1, 2). HealthPlan takes reasonable and necessary steps to protect its trade secrets, identifies its trade secrets as confidential, password protects them, restricts access to certain contractors and employees, and does not share its trade secrets with third parties unless during the course of confidential business communications. (Doc. 37, ¶¶ 29–30).

The Dixit defendants misappropriated HealthPlan's trade secrets when they repackaged the misappropriated copy of ExchangeLink® as "Fit" and included the HealthPlan Copyrighted Materials in their "Fit" demonstration package. (*Id.* at ¶¶ 59–62). HealthPlan in fact required the Dixit defendants to enter into the confidentiality agreements prohibiting the use of the trade secrets information other than assisting HealthPlan's development of ExchangeLink®. (*Id.* at ¶ 26). HealthPlan used its trade secrets in services and products sold, shipped, and ordered in interstate commerce. (*Id.* at ¶ 74).

12

HealthPlan has its principal place of business in Tampa, Florida but serves all fifty states.[7] (*See id.* at ¶ 9). HealthPlan developed ExchangeLink® to connect insurance companies and managed care providers within the United States to distribution channels. (*Id.* at ¶ 1).

Thus, the well-pleaded allegations of HealthPlan's complaint establish the Dixit defendants' liability for violating the DTSA.

### b.    Damages

HealthPlan requests an award of $2,481,936[8] in unjust enrichment damages for the Dixit defendants' misappropriation of HealthPlan's trade secrets under the DTSA. (Doc. 306, Ex. 1, p. 16). HealthPlan determined that award is equal to the developmental costs Mr. Dixit avoided by using HealthPlan's trade secrets. (*Id.* at pp. 17–18). HealthPlan's damages request can be broken down into four parts: (1) $1,152,351.00 for foundational work developing ExchangeLink®; (2) $821,833.00 for developing ExchangeLink® Management Console used to resolve discrepancies and report daily activity; (3) $535,515.00 for work on ExchangeLink® system component that is

---

[7] *See HealthPlan Services*, https://healthplan.saleslinkportal.com/ (last visited May 27, 2021).

[8] Although HealthPlan's motion requests $2,481,937, this report uses the documents provided as attachments to Mr. Prysner's affidavit to determine the total amount of damages is actually $2,481,936. (*See* Doc. 306, Ex. 2, Annex 2).

necessary to receive, translate, and send messages with other systems; and (4) timing related credit of $27,763.00 to another general ledger account that dealt with the necessary enhancements of ExchangeLink®. (Doc. 306, Ex. 2, Annex 2; Doc. 306, Ex. 3, ¶ 36).

Under the DTSA, the court may award "damages for unjust enrichment caused by misappropriation of the trade secret." 18 U.S.C. § 1836(b)(3)(B)(i)(II).[9] A defendant's unjust enrichment due to the misappropriation of trade secrets may be measured in several ways including "value of the plaintiff's lost profits, the defendant's actual profits from the use of the trade secret, the value a reasonably prudent investor would have paid for the trade secret, the developmental costs the defendant avoided by the misappropriation, and a reasonable royalty." *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013). Several circuits have awarded damages in the form of avoided research and development costs when the defendant gains a head start in the development and competition by using misappropriated trade secrets. *Id.*; *see also E.J. Brooks Co. v. Cambridge Sec. Seals*, No. 12-CV-2937 (LAP), 2015 WL 9704079, at *5 (S.D.N.Y. Dec. 23, 2015)

---

[9] Under DTSA, a party could also seek an award for damages of actual loss caused by the misappropriation of the trade secret or "the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of trade secret." 18 U.S.C. § 1836(b)(3)(B)(i)(I), (III).

(collecting cases from Second, Third, Fifth, Sixth, Ninth, and Tenth Circuits).

Thus, the report will calculate the unjust enrichment award by determining the developmental costs the Dixit defendants avoided by using HealthPlan's trade secrets. HealthPlan submits two affidavits to support is request for $2,481,936 in damages. (*See* Doc. 306, Exs. 2, 3).

Dennis Prysner, the Senior Vice President for Healthcare Reform at HealthPlan, submitted an affidavit detailing the work done by HealthPlan to develop the ExchangeLink® system. (Doc. 306, Ex. 2). Mr. Prysner explained HealthPlan identified four areas of Internal Development Software (IDS) that related to developing the source code used in ExchangeLink®. (*Id.* at ¶23). Mr. Prysner also stated there are other costs and resources that related to the development of the source code, but those costs and resources also included significant funds that did not relate to developing the source code. (*Id.* at ¶ 24). Because of the overlap with other projects, Mr. Prysner noted the four areas of IDS are true development costs, but HealthPlan's requested total from those four areas is significantly less than what HealthPlan actually spent to develop the source code. (*Id.*).

Despite giving Mr. Dixit extra time to respond to HealthPlan's motion, Mr. Dixit's short response only addresses Mr. Prysner's decision to provide the affidavit for HealthPlan. (Doc. 314, Ex. 2). Mr. Dixit objects to HealthPlan's

15

"counsel's suggestion that Dennis Prysner was ever aware of the costs and spreadsheets maintained for the purpose of 'damage calculations.'" (*Id.* at p. 2). Mr. Dixit also states he was directly involved in the creation and maintenance of the spreadsheets HealthPlan provided to support its damages request, but makes no argument to chip away at the amount of damages requested. (*Id.* at pp. 2–3).

John Plumpe, a Managing Director of Epsilon Economics (an economic consulting firm), submitted an affidavit supporting Mr. Prysner's affidavit and the evidence to support Mr. Prysner's affidavit. (Doc. 306, Ex. 3). Mr. Plumpe concluded the amount requested by HealthPlan ($2,481,936) is only part of the money HealthPlan spent to develop the source code. (*Id.* at ¶ 4). Mr. Plumpe opined those requested damages are actually the minimum amount of expenses the Dixit defendants avoided by using the misappropriated trade secrets. (*Id.* at ¶ 5). Mr. Plumpe supports his opinion with five credible reasons based on the evidence provided: (1) HealthPlan only included expenses incurred in the IDS 100% attributable to developing the source code; (2) HealthPlan included no expenditures that were less than 100% attributable to developing the source code; (3) HealthPlan included no expenditures dated after 2015; (4) HealthPlan only included personnel costs and did not include external costs, such as purchased third-party software expenses; and (5)

HealthPlan included no developmental costs for other trade secrets and confidential information the Dixit defendants misappropriated. (*Id*.).

Because the Dixit defendants misappropriated HealthPlan's trade secrets, the Dixit defendants were able to simply rebrand and reuse HealthPlan's software and so incurred no typical developmental costs. Thus, HealthPlan is entitled to unjust enrichment damages.

Because the Dixit defendants willfully and maliciously misappropriated the trade secrets, HealthPlan also requests an award of $4,963,872[10] in exemplary damages, which is twice the $2,481,936 HealthPlan requests for unjust enrichment damages. (Doc. 306, Ex. 1, p. 19). Under the DTSA, if a trade secret is willfully and maliciously misappropriated, a plaintiff is entitled to exemplary damages in an amount no more than double the actual or unjust enrichment damages. 18 U.S.C. § 1836(b)(3)(C).

Taking the well-pleaded allegations in HealthPlan's complaint as true, the Dixit defendants willfully and maliciously misappropriated HealthPlan's trade secrets. The Dixit defendants withheld HealthPlan's source code from HealthPlan. Then, even after promising not to keep a copy, the Dixit

---

[10] HealthPlan's motion requests $4,963,847 in exemplary damages. This is likely a scrivener's error and should be $ 4,963,874 (which is twice the $2,491,937 HealthPlan requests for unjust enrichment damages). However, HealthPlan's unjust enrichment damages amount was incorrectly calculated and should have been $2,481,936, which makes exemplary damages of $4,963,872.

defendants kept a copy and used it to create the same system under a different name. The Dixit defendants then solicited and received investments from a third party to "support" the development of a system created from those trade secrets. HealthPlan is entitled to exemplary damages for the Dixit defendants' willful and malicious misappropriation of HealthPlan's trade secrets.

Thus, for Count I, HealthPlan should be awarded $2,481,936 in unjust enrichment damages and $4,963,872 in exemplary damages against the Dixit defendants, jointly and severally.

### 2. Violation of Florida Deceptive and Unfair Trade Practices Act by Mr. Dixit, E-Integrate, and Media Shark (Count II)

#### a. Liability

The Florida Deceptive and Unfair Trade Practices Act (FDUTPA) proscribes "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). The statute's stated purpose is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

To state a claim for damages, a plaintiff must allege "(1) a deceptive act

or unfair practice, (2) causation, and (3) actual damages." *State v. Beach Blvd Auto. Inc.*, 139 So. 3d 380, 393 (Fla. 1st DCA 2014); *see also Crmsuite Corp. v. General Motors Co.*, No. 8:20-cv-762-T-02-WFJ-AAS, 2020 WL 5898970, at *4 (M.D. Fla. Oct. 5, 2020) (Jung, J.). "A deceptive practice is one that is likely to mislead consumers, and an unfair practice is one that 'offends established public policy' or is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350, 1364 (M.D. Fla. 2007) (quoting *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006)).

"[W]hile the claimant would have to prove that *there was an injury or detriment to consumers* in order to satisfy all of the elements of a FDUTPA claim, the claimant *does not have to be a consumer* to bring the claim." *Caribbean Cruise Line, Inc. v. Better Business Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015) (emphasis in the original). If the claimant has suffered a loss caused by deceptive act or unfair conduct, the claimant may recover actual damages. Fla. Stat. § 501.211(2). Actual damages do not include consequential damages, such as future lost profits. *See Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1294 (M.D. Fla. 2009) (Fawsett, J.). But courts have determined that past lost profits are actual damages. *See Global Tech Led, LLC. v. Hilumz Int'l Corp.*, No. 2:15-cv-553-FtM-29CM, 2017

19

WL 588669, at *9 (M.D. Fla. Feb. 14, 2017) (Steele, J.) (collecting cases).

Mr. Dixit, E-Integrate, and Media Shark engaged in an unfair practice when using HealthPlan's intellectual property, including trade secrets and copyrighted material, to induce others to invest in a company in which Mr. Dixit repackaged HealthPlan's trade secrets into "Fit." (Doc. 37, ¶ 86). Mr. Dixit, E-Integrate, and Media Shark engaged in a deceptive act by then using HealthPlan's intellectual property to rebrand, repackage, and pass off HealthPlan's intellectual property as "Fit." (*Id.*). By rebranding the same system under a different name, Mr. Dixit, E-Integrate, and Media Shark directly competed with HealthPlan. (*Id.*).

Dr. Bojkovic sued Mr. Dixit, E-Integrate, and Media Shark for fraud related to "Fit." (*Id.* at ¶ 58; Doc. 306, Ex. 1, Annex 1). Dr. Bojkovic invested $1,001,325 in developing "Fit" but received no product for the money he invested. (Doc. 306, Ex. 1, Annex 1). Mr. Dixit, E-Integrate, and Media Shark did not deliver works exclusively to HealthPlan, instead they shared the works with third parties. (Doc. 37, ¶ 89). "[A]ny injury resulting from an unfair or deceptive practice occurring in trade or commerce is a 'consumer injury'" as broadly construed under FDUPTA. *Crmsuite Corp.*, 2020 WL 5898970, at *6. HealthPlan adequately pleaded Dr. Bojkovic experienced an injury from Mr. Dixit's, E-Integrate's, and Media Shark's deceptive practices. (*See* Doc. 37, ¶

89).[11] Additionally, HealthPlan was harmed because it did not exclusively receive the demonstration package for ExchangeLink®. (*See* Doc. 306, Ex. 1, Annex 1).

HealthPlan requests the profits realized by Mr. Dixit, E-Integrate, and Media Shark for the deceptive and unfair trade practices. (Doc. 306, Ex. 1, p. 28). Thus, HealthPlan requests actual damages of past lost profits, specifically the amount Dr. Bojkovic invested in developing "Fit" which was a repackaged and rebranded version of HealthPlan's ExchangeLink®.

Thus, the well-pleaded allegations of HealthPlan's complaint establish Mr. Dixit's, E-Integrate's, and Media Shark's liability for violating FDUTPA.

### b.    Damages

HealthPlan requests the past lost profits that Mr. Dixit, E-Integrate, and Media Shark received from their deceptive and unfair practices. (Doc. 306, Ex. 1, p. 20). Although this report recommends providing HealthPlan with past lost profits under the copyright infringement claim, the successful FDUTPA claim bolsters HealthPlan's request for past lost profits.

Florida law limits a party's recovery under FDUTPA to actual damages,

---

[11] In the state court litigation, Dr. Bojkovic alleged Mr. Dixit engaged in unfair acts and deceptive practices related to Dr. Bojkovic's investment in Mr. Dixit's company to develop "Fit." *See Bojkovic v. Dixit*, 2016-CA-001246 (Sixth Judicial Circuit Florida).

plus attorney's fees and costs, but does not include punitive damages. Fla. Stat. § 501.211(2); *see also Brexendorf v. Bank of America, N.A.*, No. 6:17-cv-2065-Orl-37GJK, 2018 WL 7252954, at *2 (M.D. Fla. Oct. 15, 2018) (Kelly, J.). Under FDUTPA, actual damages are generally "those damages recoverable at common law." *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 3d DCA 1984).

For a consumer claim's under FDUTPA, the consumer's actual damages can be (1) the purchase price if the product is worthless; or (2) the difference between value of the product when it was received and the value of the product as it has been advertised. *Id.* This calculation is meaningless in the context of a competitor's claim under FDUTPA because the "competitor has not purchased a worthless product, [but] the competitor has lost business and profits." *ATD LLC v. Alarm Protection Tech. Fla., LLC*, No. 12-80898-CIV-RYSKAMP/HOPKINS, 2013 WL 11276119, at *5 (S.D. Fla. April 18, 2013) (Ryskamp, J.). Thus, actual damages under FDUTPA for a competitor is the "actual lost profits" suffered by the unfair trade practices. *Id.* Here, the Dixit defendants secured their revenue from Dr. Bojkovic by using HealthPlan's intellectual property as their own. Thus, HealthPlan lost profits it would have made if Dr. Bojkovic had contracted with HealthPlan for the system.

Because this report already recommends awarding HealthPlan the past lost profits under the copyright infringement claim, this report recommends no

22

more damages for HealthPlan prevailing on its FDUTPA claim, but instead simply notes the same damages are available under the FDUTPA claim.

### 3. Common Law Unfair Competition by the Dixit Defendants (Counts III)

To a state a claim for unfair competition under Florida common law, the plaintiff must show a "deceptive or fraudulent conduct of a competitor and likelihood of consumer confusion." *Donald Frederick Evans and Associates, Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 914 (11th Cir. 1986); *see also M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1494 (11th Cir. 1990). Florida common law of unfair competition is an "umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974), *abrogated on other grounds by B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138 (2015).

The Dixit defendants engaged in deceptive and fraudulent conduct. The Dixit defendants, after agreeing in writing not to keep a copy, surreptitiously retained a copy of HealthPlan's source code used in ExchangeLink®. (Doc. 37, ¶ 59). The Dixit defendants then used the source code to create a software platform, "Fit," that was identical in every material way to ExchangeLink®. (*Id.* at ¶ 58). To market "Fit," the Dixit defendants used exactly the same

marketing script as used in HealthPlan's marketing scripts, identical marketing materials, and identical presentations to market ExchangeLink®. (*Id.* at ¶¶ 67–68). The Dixit defendants then sought investors for their own system "Fit" by using the HealthPlan Copyrighted Materials and HealthPlan's trade secrets used to create ExchangeLink®. (*Id.* at ¶¶ 70, 92(a)).

Although HealthPlan's complaint satisfies the first element of alleging wrongful conduct by the Dixit defendants, HealthPlan alleges no facts supporting consumer confusion. HealthPlan vaguely alleges the Dixit defendants' deceptive acts "have caused and are likely to continue to cause confusion, mistake, or deception of the public." (Doc. 37, ¶ 92(c)). Although HealthPlan does detail the Dixit defendants' use of trade secrets to create exactly the same software platform HealthPlan developed, HealthPlan does not allege that any consumers, including Dr. Bojkovic, bought the Dixit defendants' "Fit" platform under the misconception that such system was HealthPlan's ExchangeLink® platform.

Thus, even taking the well-pleaded allegations of HealthPlan's complaint as true, HealthPlan fails to establish the Dixit defendants' liability for common law unfair competition (Count III). Because HealthPlan has not sufficiently pleaded its common law unfair competition claim, it cannot recover damages related to that claim.

24

### 4.   Copyright Infringement by the Dixit Defendants (Count IV)

#### a.   Liability

To establish a prima facie case of copyright infringement, a plaintiff must prove: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991).

To satisfy *Feist*'s first prong, "a plaintiff must prove that the work . . . is original and that the plaintiff complied with applicable statutory formalities." *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996) (internal quotations and citations omitted). In a judicial proceeding, a "certificate of registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Once the plaintiff produces a certificate of registration, "the burden shifts to the defendant to demonstrate why the claim of copyright is invalid." *Bateman*, 79 F.3d at 1541.

For *Feist*'s first prong, HealthPlan established ownership of all rights, title, and interest in the copyrights for ExchangeLink® and the HealthPlan Copyrighted Materials and holds a copyright registration certificate from the

25

United States Copyright Office. (Doc. 37, ¶¶ 32, 100). HealthPlan did not provide a copy of the registration but provided the names and the copyright registration numbers. (*Id.* at ¶ 33). Upon review of the Copyright Catalog, HealthPlan created the HealthPlan Copyrighted Materials between 2014 and 2016, and HealthPlan registered them with the Register of Copyrights in 2018.[12] Since the effective date of the copyright registration is "before or within five years after first publication of the work," HealthPlan's copyright registration of the HealthPlan Copyrighted Materials constitutes "prima facie evidence of the validity of the copyright and the facts stated in the certificate." 17 U.S.C. § 410(c). Based on the well-pleaded allegations in the complaint and the evidence of copyright registration for the HealthPlan Copyrighted Materials, HealthPlan established *Feist*'s first prong.

To satisfy *Feist*'s second prong, the plaintiff must establish the "alleged infringer actually copied plaintiff's copyrighted material." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1233 (11th Cir. 2010). The factual proof of copying is only part of satisfying *Feist*'s second prong. A plaintiff "must also prove that 'the copying of copyrighted material was so extensive that it rendered the

---

[12] *Public Copyright Catalog-Basic Search*, United States Copyright Office https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?DB=local&PAGE=First (last visited May 26, 2021) (finding the HealthPlan Copyrighted Materials by searching copyright registration numbers).

offending and copyrighted works substantially similar.'" *Id.* (quoting *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 813 (1st Cir. 1995)).

For *Feist*'s second prong, the Dixit defendants "prepared derivative works based on the HealthPlan Copyrighted Materials and used the derivative works in a video presentation to promote "Fit" to at least Dr. Bojkovic. (Doc. 37, ¶¶ 101–04; Doc. 37, Exs. 3–6, 8). The Dixit defendants knew "Fit" copied the infringed works of HealthPlan (which they knew HealthPlan copyrighted), knew they did not have permission to exploit HealthPlan's works, and knew their acts constituted copyright infringement. (Doc. 37, ¶¶ 106–09). By using the HealthPlan Copyrighted Materials, specifically the scripts, for the "Fit" demonstrations, the Dixit defendants' demonstration was substantially similar to the demonstrations HealthPlan used for ExchangeLink®. (*See id.* at ¶¶ 68, 101–02). Based on the well-pleaded allegations in the complaint, HealthPlan established *Feist*'s second prong.

Thus, the well-pleaded allegations of HealthPlan's complaint establish the Dixit defendants' liability for copyright infringement.

### b.   Damages

Under the Copyright Act, the infringer of a copyright is liable for either actual damages and profits or statutory damages. 17 U.S.C. § 504(a). For actual damages and profits,

27

> [t]he copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b).

HealthPlan requests only the profits the Dixit defendants received from their agreement with Dr. Bojkovic. (Doc. 306, Ex. 1, pp. 19–20). HealthPlan's documentation supports that the Dixit defendants received gross revenue of at least $1,001,325[13] from the use of the HealthPlan Copyrighted Materials. (*Id.* at p. 20). HealthPlan argues the Dixit defendants have shown no deductible expenses. (*Id.*). The Dixit defendants do not address this category of damages, let alone show any deductible expenses. (*See* Doc. 314, Ex. 2).

In a claim for profits, "the plaintiff must show a causal relationship between the infringement and profits." *Pronman v. Styles*, 676 F. App'x 846, 848 (11th Cir. 2017). Here, HealthPlan demonstrated the Dixit defendants used the HealthPlan Copyrighted Materials in their scheme to induce Dr.

---

[13] In the documentation to support HealthPlan's request for damages, HealthPlan appears to make a scrivener's error. HealthPlan states the Dixit defendants' gross revenue from Dr. Bojkovic of $1,001,345.00. (*See* Doc. 306, Ex. 1, p. 19). But Annex 2 to HealthPlan's motion for default shows Dr. Bojkovic paid the Dixit defendants $1,001,325.00. (Doc. 306, Ex. 1, Annex 2).

Bojkovic to invest in developing "Fit." HealthPlan also showed Dr. Bojkovic paid $1,001,325 for developing "Fit." The Dixit defendants showed no deductible expenses. HealthPlan should recover the Dixit defendants' profits totaling $1,001,325 from its agreement with Dr. Bojkovic.

HealthPlan also asks for punitive damages.[14] (Doc. 306, Ex. 1, p. 23). However, punitive damages are unavailable under the Copyright Act. *See Calio v. Sofa Express, Inc.*, 368 F. Supp. 2d 1290, 1292 (M.D. Fla. 2005) (Bucklew, J.) ("The Eleventh Circuit has not addressed whether punitive damages are a proper remedy under § 504(a). However, prevailing case law is clear that punitive damages are not available in a statutory copyright infringement action."). Thus, HealthPlan is not entitled to punitive damages for its copyright infringement claim.

Thus, for Count IV, HealthPlan should be awarded $1,001,325.00 in actual damages against the Dixit defendants, jointly and severally.

---

[14] HealthPlan requests $7,501,714.59[14] in punitive damages against the Dixit defendants. (Doc. 306, Ex. 1, p. 23). HealthPlan adds its request for lost profits under its copyright infringement claim ($1,001,325.00) and its request for the full amount it paid under the E-Integrate Agreement ($775,420.69) and the Media Shark contract ($723,825.84) which totals $2,500,571.53. HealthPlan then requests three times that amount because of the Dixit defendants' intentional misconduct. (*Id.* at p. 23 n.5). This report will address punitive damages under each category that HealthPlan uses to support its request.

### 5. Contributory Copyright Infringement by Mr. Dixit (Count V)

#### a. Liability

A contributory infringer is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Casella v. Morris*, 820 F.2d 632, 635 (11th Cir. 1987) (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). In the copyright context, knowledge means "either the alleged contributory infringer has actual knowledge or has reason to know of the infringing activity." *Klein & Heuchan, Inc. v. Costar Realty Info., Inc.*, 707 F. Supp. 2d 1287, 1295 (M.D. Fla. 2010) (Moody, J.).

By partnering with Ms. Kutsomarkos to develop "Fit," Mr. Dixit had access to the HealthPlan Copyrighted Materials. (Doc. 37, ¶60). Mr. Dixit provided the HealthPlan Copyrighted Materials to E-Integrate, Media Shark, and Knowmentum. (*Id.* at ¶ 116). Mr. Dixit induced, caused, and materially contributed to the infringing acts of E-Integrate, Media Shark, and Knowmentum by encouraging, allowing, and assisting them to make derivative works such as the marketing demonstration for "Fit" presented to Dr. Bojkovic. (*Id.*). Because Mr. Dixit controlled the entities and provided the entities with the HealthPlan Copyrighted Materials, Mr. Dixit knew about the

infringement of the HealthPlan Copyrighted Materials. (*Id.* at ¶ 117).

The well-pleaded allegations of HealthPlan's complaint establish Mr. Dixit knew of the infringing activities and materially contributed to the infringing conduct of others. Thus, Mr. Dixit is liable for contributory copyright infringement.

### b.   Damages

HealthPlan does not request damages in connection with its contributory copyright infringement claim. Even if HealthPlan sought damages, those damages would likely be duplicative of the past lost profits this report already recommends HealthPlan recover for prevailing on its copyright infringement claim. *See TCYK, LLC v. Martin*, No. 8:14-cv-87-T-27TBM, 2014 WL 6978149 (M.D. Fla. Dec. 9, 2014) (Whittemore, J.).

### 6.   Vicarious Copyright Infringement by Mr. Dixit (Count VI)

### a.   Liability

"Vicarious infringement occurs 'when the defendant profits directly from the infringement and has the right and ability to supervise the direct infringer.'" *Klein*, 707 F. Supp. 2d at 1289 (quoting *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)). Allegations of a "direct financial benefit" are sufficient when "there is a causal connection between the

infringing activity and any financial benefit a defendant reaps." *See Klein*, 707 F. Supp. 2d at 1299 (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)).

Mr. Dixit had the right and ability to supervise and control the infringing acts of E-Integrate and Knowmentum because he owned those companies. (Doc. 37, ¶ 123). Mr. Dixit also had the right and ability to supervise and control the infringing acts of Ms. Kutsomarkos and her company, Media Shark, because Mr. Dixit contracted with them to develop "Fit" using the HealthPlan Copyrighted Materials. (*Id.*). Mr. Dixit obtained a direct financial benefit (over a million dollars) by contracting with Dr. Bojkovic to invest in developing "Fit." (*Id.* at ¶ 124).

The well-pleaded allegations of HealthPlan's complaint establish Mr. Dixit supervised the infringing activities and directly benefited from the infringing conduct of others. Thus, Mr. Dixit is liable for vicarious copyright infringement.

### b.   Damages

HealthPlan does not request damages in connection with its vicarious copyright infringement claim. Even if HealthPlan sought damages, the damages would likely be duplicative of the past lost profits this report already recommends HealthPlan recover for prevailing on its copyright infringement

32

claim. *See Broadcast Music, Inc. et al. v. Bisla and Bisla, LLC, et al.*, No. 8:11-cv-2273-JDW-MAP, 2013 WL 12156534, at *2–3 (M.D. Fla. Apr. 29, 2013) (Whittemore, J.).

### 7. Breach of Contract by E-Integrate and Media Shark (Counts VII and VIII)

To prevail on a breach of contract action in Florida, a plaintiff must prove: (1) a valid contract existed; (2) a material breach of the contract; and (3) damages. *See Murciano v. Garcia*, 958 So.2d 423 (Fla. 3d DCA 2007).

#### a. HealthPlan-EI Agreement (Count VII)

##### i. Liability

HealthPlan and E-Integrate entered into the HealthPlan-EI Agreement. (Doc. 37, ¶ 51; Doc. 37, Ex. 1). As part of the HealthPlan-EI Agreement, E-Integrate had to return the ExchangeLink® source code to HealthPlan and not retain any of the source code. (Doc. 37, ¶¶ 130–131; Doc. 37, Ex. 1). But E-Integrate retained parts, if not all, of the source code. (Doc. 37, ¶ 132). E-Integrate also breached the HealthPlan-EI Agreement when it disclosed confidential information to a third party. (*Id.* at ¶ 133; Doc. 37, Ex. 1). Thus, HealthPlan established E-Integrate breached its contract.

##### ii. Damages

For damages, HealthPlan requests the $775,420.69 it paid to E-Integrate

under the HealthPlan-EI Agreement. (Doc. 306, Ex. 1, p. 20). HealthPlan asserts the "head start" analysis (provided to support its request for damages under DTSA) does not include its $775,420.69 in payments to E-Integrate. (Doc. 306, Ex. B, ¶ 26).

In a breach of contract action, "[a] non-breaching party is entitled to recover the benefit of its bargain under a contract." *Nat'l Educ. Ctrs., Inc. v. Kirkland*, 635 So. 2d 33, 34 (Fla. 4th DCA 1993). "A party injured by breach of contract is entitled to recover those damages that 'naturally flow from the breach and can reasonable be said to have been contemplated by the parties at the time the contract was created.'" *Siever*, 669 F. Supp. 2d at 1300 (quoting *Mnemonics, Inc. v. Max Davis Assocs. Inc.*, 808 So. 2d 1278, 1280 (Fla. 5th DCA 2002)). Here, the benefit of the bargain was for HealthPlan to receive its source code and for E-Integrate to be paid $775,420.69 to no longer retain a copy of the source code. Because the payment made to E-Integrate was primarily for the return of the source code, recovering the amount paid under the HealthPlan-EI Agreement natural flows from E-Integrate's breach by retaining a copy of the source code.

Thus, HealthPlan should be awarded the $775,420.69 it paid under the

HealthPlan-EI Agreement.[15]

HealthPlan also asks for punitive damages related to the breach of the HealthPlan-EI Agreement. (Doc. 306, Ex. 1, p. 23). Although Florida courts rarely award punitive damages for breach of contract claim, a court may award punitive damages "where the acts constituting a breach of contract also amount to a cause of action in tort." *Griffith v. Shamrock Vill., Inc.*, 94 So. 2d 854, 858 (Fla. 1957). In those cases, the underlying tort cause of action must depend on some type of "intentional wrong, willful or wanton, misconduct, or culpable negligence, the extent of which amounts to an independent tort." *S. Bell Tel. & Tel. Co. v. Hanft*, 436 So. 2d 40, 41 (Fla. 1983). Thus, even though Florida law may allow punitive damages for the underlying tort claim, it does not mean that punitive damages are available for the contract claim. "A breach of contract claim itself cannot support punitive damages." *Jacobini v. JP Morgan Chase, N.A.*, No. 6:11-cv-231-Orl-31GJK, 2011 WL 13248162, at *5

---

[15] HealthPlan's DTSA claim also allows the recovery of the payments made under the HealthPlan-EI Agreement as unjust enrichment damages. (Doc. 306, Ex. 1, p. 21). As stated in the DTSA damages section, the plaintiff can recover damages when the defendant was unjustly enriched by avoiding development costs because the defendant used misappropriated trade secrets used in development. *See Wellogix, Inc.*, 716 F.3d at 879. The Dixit defendants used the trade secrets from HealthPlan's source code to create "Fit." The Dixit defendants avoided the development costs of creating the underlying code by using HealthPlan's trade secrets. HealthPlan did not include the payments to E-Integrate in its above request for damages related to the source code. (*See* Doc. 306, Ex. 2, ¶ 26).

(M.D. Fla. Aug. 1, 2011) (Presnell, J.)

Here, although HealthPlan has shown the Dixit defendants' willful misconduct and intentional use of its intellectual property, HealthPlan has not alleged an underlying tort, such as tortious interference or fraud, to support an award of punitive damages. Instead, this report recommends exemplary damages under the DTSA to punish the Dixit defendants for their willful and malicious misappropriation of HealthPlan's trade secrets.

Thus, for HealthPlan should be awarded the $775,420.69 it paid under the HealthPlan-EI Agreement but should not recover punitive damages on its breach of contract claim against E-Integrate.

### b.    Media Shark Agreement (Count VIII)

### i.    Liability

HealthPlan and Media Shark entered into the Media Shark Agreement. (Doc. 37, ¶ 137; Doc. 37, Ex. 2). As part of the Media Shark Agreement, Media Shark was not to perform activities or services for others due to a conflict of interest with the activities or service provided to HealthPlan. (Doc. 37, ¶137; Doc. 37, Ex. 2). Media Shark was also required not to disclose confidential information to any third party. (Doc. 37, ¶ 138; Doc. 37, Ex. 2). In violation of those provisions, Media Shark performed services for Knowmentum, E-Integrate, and Dr. Bojkovic and disclosed confidential information to them.

36

(Doc. 37, ¶¶ 139–140). Thus, Media Shark's breach of the restrictive covenants of the contract entitles HealthPlan to relief.

### ii.   Damages

HealthPlan requests reimbursement of the $723,825.84 payment to Media Shark under the Media Shark Agreement because Media Shark breached the restrictive covenants in its contract with HealthPlan. (Doc. 306, Ex. 1, p. 22). HealthPlan asserts the "head start" analysis (provided to support its request for damages under DTSA) does not include the $723,825.84 payment to Media Shark. (Doc. 306, Ex. 2, ¶ 27).

Under Florida law, "[a] court shall enforce a restrictive covenant by any appropriate and effective remedy, including, but not limited to, temporary and permanent injunctions." Fla. Stat. § 542.335(1)(j). Although the court may award monetary damages for the breach of contract, the normal remedy is to grant an injunction "because of the inherently difficult, although not impossible, task of determining just what damage actually is caused by the employee's breach of the agreement." *Miller Mech., Inc. v. Ruth*, 300 So. 2d 11, 12 (Fla. 1974).

However, a party may recover lost profits as damages for a breach of restrictive covenant:

To recover damages for lost profits in a breach of contract action,

> a party must prove a breach of contract, that the party actually
> sustained a loss as a proximate result of that breach, that the loss
> was or should have been within the reasonable contemplation of
> the parties, and that the loss alleged was not remote, contingent,
> or conjectural and the damages were reasonably certain.

*Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1242 (11th Cir. 2009)

(quoting *Frenz Enterprises, Inc. v. Port Everglades*, 746 So. 2d 498, 504 (Fla

4th DCA 1999)). Thus, "many restrictive covenants have liquidated damages

clauses." *Proudfoot*, 576 F.3d at 1243 n. 23.

Rather than request lost profits (perhaps because HealthPlan already

requested lost profits for its copyright infringement claim) or liquidated

damages (because the contract does not reference liquidated damages),

HealthPlan requests reimbursement for the money it paid Media Shark to

develop materials for demonstrating ExchangeLink®. Essentially, HealthPlan

asks to be put in the same position had it not received the benefit of the

bargain—materials to demonstrate ExchangeLink®. But HealthPlan did

receive the benefit. Thus, HealthPlan is not entitled to the $723,825.84 it paid

to Media Shark under the breach of contract claim.

However, HealthPlan correctly argues that it can recover the damages

based on unjust enrichment under its DTSA claim. (Doc. 306, Ex. 1, p. 23). As

stated in the DTSA claim section, a party can recover unjust enrichment

damages the defendant received by avoiding development costs by using

misappropriated trade secrets. *See Wellogix, Inc.*, 716 F.3d at 879. While Media Shark was developing the materials (by using HealthPlan's trade secrets) to commercialize and market ExchangeLink® for HealthPlan, Media Shark also used HealthPlan's trade secrets to develop demonstrations for "Fit." Because Media Shark used different trade secrets, notably the HealthPlan Copyrighted Materials and not the source code used to develop the ExchangeLink®, HealthPlan did not include the payments to Media Shark in its above request for damages related to the source code. (*See* Doc. 306, Ex. 2, ¶ 27).

Thus, HealthPlan should be awarded $723,825.84 in unjust enrichment damages related to Media Shark being paid to develop demonstration packages for HealthPlan and then using those same demonstration packages for its own benefit without incurring those costs originally expended by HealthPlan. As discussed in the damages on the breach of the EI-HealthPlan Agreement, HealthPlan should not recover punitive damages on its breach of contract claim against Media Shark.

*        *        *

The well-pleaded factual allegations of HealthPlan's complaint properly allege the elements for these claims: (1) Violation of the DTSA by the Dixit defendants (Count I); (2) Violation of FDUTPA by Mr. Dixit, E-Integrate, and Media Shark (Count II); (3) Copyright Infringement by the Dixit defendants

39

(Count IV); (4) Contributory Copyright Infringement by Mr. Dixit (Count V); (5) Vicarious Copyright Infringement by Mr. Dixit (Count VI); and (6) Two Breach of Contract Claims (separately against E-Integrate and Media Shark) (Counts VII and VIII). The factual allegations and provided exhibits establish the defendants' liability for those claims. (Doc. 37, Ex. 1–8). Thus, default judgment under Federal Rule of Civil Procedure 55 is appropriate for Counts I, II, IV, V, VI, VII, and VIII.

Because this report concludes HealthPlan prevails on the above claims, HealthPlan should be entitled to the following damages: (1) $2,481,936.00 from the Dixit defendants for violating the DTSA by misappropriating HealthPlan's source code (Count I); (2) $723,825.84 from Media Shark for violating the DTSA by misappropriating the HealthPlan Copyrighted Materials (Count I); (3) $4,963,872.00 in exemplary damages from the Dixit defendants as allowed under the DTSA (Count I); (4) $1,001,325.00 from the Dixit defendants for copyright infringement (Count IV); and (5) $775,420.69 from E-Integrate for its breach of the HealthPlan-EI Agreement (Count VII).

## B.    Injunctive Relief against the Dixit defendants

HealthPlan asks the court to enter a permanent injunction against the Dixit defendants. Injunctive relief is authorized for each count for which the undersigned finds default judgment is appropriate. *See* 17 U.S.C. § 502(a) (A

court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."); 18 U.S.C. § 1836(b)(3)(A) (providing injunctive relief as a remedy for the misappropriation of trade secret); *Miller Mech., Inc.*, 300 So. 2d at 12 (Although a trial court may award damages for a breach of a noncompete agreement, "the normal remedy is to grant an injunction.").

The entry of a permanent injunction is appropriate if a plaintiff can show:

> (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; (3) irreparable harm will result if the court does not order injunctive relief; and (4) if issued, the injunction would not be adverse to the public interest.

*Thomas v. Bryant*, 614 F.3d 1288, 1317 (11th Cir. 2010). Although typically a permanent injunction is used when there is no adequate remedy at law, the Copyright Act and the Defend Trade Secret Act permit courts to enter a permanent injunction and award monetary damages. *See U.S. Sec. Associates, Inc. v. Campos*, No. 19-24290-CIV-GRAHAM, 2020 WL 2494597, at *3–4 (S.D. Fla. May 13, 2020) (Graham, J.) (awarding compensatory and exemplary damages and injunctive relief in a default judgment on a DTSA claim); *LHF Productions, Inc. v. O'Connor*, No. 8:16-cv-2170-T-27AEP, 2017 WL 393613, at *2–3 (M.D. Fla. Jan. 27, 2017) (Whittemore, J.) (awarding monetary damages

and injunctive relief in a default judgment for a copyright infringement claim).

Applying the four factors here, the undersigned finds the threat is ongoing, as shown by the Dixit defendants' failure to cease using HealthPlan's trade secrets including the HealthPlan Copyrighted Materials. The Dixit defendants continued use of those trade secrets causes HealthPlan irreparable injury. If not enjoined, the Dixit defendants will continue to injure HealthPlan in a manner that cannot be compensated only in money.

The Dixit defendants will suffer minimal, if any, hardship if enjoyed because the Dixit defendants were not permitted to retain access to the HealthPlan Copyrighted Materials or ExchangeLink® source code. If the Dixit defendants are not enjoined from engaging in the infringing activity or using HealthPlan's intellectual property to develop similar software platforms, HealthPlan could sustain hardship, including loss of goodwill and loss of the ability to control its business reputation. *See BellSouth Tellecomms., Inc. v. MCIMetro Access Transmission Servs.*, LLC, 425 F.3d 964, 970 (11th Cir. 2005). Finally, there is no indication that the public interest would be disserved by issuing a permanent injunction against the Dixit defendants. Thus, upon review of the well-pled allegations, taken as true, the undersigned recommends granting HealthPlan a permanent injunction.

### C.      Request for Attorneys' Fees and Expenses

HealthPlan requests $1,461,405.00 in attorney's fees. (Doc. 306, Ex. 4).

Because Brinks Gilson and Lione (Brinks) closed its Tampa office, and its

Tampa attorneys and paralegal became employed by Akerman, LP,

HealthPlan's request for attorney's fees is separated by amounts billed by each

law firm. HealthPlan requests an award of attorney's fees for the following

legal work by Brinks:

| Timekeeper | Hours | Rate per Hour[16] | Total |
|---|---|---|---|
| William Frankel (Shareholder) | 722.10 | $550.00 | $397,155.00 |
| Alejandro Fernandez (Shareholder) | 1234.50 | $400.00 | $493,800.00 |
| Andrew Avsec (Shareholder) | 163.40 | $400.00 | $65,360.00 |
| Stephen Leahu (Senior Associate) | 538.70 | $325.00 | $175,077.50 |
| Evi Christou (Mid-level Associate) | 818.80 | $250.00 | $204,700.00 |
| Jieun Lee (Junior Associate) | 350.55 | $200.00 | $70,110.00 |
| Cindy Lovell (Paralegal) | 129.50 | $125.00 | $16,187.50 |
| Lisa Reyes (Paralegal) | 224.20 | $125.00 | $28,025.00 |
| **Total** | **4181.75** | | **$1,450,415.00** |

[16] The rates per hour for Attorneys Frankel, Fernandez, Leahu, and Christou and Ms. Lovell, a paralegal, follow the amounts previously ordered by this court as reasonable. (Docs. 234, 280).

HealthPlan also requests an award of attorney's fees for legal work from these individuals after they became employed by Akerman:

| Timekeeper | Hours | Rate per Hour | Total |
| --- | --- | --- | --- |
| Alejandro Fernandez (Shareholder) | 23.5 | $400.00 | $9,400.00 |
| Stephen Leahu (Senior Associate) | 3.7 | $325.00 | $1,202.50 |
| Cindy Lovell (Paralegal) | 3.1 | $125.00 | $387.50 |
| **Total** | **30.3** | | **$10,990.00** |

As an initial matter, HealthPlan states it included the hours that the court previously awarded for the Dixit defendants' disregard of the court's discovery orders and spoliation of evidence. (Doc. 306, Ex. 4, p. 9 n.7). Although HealthPlan represents those fees have not been paid, the previous awards still stand and should be added to the judgment but will not be included again in the fee award recommended in this report. *See People for the Ethical Treatment of Animals, Inc. v. Dade City Wild Things, Inc., et al.*, No. 8:16-cv-2899-T-36AAS, 2020 WL 3266524, at \*2 (M.D. Fla. May 28, 2020). Instead, this report will recommend including those prior awards in the final judgment entered against the Dixit defendants. (*See* Doc. 234; $35,890.00; Doc. 252, $5,800.00; Doc. 280, $15,835.00). Thus, after removing the previously award attorney's fees, HealthPlan's request for attorney's fees by Brinks is as follows:

44

| Timekeeper | Adjusted Hours[17] | Rate per Hour | Total |
|---|---|---|---|
| William Frankel (Shareholder) | 710.45 | $550.00 | $390,747.50 |
| Alejandro Fernandez (Shareholder) | 1129.9 | $400.00 | $451,960.00 |
| Andrew Avsec (Shareholder) | 163.40 | $400.00 | $65,360.00 |
| Stephen Leahu (Senior Associate) | 537.50 | $325.00 | $174,687.50 |
| Evi Christou (Mid-level Associate) | 784.70 | $250.00 | $196,175.00 |
| Jieun Lee (Junior Associate) | 350.55 | $200.00 | $70,110.00 |
| Cindy Lovell (Paralegal) | 126.60 | $125.00 | $15,825.00 |
| Lisa Reyes (Paralegal) | 224.20 | $125.00 | $28,025.00 |
| **Total** | **4027.20** | | **$1,392,890.00[18]** |

Because the previously awarded attorney's fees were billed when all the attorneys worked for Brinks, no prior awards were subtracted from the hours submitted by Akerman.

In considering a motion for attorneys' fees, "the threshold issue . . . is always entitlement." *Universal Physician Services, LLC v. Del Zotto*, No. 8:16-

---

[17] This report has subtracted the hours previously awarded for work by Attorneys Frankel, Fernandez, Leahu, and Christou, and Ms. Lovell. (*See* Docs. 234, 252, 280).

[18] The court previously awarded HealthPlan $57,525.00 in attorney's fees. (*See* Docs. 234, 252, 280).

cv-1274-T-36JSS, 2017 WL 343905, *2 (M.D. Fla. Jan. 6, 2017) (Sneed, J.), *report and recommendation adopted by* 2017 WL 320964 (M.D. Fla. Jan. 23, 2017) (Honeywell, J.).

### 1.    Entitlement

In the amended complaint, HealthPlan requests reasonable attorney's fees incurred because of the Dixit defendants' misappropriation of trade secrets, copyright infringement, and deceptive trade practices. (Doc. 37, p. 29). HealthPlan also requests reasonable attorney's fees related to Media Shark's breach of contract and E-Integrate's breach of contract. (*Id.*).

The principle that guides motions for attorney's fees is the American Rule: Each party must pay its own attorney's fees unless a statute or contract provides otherwise. *Baker Botts LLP v. ASARCO LLC*, 576 U.S. 121, 126 (2015) (quotation and citation omitted). Florida follows this common law rule. *Price v. Tyler*, 890 So. 2d 246, 251 (Fla. 2004). A party must show entitlement to attorney's fees by identifying either a statute or contract provision that allows for the shifting of attorney's fees. *See id.* at 250. Although HealthPlan does not brief entitlement for attorney's fees (*See* Doc. 306, Ex. 4), HealthPlan pleaded attorney's fees and is entitled to attorney's fees.

First, the Copyright Act provides the prevailing party may receive its reasonable attorney's fees. *See* 17 U.S.C. § 505. HealthPlan is the prevailing

party on its copyright infringement claim. Next, the DTSA entitles the prevailing party to attorney's fees if the trade secret was willfully and maliciously misappropriated. 18 U.S.C. § 1836(b)(3)(D). FDUTPA also provides the prevailing party "may receive [its] reasonable attorney's fees and costs from the nonprevailing party." Fla. Stat. § 501.2105(1). HealthPlan is the prevailing party on its FDUTPA claim.

Last, HealthPlan is entitled to its attorney's fees based on its contracts with Media Shark and E-Integrate. Both contracts contain provisions entitling HealthPlan to attorney's fees if a breach occurs. (*See* Doc. 37, Exs. 1, 2). Courts must strictly construe contractual provisions for attorney's fees. *Int'l Fid. Ins. Co. v. Americaribe-Moriarty JV*, 906 F.3d 1329, 1335–36 (11th Cir. 2018) (quotation and citation omitted); *Islander Beach Club Condo. v. Skylark Sports, LLC*, 975 So. 2d 1208, 1211–12 (Fla. 5th DCA 2008) (citations omitted). HealthPlan's contracts with Media Shark and E-Integrate provide HealthPlan with a matter of right to attorney's fees.

HealthPlan is entitled to its reasonable attorney's fees in litigating this case against the Dixit defendants.

### 2.    Amount of Attorney's Fees

The initial burden of proof that the fee is reasonable falls on HealthPlan, who must submit evidence about the number of hours expended and the hourly

rate claimed. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988). Even though Mr. Dixit's response did not address HealthPlan's request for attorney's fees (*See* Doc. 314, Ex. 2), the court must analyze the reasonableness of the requested attorney's fees.

The starting point for setting an attorney's fee is to determine the "lodestar" figure: the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Hensley*, 461 U.S. at 433; *Norman*, 836 F.2d at 1299. A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation. *Gaines v. Dougherty Cty. Bd. of Edu.*, 775 F.2d 1565, 1571 (11th Cir. 1985).

Most or all of these factors are subsumed in the calculation of the hourly rate:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of any professional relationship with the client; and (12) awards in similar cases.

*Gaines*, 775 F.2d at 1571, n.13 (citing *Johnson v. Ga. Hwy. Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)). The going rate in the community is the most critical factor in setting the fee rate. *Martin v. Uni. of S. Ala.*, 911 F.2d 604, 610 (11th Cir. 1990).

A fee applicant may meet the burden to show the reasonable rate by producing either direct evidence of rates charged under similar circumstances, or opinion evidence of reasonable rates. *Norman*, 836 F.2d at 1299. The court may also use its own expertise and judgment to assess the value of an attorney's services. *Id.* at 1303; *Scelta v. Delicatessen Support Servs.*, 203 F. Supp. 2d 1328, 1331 (M.D. Fla. 2002) (Wilson, J.).

The courts are not authorized "to be generous with the money of others, and it is as much the duty of courts to see that excessive fees and expenses are not awarded as it is to see that an adequate amount is awarded." *Am. Civil Liberties Union of Ga. v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999). When reducing fees, courts may "conduct an hour-by-hour analysis or it may reduce the requested hours with an across-the-board cut." *Bivins v. Wrap it Up Inc.*, 548 F.3d 1348, 1350 (11th Cir. 2008). Although courts may apply either method, they cannot apply both. *See id.* Finally, courts need not become "green-eyeshade accountants." *Fox v. Vice*, 563 U.S. 826, 838 (2011). Instead, the

essential goal for the court is to "do rough justice, not to achieve auditing perfection." *Id.*

This report will address the reasonableness of the hourly rates charged before addressing the reasonableness of the time entries.

### a.    Reasonable Hourly Rate

The court may decide a reasonable rate based on its own expertise and judgment. *Norman*, 836 F.2d at 1303–04. The court looks to the skills, experience, and reputation of the attorneys to determine what comparable lawyers charge for similar services in this locality. "The general rule is that the 'relevant market' for purposes of determining the reasonable hourly rate for an attorney's services is 'the place where the case is filed.'" *Barnes*, 168 F.3d at 437; *Cullens v. Ga. Dept. of Transp.*, 29 F.3d 1489, 1494 (11th Cir. 1994). Thus, the relevant legal market is Tampa, Florida.

This report need not address the reasonable hourly rates of Attorneys Frankel, Fernandez, Leahu, and Christou or Ms. Lovell's hourly rate because the rates submitted reflect the reduced hourly rate this court previously found reasonable. (*See* Docs. 234, 280). This report must address Attorneys Avsec's and Lee's hourly rate and paralegal Lisa Reyes's hourly rate.

HealthPlan states Attorney Avsec is a Shareholder with Brinks, has over ten years of litigation experience, and is the co-chair of the firm's Trademark

50

Practice Group. (Doc. 306, Ex. 4, Annex 6). HealthPlan requests to recover $400.00 as Attorney Avsec's hourly rate because his typical rate and experience is much like Attorney Fernandez whose reduced hourly rate is $400. (Doc. 306, Ex. 4, p. 6). Based on his experience and the reasonable hourly rate for attorneys in Tampa, Attorney Avsec's requested rate is reasonable. *See MWR Holdings, LLC v. Academy of Tampa, Inc.*, No. 8:14-cv-1325-T-30MAP, 2014 WL 5590998, at *1 (M.D. Fla. Nov. 3, 2014) (Moody, J.) (hourly rates between $400 and $475 were reasonable given the respective attorneys' experience and the market rate in Tampa, Florida).

HealthPlan states Attorney Lee is a junior associate at Brinks with about three years' experience. (Doc. 306, Ex. 4, Annex 9). HealthPlan requests to recover $200.00 as Attorney Lee's hourly rate because her experience is below Attorney Christou whose reduced hourly rate is $250. (Doc. 306, Ex. 4, p. 6). Based on her experience and the reasonable hourly rate for attorneys in Tampa, Attorney Lee's requested rate is reasonable. *See Lewis v. Fla. Default Law Group, P.L.*, No. 8:10-cv-611-T-30AEP, 2012 WL 252837, at *2 (M.D. Fla. Jan 26, 2012) (Moody, J.) (awarding $200 per hour to an attorney with less than four years of experience).

HealthPlan states Ms. Reyes is a paralegal with Brinks and has similar experience as Ms. Lovell. (Doc. 306, Ex. 4, p. 7). HealthPlan requests the same

51

reduced $125 hourly rate for Ms. Reyes as the court found reasonable for Ms. Lovell. (*Id.*). Ms. Reyes's requested rate is reasonable.

### b.   Reasonable Hours Expended

Next, the lodestar analysis requires the court to determine the reasonable number of hours the moving party's attorneys expended. *Rowe v. Fla. Patient Compensation Fund*, 472 So. 2d 1145, 1150 (Fla. 1985). To prevail on its request for attorney's fees, the moving party should present accurate records that detail the work the attorneys performed. *Id.* Inadequate documentation may reduce the fees requested. *Id.*; *Hensley*, 461 U.S. at 433. The court may also reduce hours it finds excessive or unnecessary. *Rowe*, 472 So. 2d at 1150.

After the moving party provides sufficient documentation to support an attorney's fees award, the burden shifts to the opposing party to point out with specificity which hours should be reduced. *22nd Century Prop., LLC v. FPH Prop., LLC*, 160 So. 3d 135, 142–43 (Fla. 4th DCA 2015) (quotation and citation omitted). Conclusory objections and generalized statements are not given much weight. *Gray v. Lockheed Aeronautical Sys., Co.*, 125 F.3d 1387, 1389 (11th Cir. 1997) (citation omitted). Hours to which the opposing party fails to object with specificity are accepted as reasonable. *Scelta*, 203 F. Supp. 2d at 1333–34 (citations omitted). And the court must review the billing log to

determine whether the work was unnecessary, excessive, redundant, or included improper billing or clerical work performed by attorneys. *See Barnes*, 168 F.3d at 428.

Upon review of the billing records, this report finds a reduction is necessary because HealthPlan's extensive billing records contain hundreds of redacted time entries. (*See* Doc. 306, Ex. 4, Annexes 1, 2). For example, an August 27, 2018 time entry only records "[p]reparing for meeting with [redacted] regarding identification and collection of source code associated with ExchangeLink and ServiceLink software" and "[r]eviewing and analyzing [redacted]." (*See* Doc. 306, Ex. 4, Annex 1 (August 2018 time sheet)). In another example, three time entries from March 2018 have been completely redacted, but HealthPlan still requests the time associated with those time entries. (*See* Doc. 306, Ex. 4, Annex 1 (March 2018 time sheet)). When the subject of work performed is redacted, the court cannot determine whether an activity or the time spent on that activity is reasonable if it does not know the details about the work performed. *See Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1197 (11th Cir. 2002) ("We caution, however, that where a significant number of entries are severely redacted or it appears that fee counsel has failed to use billing judgment, it may be an abuse of discretion to award fees based on the redacted entries."). Thus, the time billed in the heavily redacted entries should

53

not be fully compensated.

Considering the redacted billing records, this report recommends a 15% reduction in HealthPlan's attorney's fees award for both Brinks and Akerman.[19]

\*      \*      \*

Applying the recommended deductions, HealthPlan's request for attorney's fees should be reduced by $57,525.00 to exclude already awarded attorney's fees. (*See* Doc. 234; $35,890.00; Doc. 252, $5,800.00; Doc. 280, $15,835.00). Then applying the recommended 15% reduction due to the redactions, HealthPlan's request for $1,392,890.00 for Brinks should be reduced by $208,933.50 to a recovery of **$1,183,956.50**. Also applying the recommended 15% reduction, HealthPlan's request for $10,990.00 for Akerman should be reduced by $1,648.50 to a recovery of **$9,341.50**.

### 3.    Expenses

HealthPlan requests $56,500.77 in expenses: (Doc. 306, Ex. 4).

| Expense | Total |
|---|---|
| EPIQ Expenses (includes Forensic expert) | $23,749.09 |
| Business Asset Searches | $4,000.00 |
| Federal Express Charges | $804.92 |
| Lexis Search Charges | $7,965.00 |

---

[19] The time entries from the Akerman firm are similarly redacted. (*See* Doc. 306, Ex. 4, Annex 2).

| | |
|---|---|
| Other Search Charges | $315.30 |
| Copyright Registration Fees | $6,895.00 |
| Court Fees | $850.00 |
| Process Server Fees | $300.00 |
| Deposition Related Charges | $345.01 |
| Mediator Fees | $1,400.00 |
| Court Reporter Fees | $6,532.75 |
| Other Transcripts | $1,031.20 |
| Expert Fees | $2,312.50 |
| **Total** | **$56,500.77** |

First, HealthPlan's requested expenses do not match the invoices HealthPlan has provided. (*See* Doc. 306, Ex. 4, Annex 3). Because the court lacks the invoices to verify the total expenses to which HealthPlan argues it is entitled, this report will reduce the totals based on the invoices provided in Annexes 1, 2, 3 of Exhibit 4. Second, HealthPlan states it included the expenses that the court previously awarded for the Dixit defendants' disregard of the court's discovery orders and spoliation of evidence. (Doc. 306, Ex. 4, p. 9 n.7). Although HealthPlan represents the Dixit defendants have not paid those expenses, those prior orders still stand and the previous awards will not be included again in the expenses award recommended in this report. *See People for the Ethical Treatment of Animals, Inc.*, 2020 WL 3266524, at \*2. But like the attorney's fees, this report recommends those expenses be incorporated in the final judgment as non-taxable costs against the Dixit defendants. (*See* Doc. 234; $600.00; Doc. 280, $14,132.07).

After removing the previously awarded expenses[20] and expenses for which HealthPlan failed to provide invoices,[21] HealthPlan's request for expenses is as follows:

| Expense | Total |
|---|---|
| EPIQ Expenses (includes Forensic expert) | $9,820.96 |
| Business Asset Searches | $4,000.00 |
| Federal Express Charges | $692.28[22] |
| Lexis Search Charges | $2,085.00 |
| Other Search Charges | $271.00 |
| Copyright Registration Fees[23] | $6,895.00 |
| Court Fees | $850.00 |
| Process Server Fees | $300.00 |
| Mediator Fees | $1,400.00 |
| Court Reporter Fees for Court Hearings | $1,804.80 |
| Court Reporter Fees for Depositions[24] | $5,727.15 |

---

[20] This included EPIQ Expenses, Federal Express Charges, and Other Search Charges. (Docs. 234, 280).

[21] This includes the Deposition Related Charges and a significant portion of HealthPlan's Lexis Research Charges. HealthPlan did not include the previously awarded $600.00 in Lexis Research Charges in its request, so that amount was not subtracted from the Lexis Research Charges.

[22] HealthPlan's invoices for Federal Express Charges comes to $826.92 which is more than what HealthPlan put in its motion. This report uses the total from the invoices and subtracted the previously awarded amount of $134.69. (*See* Doc. 280).

[23] HealthPlan includes an invoice for $7,500.00 in registering copyrights, but because this report addresses entitlement to this expense later, the original amount HealthPlan requested ($6,895.00) is left as provided in its motion for attorney's fees and costs.

[24] Based on the undersigned's review of HealthPlan's invoices, HealthPlan included all transcript costs under one category. Because HealthPlan fails to explain its

| Other Transcripts (Durot Depo) | $1,031.20 |
|---|---|
| Video Services for Deposition[25] | $575.00 |
| Expert Fees | $2,312.50 |
| **Total** | **$37,764.89** |

HealthPlan must show it is entitled to its expenses. HealthPlan does not address entitlement or delineate its expenses into taxable and non-taxable costs. First, this report will address the taxable costs that HealthPlan can recover as the prevailing party. Then, this report will address the remaining expenses requests to determine whether HealthPlan's contractual provisions entitle it to those expenses.

### a.    Taxable Costs

Federal Rule of Civil Procedure 54(d) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). A prevailing party is "one who has been awarded some relief by the court." *Morillo-Cedron v. Dist. Dir. for the U.S. Citizenship & Immigration Servs.*, 452 F.3d 1254, 1257 (11th Cir. 2006) (citation omitted). In awarding

---

expenses request and the undersigned must sift through the invoices, this report has divided the category into court reporter fees for court hearings and depositions. The total also includes the number based on the invoices provided.

[25] This category was not included in HealthPlan's motion but because HealthPlan included this invoice in Annex 3, this report considers this as part of the expenses request.

costs, courts are limited to those listed in 28 U.S.C. Section 1920. *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987). It is within the court's discretion to deny a full award of costs if the court has, and states, a sound reason. *Chapman v. AI Transp.*, 229 F.3d 1012, 1039 (11th Cir. 2000).

The categories of taxable costs include: (1) fees of the clerk and marshal; (2) fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) docket fees under 28 U.S.C. Section 1923; and (6) compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under 28 U.S.C. Section 1828. 28 U.S.C. § 1920.

Because the undersigned recommends default judgment against the Dixit defendants, HealthPlan should be the prevailing party and should be entitled to taxable costs.[26] *See Head v. Medford*, 62 F.3d 351, 354 (11th Cir. 1995) ("[T]he litigant in whose favor judgment is rendered is the prevailing

---

[26] Because HealthPlan prevailed in its copyright-infringement claim, the court may award the costs listed in 18 U.S.C. § 1920 to HealthPlan. *See* 17 U.S.C. § 505; *Artisan Contractors Ass'n of Am., Inc. v. Frontier Ins. Co.*, 275 F.3d 1038, 1039 (11th Cir. 2001). HealthPlan can also recover its costs under FDUTPA. Fla. Stat. § 501.2105; *see also Chow v. Chak Yam Chau*, 640 F. App'x 834, 836 n.4 (11th Cir. 2015).

party for purposes of Rule 54(d)."). Parsing out HealthPlan's requested expenses, HealthPlan requests (1) $850.00 in fees of the clerk, (2) $300.00 in process service fees, and (3) $9,138.15 in fees for transcripts. (Doc. 304, Ex. 4, p. 8).

### 1.      Fees of the Clerk

HealthPlan requests $400.00 to reimburse its filing fee it paid to the Clerk. (Doc. 304, Ex. 4, p. 8). Clerk fees are taxable. 28 U.S.C. § 1920(1). A party instituting a civil action in the Middle District of Florida must pay a filing fee of $350 and a $50 administrative fee. 28 U.S.C. § 1914. HealthPlan should recover its $400.00 for the filing fee.[27]

HealthPlan requests the fee spent ($450.00) to have Attorneys Frankel, Avsec, and Christou appear pro hac vice. (*See* Doc. 306, Ex. 4, p. 8). HealthPlan chose to engage attorneys who are not licensed to practice law in Florida, despite having counsel licensed in Florida who appeared alongside those attorneys and whose hours account for many of the hours requested by HealthPlan. Although HealthPlan may hire counsel of its choice, that choice and the fee associated with it should not be shifted to HealthPlan's opponent

---

[27] On January 1, 2021, the filing fee for a civil action increased to $402. *See Fees*, https://www.flmd.uscourts.gov/fees-for-filing-a-case (last visited May 3, 2021). Because HealthPlan filed before this increase, HealthPlan can only recover what it paid to file its case.

for reimbursement. *See Lane v. Accredited Collection Agency*, No. 6:13-cv-530-Orl-18GJK, 2014 WL 1685677, at *10 (M.D. Fla. Apr. 28, 2014) (Sharp, J.). Thus, HealthPlan should not recover its $450.00 in pro hac vice fees.

## 2.      Service of Process Costs

HealthPlan requests $300.00 in fees for service of the complaint. (Doc. 306, Ex. 4, Annex 3). Broken down, HealthPlan requests (1) $45.00 for Media Shark; (2) $45.00 for Knowmentum; (3) $45.00 for E-Integrate; (4) $45.00 for Mr. Dixit; and (5) $120.00 for Ms. Kutsomarkos. (*Id.*).

Under Section 1920(1), a prevailing party may recover service of process costs for the complaint. *Powell v. Carey Int'l., Inc.*, 548 F. Supp. 2d 1351, 1356 (S.D. Fla. 2008) (Seitz, J.). Courts can tax costs for a private process server's fee, but the fee should not exceed the statutory maximum authorized for service by the U.S. Marshals Service. *EEOC v. W & O, Inc.*, 213 F.3d 600, 623–24 (11th Cir. 2000). According to regulations proscribed by the Attorney General, the U.S. Marshals Service may charge $65 per hour for each item served, plus travel costs and other out-of-pocket expenses. 28 U.S.C. § 1921(b); 28 C.F.R. § 0.114(a)(3).

As for the service of process to Ms. Kutsomarkos, HealthPlan's claims against her remain pending. Thus, HealthPlan is not the prevailing party in its case against Ms. Kutsomarkos and cannot recover, at this time, its costs for

serving Ms. Kutsomarkos with the complaint. As for the service of process for the Dixit defendants, those service costs are within the statutory maximum authorized for service by the U.S. Marshals Service. HealthPlan should recover its $180.00 in service of process fees.

### 3. Fees for Hearing Transcripts and Depositions

Under Section 1920(2), courts may tax costs for transcripts necessarily obtained for use in the case. Here, HealthPlan's request for transcript fees can be divided into pretrial hearing transcripts and deposition transcripts.

### i. Pretrial Hearing Transcripts

HealthPlan requests $1,804.80 in pretrial hearing transcripts:

| Hearing Date | Category | Price per page | Pages | Total Price |
|---|---|---|---|---|
| May 3, 2019 | Daily (within 24 hours) | $6.05 | 90 | $544.50 |
| May 23, 2019 | 7-Day Expedited | $4.85 | 45 | $218.25 |
| July 29, 2019 | 14-Day Expedited | $4.25 | 99 | $420.75 |
| October 16, 2019 | 3-Day Expedited | $5.45 | 114 | $621.30 |
| | | | **Total:** | $1,804.80 |

In some cases, pretrial hearing transcripts are taxable under Section 1920(2). Hearing transcript costs are taxable when reasonably obtained "in

preparation for additional argument and/or motion practice." *U.S. Fire Ins. Co. v. Mikes,* No. 8:04-cv-2783-T-23TBM, 2008 WL 61602, at *3 (M.D. Fla. Mar. 3, 2008) (Merryday, J.). Because these transcripts were appropriately utilized in discovery motion practice, the pretrial hearing transcripts are taxable.

However, HealthPlan does not specify why it needed to expedite these hearing transcripts. Even though there may be circumstances that warrant expedited transcripts, HealthPlan fails to show it is entitled to reimbursement of the expedited rate. *See Hughes ex rel. J.B. v. Judd*, No. 8:12-cv-568-T-23MAP, 2015 WL 5135538, at *4 (M.D. Fla. July 17, 2015) (Merryday, J.); *Durden v. Citicorp. Trust Bank, FSB*, No. 3:07-cv-974-J-34JRK, 2010 WL 2105921, at *3 (M.D. Fla. Apr. 26, 2010) (Howard, J.). Thus, this report reduces the reimbursable costs to the ordinary rate of $3.65 per page. HealthPlan should recover $1,270.20[28] in pretrial hearing transcripts.

### ii.   Deposition Transcripts

HealthPlan requests $5,727.15 for deposition transcripts for the Dixit defendants and $1,031.20 for deposition transcript for George Durot. (Doc. 306, Ex. 4, Annex 3). For the Dixit defendants, the invoices state the names of the deponents, the number of pages for each transcript, and the total cost. (*Id.*).

---

[28] Separating the final number by hearings: (1) May 3, 2019 - $328.50; (2) May 23, 2019 - $164.25; (3) July 29, 2019 - $361.35; and (4) October 16, 2019 - $416.10.

"The party seeking costs must not only show that the costs claimed are recoverable, but must also provide sufficient detail and documentation regarding those costs in order to permit challenges by opposing counsel and *meaningful review by the Court*." *Pelc v. Nowak*, No. 8:11-CV-79-T-17TGW, 2013 WL 3771233, at *5 (M.D. Fla. July 17, 2013), *aff'd*, 596 F. App'x 768 (11th Cir. 2015) (emphasis added). Although the Dixit defendants' deposition transcripts are recoverable under Section 1920,[29] HealthPlan's documents do not permit meaningful review of how much the transcriber charged per page and whether there were other costs included, such as litigation support package and process and handling. (*See* Doc. 306, Ex. 4, Annex 3). A party's failure to provide sufficient detail or documentation for the costs can be grounds to deny the costs. *Pelc*, 2013 WL 3771233, at *5. Thus, without more information, HealthPlan should not recover the $5,727.15 in deposition transcripts for the defendants.

Turning to Mr. Durot's deposition, under Section 1920(2), courts may tax costs for deposition transcripts necessarily obtained for use in the case. "District courts have great latitude in determining whether a deposition was

---

[29] The prevailing party must have taken the deposition about an issue the parties contested when the deposition occurred. *Muldowney v. MAC Acquisition, LLC*, No. 09-22489-CIV-HUCK, 2010 WL 3385388, at *4 (S.D. Fla. July 30, 2010) (Sullivan, J.). Here, no doubt exists that the parties had contested issues when the depositions occurred.

'necessarily obtained' for use in the case." *Ass'n for Disabled Americans, Inc. v. Integra Resort Mgmt., Inc.*, 385 F. Supp. 2d 1272, 1289 (M.D. Fla. 2005) (Glazebrook, J.) (citing *Newman v. A.E. Staley Mfg. Co.*, 648 F.2d 330, 337 (5th Cir. Unit B 1981)). But HealthPlan does not provide the basis for why Mr. Durot's deposition transcript was necessarily obtained for use in this case. Additionally, in October 2019, the court addressed HealthPlan's protective order to prevent E-Integrate from deposing Mr. Durot in this litigation and a state court case. (*See* Docs. 167, 173, 200). But the invoice for Mr. Durot's deposition shows that the deposition occurred in May 2019. (*See* Doc. 306, Ex. 4, Annex 3). The May 2019 deposition transcript was not necessarily obtained for use in this case, and HealthPlan should not recover the $1.031.20 for the deposition transcript of Mr. Durot.

### iii.    Deposition Video Recording

HealthPlan requests $575.00 for video services for Mr. Dixit's deposition as the custodian of Knowmentum.[30] (*See* Doc. 306, Ex. 4, Annex 3). "A prevailing party may recover the cost of video recording a deposition, but only if the party noticed the deposition to be video recorded, the other party did not

---

[30] HealthPlan's invoice for Mr. Dixit's deposition on September 3, 2019 included costs for two cameras. (*See* Doc. 306, Ex. 4, Annex 3). Because the invoice did not delineate costs and this report recommends HealthPlan should not recover those costs, this report did not address the two cameras from that deposition.

raise any objection regarding the method of recording at the time, and the video was necessarily obtained for use in the case." *Gonzalez v. Geico Gen. Ins. Co.*, No. 8:15-cv-240-T-30TBM, 2017 WL 1519755, at *2 (M.D. Fla. Apr. 27, 2017) (Moody, J.) (citing *Morrison v. Reichhold Chems., Inc.*, 97 F.3d 460, 465 (11th Cir. 1996)). HealthPlan provides no information about the circumstances surrounding the video recording of Mr. Dixit's custodian deposition. Without more information, the court cannot determine how the deposition was noticed, any objections made, and whether the video was necessarily obtained for use in this case. *See Strong v. GEICO General Ins. Co.*, No. 8:16-cv-1757-T-36AAS, 2018 WL 671342, at *2 (M.D. Fla. Jan. 10, 2018) (Sansone, J.), *report and recommendation adopted*, 2018 WL 647457 (M.D. Fla. Jan. 31, 2018) (Honeywell, J.). Thus, HealthPlan should not recover the $575.00 in fees for the video services associated with Mr. Dixit's records custodian deposition.

\*       \*       \*

After making those reductions, HealthPlan should be entitled to recover $1850.20 in taxable costs.

### b.    Non-Taxable Costs

Although HealthPlan does not state the contractual provisions allow it to recover its non-taxable costs, this report construes HealthPlan's request for non-taxable costs is based under its contractual provisions giving the

prevailing party its expenses. "[B]oth the Supreme Court and [the Eleventh] Circuit have long recognized that contractual provisions can circumvent these restrictions on taxable costs." *Yellow Pages, Photos, Inc. v. Ziplocal, LP*, 846 F.3d 1159, 1166 (11th Cir. 2017). "[U]nder Florida law, provisions in ordinary contracts awarding attorney's fees and costs to the prevailing party are generally enforced" and "trial courts do not have the discretion to decline to enforce such provisions, even if the challenging party brings a meritorious claim in good faith." *Id.* at 1167 (citations omitted).

Because HealthPlan prevailed on its breach of contract claim against E-Integrate and the HealthPlan-EI Agreement allows HealthPlan to recover its expenses incurred to enforce that contract, HealthPlan is entitled to its costs in enforcing that contract. (*See* Doc. 37, Ex. 1). Any taxable costs denied above are to be considered non-taxable costs because of the contractual entitlement. *Yellow Pages, Photos, Inc.*, 846 F.3d at 1165. Thus, HealthPlan requests reimbursement for the following:

| Expense | Total |
|---|---|
| EPIQ Expenses (includes Forensic expert) | $9,820.96 |
| Business Asset Searches | $4,000.00 |
| Federal Express Charges | $692.28 |
| Lexis Search Charges | $2,085.00 |
| Other Search Charges | $271.00 |
| Copyright Registration Fees | $6,895.00 |
| Pro Hac Vice Fees | $450.00 |

| Mediator Fees | $1,400.00 |
|---|---|
| Court Reporter Fees for Depositions | $5,727.15 |
| Other Transcripts (Durot Depo) | $1,031.20 |
| Video Services for Deposition | $575.00 |
| Expert Fees | $2,312.50 |
| **Total** | **$35,260.09** |

HealthPlan's contractual provision states the prevailing party can recover "expert fees (including consulting and testifying experts), court costs, mediation fees and costs, deposition fees and costs, subpoena fees, witness fees, service of process fees, travel time, expense associated with the same and other costs associated with copies, long-distance phone calls and meals." (Doc. 37, Ex. 1, ¶ 16(p)). Although HealthPlan's contractual provision is broad and includes most of the categories of non-taxable costs requested, this report will address two specific categories that Healthplan should not recover.

For the same reasons stated above about pro hac vice fees, HealthPlan should not recover the pro hac vice fees for out of state attorneys applying to litigate the case here.

HealthPlan also requests its copyright registration fees ($6,895.00). (*See* Doc. 306, Ex. 4, p. 8). Registration of a copyright is not mandatory, but "Congress, wishing to encourage the development of a robust federal register of copyrights, provides certain incentives to copyright registrants." *Stern v. Doe*, 978 F. Supp. 2d 1031, 1050 (C.D. Cal. 2011) (Gee, J.); *see also* 17 U.S.C. §

408(a). "Under the Copyright Act of 1976, registration is a prerequisite to filing an infringement action." *Roberts v. Gordy*, 877 F.3d 1024, 1029 (11th Cir. 2017) (citing 17 U.S.C. § 411(a)). Thus, copyright registration fees "are fees copyright holders pay to obtain additional rights, such as the right to sue." *Stern*, 978 F. Supp. 2d at 1050; *see also Bly v. Banbury Books, Inc.*, 638 F. Supp. 983, 989 (E.D. Penn. 1986) (Lord, J.) (denying the plaintiff's request for reimbursement of copyright registration fees because those fees are "not properly considered a cost of prosecuting this action for copyright infringement"). Thus, HealthPlan should not recover its copyright registration fees.

After removing those categories, HealthPlan should recover $27,915.09 in non-taxable costs.

## IV.   CONCLUSION

As discussed above, the undersigned respectfully **RECOMMENDS**:

1.   HealthPlan's Motion for Default Judgment (Doc. 306) be **GRANTED in part** and **DENIED in part**.

2.   A permanent injunction be entered against the Dixit defendants, but the language provided by HealthPlan does not "state its terms specifically" or "describe in reasonable detail . . . the act or acts restrained." Fed. R. Civ. 65(d)(1). HealthPlan should be allowed to provide a proposed permanent injunction that

complies with the Rules of Civil Procedure and is understandable to any person or entity who would receive a copy (i.e. without case specific defined terms).

3.    HealthPlan be awarded these damages:

    a.    For Count I, judgment be entered for:

        i.    **$2,481,936.00** in compensatory damages against Mr. Dixit, Knowmentum, E-Integrate, and Media Shark for violating the DTSA by misappropriating HealthPlan's source code,

        ii.    **$723,825.84** in compensatory damages against Media Shark for violating the DTSA by misappropriating the HealthPlan's Copyrighted Materials, and

        iii.    **$4,963,872.00** in exemplary damages as allowed under the DTSA.

    b.    For Count IV, judgment be entered for **$1,001,325.00** in actual damages against Mr. Dixit, Knowmentum, Media Shark, and E-Integrate for copyright infringement.

    c.    For Count VII, judgment be entered for **$775,420.69** in compensatory damages against E-Integrate for breach of the HealthPlan-EI Agreement.

4.    HealthPlan be awarded no punitive damages.

5.    HealthPlan's request for attorney's fees and expenses be

**GRANTED in part** and **DENIED in part**:

a.    HealthPlan should be awarded **$1,183,956.50** in attorney's

fees for the law firm of Brinks Gilson & Lione.

b.    HealthPlan should be awarded **$9,341.50** in attorney's fees

for the law firm of Akerman.

c.    HealthPlan should be awarded the following in expenses:

i.    **$1,850.20** in taxable costs and

ii.    **$27,915.09** in non-taxable costs.

6.    The prior awards for attorney's fees and non-taxable costs (Doc.

234; $36,490.00; Doc. 252, $5,800.00; Doc. 280, $29,967.07) be

incorporated into the final judgment against Mr. Dixit,

Knowmentum, Media Shark, and E-Integrate.

7.    The Clerk be directed to enter a final judgment[31] as follows:

a.    **$9,742,453.36** against Mr. Dixit, Knowmentum, Media

Shark, and E-Integrate to be jointly and severally liable,

b.    **$723,825.84** against Media Shark, and

---

[31] This total amount includes the previously awarded attorney's fees and costs (see paragraph 6) and the recommended attorney's fees and costs from this report (see paragraph 5).

70

      c.    **$775,420.69** against E-Integrate.

8.    The final judgment should state that post-judgment interest at the statutory rate will accrue until paid in full.

**ENTERED** in Tampa, Florida on May 27, 2021.

 

AMANDA ARNOLD SANSONE
United States Magistrate Judge

**NOTICE TO PARTIES**

The parties have fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations. 28 U.S.C. § 636(b)(1)(C). Under 28 U.S.C. Section 636(b)(1), a party's failure to object to this report's proposed findings and recommendations waives that party's right to challenge on appeal the district court's order adopting this report's unopposed factual findings and legal conclusions.

71